# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBINHOOD DERIVATIVES, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; JORDAN MAYNARD, in his official capacity as Chair of the Massachusetts Gaming Commission; EILEEN O'BRIEN, in her official capacity as Commissioner of the Massachusetts Gaming Commission; BRADFORD R. HILL, in his official capacity as Commissioner of the Massachusetts Gaming Commission; NAKISHA SKINNER, in her official capacity as Commissioner of the Massachusetts Gaming Commission; and PAUL BRODEUR, in his official capacity as Commissioner of the Massachusetts Gaming Commission,<br><br>Defendants. | Civil Action No.: 1:25-cv-12578<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |

Plaintiff Robinhood Derivatives, LLC ("Robinhood"), by its undersigned counsel, alleges, with knowledge with respect to its own acts and on information and belief as to other matters, as follows:

## NATURE OF THE ACTION

1.      Robinhood is a financial-services company that offers its approved customers the opportunity to trade, among other things, sports-related event contracts through the Robinhood platform.  While Robinhood facilitates the placement and liquidation of event contracts for its customers, the contracts themselves trade on KalshiEx LLC's ("Kalshi")

Commodity Futures Trading Commission ("CFTC")-designated exchange.  Thus, while Robinhood's approved customers can access event contracts trading through Robinhood's platform, all actual trades occur on Kalshi's regulated exchange.

       2.      On September 12, 2025, the Commonwealth of Massachusetts, by and through its Attorney General, Andrea Joy Campbell, filed a lawsuit against Kalshi for allegedly "offering sports wagering without a license in violation of G.L. c. 23N, § 5 *et seq.*"  Exhibit 1 ¶ 1 (*Commonwealth of Massachusetts v. KalshiEx LLC*, No. 2584CV02525, Dkt. 1 (Mass. Super. Ct., Suffolk Cnty. Sept. 12, 2025) (hereinafter "*Massachusetts v. Kalshi*")).  Massachusetts seeks monetary relief and a permanent injunction enjoining Kalshi "from engaging in sports wagering without a license in violation of G.L. c. 23N."  *Id.* at 42.  In its Complaint, Massachusetts explicitly refers to Robinhood and its contractual relationship with Kalshi, alleging that "[t]he availability of Kalshi's contracts are not limited to Kalshi's platform, but are also available on Robinhood, a stock-trading platform accessible via app and webpage."  *Id.* ¶ 129.  Massachusetts further alleges that "[a]pproximately $1 billion worth of Kalshi wagers were traded on Robinhood during the second quarter of the year, which likely generated an estimated $10 million in revenue for Kalshi."  *Id.* ¶ 130.

       3.      Also on September 12, 2025, Massachusetts filed an Emergency Motion for a Preliminary Injunction seeking to enjoin Kalshi from "engaging in any activity in connection with sports wagering in the Commonwealth of Massachusetts" "until further order of the Court."  Exhibit 2, Ex. A at 1-2 (*Commonwealth of Massachusetts v. KalshiEx LLC*, No. 2584CV02525, Dkt. 4 (Mass. Super. Ct., Suffolk Cnty. Sept. 12, 2025)).

       4.      However, as applied to trading on a CFTC-designated contract market, Massachusetts law is preempted by the Commodity Exchange Act's ("CEA") comprehensive

federal framework for regulating commodity futures and swaps trading. Kalshi has twice won preliminary relief on this basis against state regulators seeking to enforce their gambling or gaming laws against its facilitation of transactions involving sports-related event contracts. *KalshiEx LLC v. Flaherty*, No. 25-cv-2152, 2025 WL 1218313, at *3-8 (D.N.J. Apr. 28, 2025) (hereinafter "*KalshiEx (D.N.J.)*"), *appeal filed*, No. 25-1922 (3d Cir. May 8, 2025) (enjoining New Jersey Division of Gaming Enforcement and its members from enforcing New Jersey gambling laws against Kalshi for offering sports-related event contracts on its CFTC-designated exchange); *KalshiEX, LLC v. Hendrick*, No. 25-00575, 2025 WL 1073495, at *8 (D. Nev. Apr. 9, 2025) (hereinafter "*KalshiEx (D. Nev.)*") (enjoining Nevada Gaming Control Board, Nevada Gaming Commission and their members from enforcing Nevada gaming laws against Kalshi for offering sports-related event contracts on its CFTC-designated exchange). Robinhood also has ongoing litigation in these jurisdictions concerning the same issues and seeking similar relief. *Robinhood Derivatives, LLC v. Flaherty*, No. 1:25-cv-14723 (D.N.J. filed Aug. 29, 2025), *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-01541 (D. Nev. filed Aug. 29, 2025).

5.      In light of Massachusetts's complaint against Kalshi, in which Massachusetts sets forth allegations explicitly referring to Robinhood and the availability of Kalshi's contracts on Robinhood's platform, and motion for preliminary injunction filed against Kalshi, *Massachusetts v. Kalshi*, No. 2584CV02525, Dkts. 1, 4, and because Robinhood intermediates its customers' event contract trades, including sports-related event contract trades, on Kalshi's exchange, there is a real and imminent threat that Massachusetts will file a similar complaint and motion against Robinhood. Were it to do so, Robinhood would face an immediate threat of civil penalties and potentially criminal penalties as well, along with the attendant reputational harm that such an enforcement proceeding would cause. Robinhood's

Massachusetts customers would also face abruptly losing access to sports-related event contract trading through their Robinhood account.

6.      Robinhood therefore had no choice but to file this lawsuit to protect its customers and its business.  Robinhood respectfully requests that this Court enjoin Defendants from enforcing preempted Massachusetts law against Robinhood for its facilitation of transactions involving sports-related event contracts.

## PARTIES

7.      Plaintiff Robinhood is a Delaware limited liability company with its principal place of business in Chicago, Illinois.  Robinhood is one of the family of companies within the broader Robinhood organization.  The Robinhood companies' mission is to democratize finance for all by removing barriers to access to financial markets.  Robinhood is registered with the Commodity Futures Trading Commission as a futures commission merchant ("FCM").

8.      Defendant Andrea Joy Campbell is sued in her official capacity as the Attorney General of the Commonwealth of Massachusetts.

9.      Defendant Jordan Maynard is sued in his official capacity as the Chair of the Massachusetts Gaming Commission.

10.      Defendant Eileen O'Brien is sued in her official capacity as Commissioner of the Massachusetts Gaming Commission.

11.      Defendant Bradford R. Hill is sued in his official capacity as Commissioner of the Massachusetts Gaming Commission.

12.      Defendant Nakisha Skinner is sued in her official capacity as Commissioner of the Massachusetts Gaming Commission.

13.     Defendant Paul Brodeur is sued in his official capacity as Commissioner of the Massachusetts Gaming Commission.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over Robinhood's claim pursuant to 28 U.S.C. § 1331.  This action presents a federal question under the Supremacy Clause of the United States Constitution because it concerns whether Massachusetts laws are preempted by the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, to the extent they purport to regulate trading on a CFTC-designated contract market.

15.     The Eleventh Amendment does not preclude this Court from exercising its jurisdiction because it does not bar suits "[to] enjoin state officials to conform future conduct to the requirements of federal law."  *Town of Barnstable v. O'Connor*, 786 F.3d 130, 138 (1st Cir. 2015) (alteration in original) (quoting *Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 234 (1st Cir. 2002)).

16.     This Court has personal jurisdiction over the Defendants.  The Individual Defendants are domiciled and perform their duties in Massachusetts.  The Massachusetts Gaming Commission maintains its principal place of business in this District.

17.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2).  The Individual Defendants reside and perform their duties in this District.  The Massachusetts Gaming Commission's office is in Boston.  A substantial part of the events giving rise to Robinhood's claim occurred in this District.

## RELEVANT FACTS

### A.     Event Contracts

18.     An event contract is a type of derivative that allows customers to trade on their predictions about the occurrence of future events.  Event contracts are typically structured

as binary options posing a particular yes-or-no question.  A buyer takes the "yes" side and a seller takes the "no" side, and upon the expiration of the contract—typically, when the outcome of the future event in question becomes known—the value of the contract goes to the party who was right.

19.     Until that time, buyers and sellers can trade the contract, and the price of the contract fluctuates based on the market's assessment of the probability that the event will occur.  For example, for an event contract worth $1, if the "yes" position is trading at 17 cents and the "no" position is trading at 83 cents, that implies that the market believes there is a 17% chance the event will occur.  If new information becomes available that indicates that the event is more likely to occur, market participants' trading will change in ways that reflect that new information (for example, more market participants might purchase the "yes" position), which will cause the price of the "yes" position to go up.  Thus, the price of an event contract can reveal valuable information about market sentiment concerning the underlying event and can therefore be an important information-gathering tool.

20.     Traders may use event contracts to mitigate risk (*e.g.*, an orange grower may buy a contract predicting an early frost to offset the risk of loss of income from frost damage) or simply to seek a financial return.

**B.     Robinhood Makes Available Certain Kalshi Event Contracts**

21.     The companies within the Robinhood organization are financial-services companies that are democratizing finance by removing barriers to access to financial markets, including by offering zero-commission stock trading and easy-to-use mobile and web applications.  With their commitment to offering low fees, an intuitive mobile experience and powerful tools, the Robinhood companies empower everyday investors to navigate financial markets safely and efficiently.  Robinhood is registered with the Commodity Futures Trading

6

Commission ("CFTC") as a futures commission merchant ("FCM"), which is an entity that solicits or accepts orders to buy or sell futures and swaps and accepts payment from customers to support such orders. *See* National Futures Association, Futures Commission Merchant (FCM) Members, *available at* https://www.nfa.futures.org/members/fcm/index.html.

22.     Kalshi is a CFTC-designated contract market ("DCM"). *See infra* ¶¶ 27-28. Kalshi offers many types of event contracts relating to a variety of areas including climate, technology, health, cryptocurrencies, popular culture, economics and, as relevant here, event contracts relating to the outcome of sporting events. Kalshi self-certified that its sports-related event contracts comply with the CEA's requirements and began listing them on January 24, 2025. Because the CFTC declined to review or prohibit Kalshi's sports-related contracts, they were deemed approved by the CFTC, became effective and are legal under federal law. *See infra* ¶¶ 29-31.

23.     On March 17, 2025, Robinhood launched its prediction markets hub, through which its customers can place event contract trade orders.[1] Robinhood intermediates its customers' event contract trades, including sports-related event contract trades, on Kalshi's exchange. Robinhood has entered into agreements with Kalshi that allow it to access Kalshi's contract market facilities for this purpose. Those agreements obligate Robinhood to ensure such access is secure and in compliance with all applicable laws, including the CEA and CFTC regulations; they also require Robinhood to comply with Kalshi's rules.

---

[1] Robinhood began offering some limited event contract trading starting in October 2024, prior to the launch of the prediction markets hub. The only event contracts Robinhood offered in 2024 were related to the outcome of the U.S. presidential election; those contracts were not traded on Kalshi's exchange.

24.     This means that while Robinhood customers are placing orders for event

contract trades in their Robinhood accounts, the *trades* themselves are taking place on Kalshi's

CFTC-designated exchange.  This is no different from when a Kalshi customer places an order

for an event contract trade through her Kalshi account, which is then executed on Kalshi's

exchange.  Here, the user interface is Robinhood's instead of Kalshi's, which is convenient for

Robinhood customers but does not affect the way in which trades are executed on Kalshi's

exchange or regulated by the CFTC; it merely adds additional CFTC regulation of Robinhood's

activities as an FCM.

C.     **The Commodity Exchange Act and the Commodity Futures Trading Commission**

25.     Since the 1930s, futures contracts have been regulated by the federal

government.  In 1936, Congress passed the Commodity Exchange Act ("CEA"), which provided

for federal regulation of all commodity futures trading activities and required that all futures and

commodity options be traded on organized, regulated exchanges.

26.     In 1974, Congress passed a series of amendments to update the CEA's

regulatory framework and established the Commodity Futures Trading Commission ("CFTC"),

which is empowered to oversee and regulate commodity futures and (since 2010) swaps trading

under the CEA.  Congress intended to centralize regulatory authority with the CFTC to avoid the

"total chaos" that could ensue if states attempted to regulate the futures markets, thereby

subjecting exchanges to different regulations.  Hearings Before the Committee on Agriculture

and Forestry, United States Senate, on S. 2485, S. 2587, S. 2837 and H.R. 13113, 93d Cong., 2d

Sess. 685 (1974) ("Senate Hearings") (statement of Sen. Clark); *see also Am. Agric. Movement,*

*Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992) (setting forth

legislative history of the CFTC Act of 1974), *abrogated on other grounds by Time Warner Cable*

*v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995). Accordingly, Congress put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). Indeed, Congress considered adding but ultimately removed from the bill's final language a provision of the CEA that would have preserved parallel state authority over futures trading. *See* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge). As described below, the CEA was further amended by the Dodd-Frank Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376, which brought swaps within the coverage of the CEA and added a special rule about event contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

27.     The CEA provides that the CFTC has "exclusive jurisdiction" over transactions involving event contracts—which, as described below, are swaps or contracts of sale of a commodity for future delivery—traded on registered exchanges (known as "designated contract markets"): "The Commission shall have exclusive jurisdiction . . . with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and *transactions involving swaps or contracts of sale of a commodity for future delivery* (including significant price discovery contracts), *traded or executed on a contract market designated pursuant to section 7 of this title . . . .*" 7 U.S.C. § 2(a)(1)(A) (emphasis added). The CEA expressly preserves state authority to regulate transactions "not conducted on or subject to the rules" of a CFTC-regulated exchange. *Id.* § 16(e)(1)(B)(i).

28.     To receive the CFTC's designation as a contract market, an exchange must apply and set forth its ability to comply with CFTC rules and regulations. *Id.* §§ 2(e), 7(a); 17

C.F.R. § 38.3(a).  The CFTC's comprehensive regulatory framework for contract markets, including a set of 23 "Core Principles," 17 C.F.R. pt. 38, is designed to ensure and protect the integrity of those markets.  Status as a CFTC-designated contract market "imposes upon [an exchange] a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances."  *Am. Agric. Movement, Inc.*, 977 F.2d at 1150-51.  The CFTC is authorized to suspend or revoke an exchange's designation if it fails to comply with any of the provisions of the CEA or the CFTC's regulations. 7 U.S.C. § 8(b).

29.    An exchange may submit new contracts to the CFTC for approval prior to listing; alternatively, it may self-certify the contracts as complying with CFTC requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c).  Generally, the CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B).

30.    The CEA contains a special rule relating to CFTC review and approval of event contracts, which was added by the Dodd-Frank Act of 2010.  Pub. L. No. 111-203, § 745(b), 124 Stat. 1376, 1735-36.  With respect to event contracts specifically, the CFTC may prohibit event contracts in specific categories if it determines them to be "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2).

31.    If an exchange self-certifies a new contract, the CFTC may initiate a review of that contract within 10 business days of receiving notice of it.  *See id.* § 7a-2(c)(2); *see also* 17 C.F.R. § 40.11(c) (permitting the CFTC to select a 90-day review period for event

contracts). If the CFTC does not act within that window, the new contract is deemed approved and becomes effective. *See* 7 U.S.C. § 7a-2(c)(2).

      32.    Fundamental differences in how contract markets and sportsbooks operate mean they are susceptible to different forms of risk to participants. Contract markets leverage the power and rigor of financial markets to provide traders with liquidity and transparency, and prices are set by market participants. Customers can manage risk by adjusting or exiting their positions up until the contract expires, and prices respond accordingly. These markets may be at risk of market manipulation and other market distortions and inefficiencies. Sportsbooks, by comparison, have a line set by the house, which is typically set ahead of time and, once a bet is placed, does not change for that bet. Gamblers bet directly against the house, and once a position is entered, gamblers typically do not have the option to exit their position. Sportsbooks risk exploitation of gamblers due to the power imbalance between the house and the gambler. Based on these different risks, it makes sense that contract markets and sportsbooks are subject to two different modes of regulation. The federal regulations that govern commodity futures and swaps trading have as a major focus creating and maintaining fair and efficient markets for trading, *see* 17 C.F.R. §§ 38.250, 38.151, whereas sportsbooks are regulated by state law and subject to the police powers of the state to halt and remedy any exploitation of gamblers.

      33.    Robinhood is registered with the CFTC as a futures commission merchant. As relevant here, an FCM is "an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of a commodity for future delivery; a security futures product; a swap" or certain other transactions and "in or in connection with [those activities], accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result

therefrom." 7 U.S.C. § 1a(28) (subsection headings omitted).  FCMs must register with the CFTC unless they fall within certain exemptions.  *Id.* § 6f; 17 C.F.R. § 3.10(c).

34.     Similar to a registered DCM (such as Kalshi), registered FCMs such as Robinhood must comply with a host of federal requirements.  FCMs are subject to reporting requirements to the CFTC, 17 C.F.R. §§ 1.10(b), 1.10(d), 17.00, disclosure requirements to the public, *id.* § 1.55, and minimum financial requirements, *id.* §§ 1.12, 1.17.  FCMs must "establish, maintain, and enforce a system of risk management policies and procedures designed to monitor and manage the risks associated with the activities of the" FCM, *id.* § 1.11(c)(1), and the CFTC's regulations set forth elements that such a risk management program must include, *id.* § 1.11(e), as well as reporting requirements related to risk management, *see id.* § 1.15.  The CFTC requires FCMs to "establish and enforce internal rules, procedures and controls to" ensure compliance with certain trading standards.  *Id.* § 155.3.  FCMs must also "adopt and implement written policies and procedures" to ensure that they and their employees comply with CFTC regulations concerning conflicts of interest.  *Id.* § 1.71.  Finally, the CFTC imposes recordkeeping requirements on FCMs.  *Id.* §§ 1.14, 1.18.  Failure to comply with these requirements could require the FCM to "transfer all customer accounts and immediately cease doing business as a futures commission merchant."  *Id.* § 1.17(a)(4).

**D.     The Massachusetts Lawsuit Against Kalshi**

35.     On September 12, 2025, the Commonwealth of Massachusetts, by and through its Attorney General, Andrea Joy Campbell, filed a lawsuit against Kalshi for allegedly "offering sports wagering without a license in violation of G.L. c. 23N, § 5 *et seq.*"  Exhibit 1 ¶ 1.  Massachusetts seeks monetary relief and a permanent injunction enjoining Kalshi "from engaging in sports wagering without a license in violation of G.L. c. 23N."  *Id.* at 42.  In its Complaint, Massachusetts explicitly refers to Robinhood's contractual relationship with Kalshi,

alleging that "[t]he availability of Kalshi's contracts are not limited to Kalshi's platform, but are also available on Robinhood, a stock-trading platform accessible via app and webpage." *Id.* ¶ 129. Massachusetts further alleges that "[a]pproximately $1 billion worth of Kalshi wagers were traded on Robinhood during the second quarter of the year, which likely generated an estimated $10 million in revenue for Kalshi." *Id.* ¶ 130.

36.     That same day, Massachusetts filed an Emergency Motion for a Preliminary Injunction seeking to enjoin Kalshi from "engaging in any activity in connection with sports wagering in the Commonwealth of Massachusetts" "until further order of the Court". Exhibit 2, Ex. A at 1-2. In its Motion, Massachusetts argues that sports wagers are not swaps under the CEA, and that the CEA does not, expressly or impliedly, preempt Massachusetts law. *Id.* at 13-20.

37.     In light of Massachusetts's complaint and motion for preliminary injunction filed against Kalshi, *Massachusetts v. Kalshi*, No. 2584CV02525, Dkts. 1, 4, and because Robinhood intermediates its customers' sports-related event contract trades on Kalshi's exchange, there is a real and imminent threat that Massachusetts will file a similar complaint and motion against Robinhood. Were it to do so, Robinhood would face an immediate threat of civil penalties and potentially criminal penalties as well, along with the attendant reputational harm that such an enforcement proceeding would cause. Robinhood's Massachusetts customers would also face abruptly losing access to sports-related event contract trading through their Robinhood account.

### E.     The CEA Preempts Application of State Gaming Laws to Sports-Related Event Contract Trading on CFTC-Designated Exchanges.

38.     Transactions involving sports-related event contracts traded on Kalshi's designated contract market—regardless of whether the orders come directly to Kalshi from

Kalshi's customers or indirectly to Kalshi from Robinhood's customers—are subject to the CFTC's exclusive jurisdiction, and Massachusetts law is preempted to the extent it purports to regulate those transactions.

39.     The Constitution and laws of the United States "shall be the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and accordingly, "Congress has the power to preempt state law." *Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Federal law can preempt state law expressly, through a statement to that effect in the statute itself, or impliedly, through either field preemption or conflict preemption.  Field preemption exists where Congress manifests an intent to occupy exclusively an entire field of regulation.  *See Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982).  Conflict preemption exists where compliance with federal and state law is "a physical impossibility" or when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation omitted).

40.     The statutory language of the CEA, its legislative history and the comprehensive regulatory framework it sets out demonstrate that Congress deliberately preempted state law.  Whether analyzed as express or implied preemption, the scope of preemption is the field of commodity futures and swaps trading, including event contract trading, on CFTC-designated exchanges.

41.     The CEA provides expressly that the CFTC "shall have exclusive jurisdiction" over commodity futures and swaps trading on CFTC-designated exchanges.  7 U.S.C. § 2(a)(1)(A).  Express provisions of this type are regularly held to preempt state law.  *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 765-66 (9th Cir. 2018) (describing statute's grant of "exclusive" jurisdiction as a "broad and general" preemption

provision); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir. 2001) (holding that statute's "exclusive jurisdiction" provision preempts state law claims).

42.     This express preemption provision includes event contracts, which are "transactions involving swaps or contracts of sale of a commodity for future delivery," over which the CFTC has "exclusive jurisdiction" when "traded or executed on a [designated] contract market."  7 U.S.C. § 2(a)(1)(A).  The term "swap" includes "any agreement, contract, or transaction" that (among other things) "provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  *Id.* § 1a(47)(A)(ii).  The term "swap" was added to the CEA in 2010 by the Dodd-Frank Act.  *See* Pub. L. No. 111-203, §§ 721(a)(21) (adding the definition of "swap" in 7 U.S.C. § 1a(47)), 722(a)(1)(D) (adding "swaps" to the exclusive jurisdiction provision in 7 U.S.C. § 2(a)(1)), 124 Stat. 1376, 1666, 1672.

43.     Event contracts are transactions in a type of intangible commodity that the CEA calls an "excluded commodity."  *See United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021) (reviewing "excluded commodities" under the CEA).  An "excluded commodity" includes "an occurrence, extent of an occurrence, or contingency (other than [certain exceptions]) that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence."  7 U.S.C. § 1a(19)(iv).

44.     This is precisely what the event contracts traded on Kalshi's exchange are. Sports-related event contracts are within these statutory definitions of swaps and transactions in excluded commodities because:  (i) they are binary contracts that pay out depending on the

occurrence or non-occurrence of a future event that is beyond the control of the parties to the contract; and (ii) the underlying sporting events they concern have economic consequence. *See KalshiEx (D.N.J.)*, 2025 WL 1218313, at *2, *6; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *5 n.3.

45.    With respect to the latter requirement, wins and losses in sporting events have obvious, significant financial consequences for the players, the teams, the owners or schools they represent, their communities, the television networks that cover the matches, and other stakeholders. These economic consequences include, among many other things, increased revenue from ticket sales, sponsorships and TV viewership for winning teams, and boosts in economic activity for cities where playoff games occur.

46.    The CEA expressly grants the CFTC "exclusive jurisdiction" over all "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A). The CEA also includes a separate provision entitled "Special rule for review and approval of event contracts and swaps contracts," which confirms that the CFTC has authority over "the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than [certain exemptions]), by a designated contract market or swap execution facility." *Id.* § 7a-2(c)(5)(C)(i). The "special rule," added by the Dodd-Frank Act of 2010, Pub. L. No. 111-203, § 745(b), 124 Stat.at 1735-36, makes clear that the CEA's grant of exclusive jurisdiction to the CFTC extends to event contracts.

47.    To the extent the text of the statute leaves any doubt about preemption, the legislative history of the 1974 amendment to the CEA that established the CFTC confirms that

this grant of exclusive jurisdiction was intended to preempt state law. As the Conference Committee explained, "[u]nder the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned. Therefore, if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern. In view of the broad grant of authority to the Commission to regulate the futures trading industry, the Conferees do not contemplate that there will be a need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897; *see also Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978). As the D.C. Circuit has recognized, "the statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*.'" *Fed. Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (quoting S. Rep. No. 93-1131, at 23 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5863) (emphasis in original). "The passage of 7 U.S.C. § 2 is intended to clarify 'the preemption of all other would-be regulators at every level of government.'" *Witzel v. Chartered Sys. Corp. of N.Y.*, 490 F. Supp. 343, 347 (D. Minn. 1989) (quoting *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 219 (D. Kan. 1979)). Likewise, the history surrounding the adoption of the "special rule" concerning event contracts in 2010 makes it clear that Congress intended the CFTC's exclusive jurisdiction to embrace event contracts. *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sens. Lincoln and Feinstein).

48.     Congressional statements about the creation of the CFTC confirm the intent for broad express or implied field preemption. The 1974 amendments to the CEA were motivated by "concerns that states might regulate futures markets" themselves and create

"conflicting regulatory requirements." *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *1; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *6; *see also Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 605 F. Supp. 1105, 1112 (N.D. Ga. 1985) ("The congressional hearings focused on the need for sole regulatory power of commodities to be placed in one federal agency, unlike the regulation of securities which is shared by a federal agency and state agencies.").  Establishing the CFTC and endowing it with exclusive jurisdiction was meant to "avoid unnecessary, overlapping and duplicative regulation." *Ken Roberts Co.*, 276 F.3d at 588 (quoting 120 Cong. Rec. 34,736 (1974) (remarks of House Agriculture Committee Chairman Poage)); *see also* 120 Cong. Rec. 34,997 (1974) (remarks of Sen. Curtis on behalf of Sen. Talmadge); Senate Hearings at 685 (statement of Sen. Clark) ("[D]ifferent State laws would just lead to total chaos.").  Accordingly, the CFTC was empowered to set forth uniform rules and regulations for "all exchanges and all persons in the industry." H.R. Rep. No. 93-975, at 79 (1974). Congressional statements concerning the event contract "special rule," including by the drafters of the Dodd-Frank Act of 2010, are consistent with these earlier statements and reveal clear Congressional intent to vest exclusive jurisdiction over event contracts with the CFTC. *See* Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Lincoln conveying her intent and that of Sen. Dodd).

49.     As further indication of Congressional intent that the CEA preempt broadly, during the amendment process for the 1974 amendments, the Senate considered adding but ultimately did not include a provision that retained the states' jurisdiction over futures trading. *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 687-88 (1982); *see also* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and

18

Talmadge).  Congress therefore could not have intended States to regulate futures trading in parallel with the CFTC.

50.    The regulatory scheme set out in the CEA, over which the CFTC has exclusive jurisdiction, is comprehensive as it relates to designated and registered entities, and the existence of this comprehensive scheme further evinces Congressional intent to preempt the field and foreclose parallel state regulation.  *See Arizona v. United States*, 567 U.S. 387, 401 (2012) (comprehensive statutory framework led to the conclusion that "the Federal Government has occupied the field" in the relevant area); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368-69 (1986) ("Pre-emption occurs . . . where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law . . . ."). Indeed, the Supreme Court has recognized that the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)).

51.    Accordingly, the CEA, as amended in 1974 to give the CFTC exclusive jurisdiction and in 2010 to add swaps and the special rule regarding event contracts, expressly or impliedly preempts the field of commodity futures and swaps trading, including event contracts trading, on designated contract markets.

52.    In addition to express or implied field preemption, conflict preemption exists here with respect to the determination of *which* event contracts are permitted on CFTC-designated exchanges.  As noted above, the special rule relating to CFTC review of event contracts vests the CFTC with the power to approve or prohibit certain event contracts.  7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2).  If Massachusetts or the Massachusetts Gaming

Commission were permitted *also* to make a determination about whether event contracts on a CFTC-regulated exchange were permitted, there would be a direct conflict between federal and state regulation because the CFTC has already impliedly approved those same event contracts. *See Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363, 380 (2000) (conflict preemption exists where state law "undermines the congressional calibration of force" and is "at odds with achievement of the federal decision about the right degree of pressure to employ"); *De la Cuesta*, 458 U.S. at 153 (conflict preemption exists where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (internal quotation marks omitted)). Here, the CFTC has determined to allow Kalshi's sports-related event contracts by taking no action in response to Kalshi's self-certification of those contracts, making them legal under federal law, but Massachusetts, in *Massachusetts v. Kalshi*, is attempting to preclude trading of those same event contracts by enforcing Massachusetts sports-wagering laws. The conflict is clear.

      **F.    The CEA's Preemption of State Gaming Laws as Applied to Sports-Related Event Contracts Includes Those Opened and Traded Through Robinhood's Platform.**

      53.    Kalshi and Robinhood participate in transactions involving "swaps or contracts of sale of a commodity for future delivery" traded on a DCM, and these transactions therefore fall squarely within the statutory grant of exclusive jurisdiction to the CFTC. *See* 7 U.S.C. § 2(a)(1)(A) (granting CFTC "exclusive jurisdiction" over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC). Because it is the *transaction* on a regulated exchange over which the CFTC has exclusive jurisdiction, *see id.*, the CFTC must have jurisdiction over the *entire* transaction and all participants. This

includes entities like Robinhood that accept orders or otherwise facilitate transactions, as well as entities like Kalshi that execute transactions.

54.     If states could regulate some but not all entities relevant to these transactions, such regulation would infringe on the CFTC's exclusive jurisdiction and fracture what Congress intended to be a uniform set of regulations for commodity futures and swaps trading.  A state cannot circumvent the exclusive jurisdiction of the CFTC by enforcing state law against an entity involved in facilitating a transaction when the state has been enjoined from enforcing state law against the entity involved in executing that same transaction.  Indeed, as the CFTC itself recently explained to the D.C. Circuit, "due to federal preemption, event contracts *never violate state law when they are traded on a [designated contract market]*."  CFTC Brief, *KalshiEx LLC v. U.S. Commodity Futures Trading Comm'n*, No. 24-5205, at 27, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

55.     The conclusion that preemption applies equally to Robinhood's facilitation of these transactions as an FCM is further supported by the fact that Congress explicitly included FCMs such as Robinhood within the extensive set of federal regulatory requirements and CFTC oversight established to manage commodity derivatives trading.  The "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex," *Curran*, 456 U.S. at 356 (internal quotation marks omitted), established by Congress includes FCMs that facilitate purchases and sales of commodities for future delivery and swaps; indeed, this is in part what defines an FCM, 7 U.S.C. § 1a(28)(A)(i)(I)(aa)(AA), (CC).  As noted above, FCMs such as Robinhood that are registered with the CFTC must comply with a multitude of requirements, including minimum financial requirements, 17 C.F.R. §§ 1.12, 1.17, reporting requirements, *id.* §§ 1.10(b), 1.10(d), 17.00, and disclosure requirements, *id.* § 1.55.  They must also establish and

enforce policies relating to trading standards, risk management, and conflicts of interest. *Id.* §§ 1.15, 1.71, 155.3. State regulation of orders on an FCM (when those orders will be executed on a DCM) would conflict with federal authorization of transactions through FCMs subject to CFTC jurisdiction. *See id.* § 1a(28)(A) (CEA expressly envisions FCMs facilitating transactions in swaps and commodities for future delivery).

56.    In short, the "oversight of futures commission merchants ('FCMs')" is an "important aspect" of the CFTC's oversight responsibility for futures trading. *Prestwick Capital Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 650 (7th Cir. 2013). FCMs like Robinhood are therefore an integral part of the fabric of the CEA's comprehensive regulatory scheme, and their activities in facilitating trading on DCMs are equally subject to federal preemption as those of DCMs like Kalshi.

### G.    Robinhood Will Suffer Irreparable Harm Without Injunctive Relief.

57.    In light of Massachusetts's complaint and motion for preliminary injunction filed against Kalshi, in which Massachusetts sets forth allegations explicitly referring to Robinhood and the availability of Kalshi's contracts on Robinhood's platform, *Massachusetts v. Kalshi*, No. 2584CV02525, Dkts. 1, 4, and because Robinhood intermediates its customers' event contract trades, including sports-related event contract trades, on Kalshi's exchange, Robinhood faces the imminent threat of a similar enforcement action by Massachusetts and/or the Massachusetts Gaming Commission and the potential for civil and criminal penalties. The sanctions for violation of the Massachusetts statute that Massachusetts alleges Kalshi violated (Mass. Gen. Laws ch. 23N) include civil and criminal penalties, including "a civil penalty not to exceed $2,000 for each violation or $5,000 for violations arising from the same series of events" and imprisonment and criminal fines, which escalate after the first offense. Mass. Gen. Laws ch. 23N, § 21. The threat of prosecution is actual and imminent, especially in light of the fact

that Massachusetts explicitly mentions Robinhood in its *Massachusetts v. Kalshi* complaint and recognizes that trading of Kalshi event contracts is available on Robinhood's platform, Exhibit 1 ¶¶ 129-130, and the emergency expedited relief Massachusetts has sought, *Massachusetts v. Kalshi*, No. 2584CV02525, Dkts. 4, 10. A credible threat of prosecution under a preempted state statute causes irreparable harm. *See Morales*, 504 U.S. at 381.

58.    Further, the harm to Robinhood's reputation caused by the potential or actual enforcement proceedings by Massachusetts and/or the Massachusetts Gaming Commission is also irreparable, because it cannot be easily or quickly repaired. *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *7; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *7-8; *see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("[I]njury to . . . reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable."). Robinhood also stands to lose the goodwill of its customers, including its over 31,000 customers in Massachusetts. This goodwill, once lost, cannot easily or quickly be regained, even if Robinhood ultimately prevails in litigation, and the risk to goodwill therefore also constitutes irreparable harm. *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *7; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *7; *see also Get In Shape Franchise, Inc. v. TFL Fishers, LLC*, 167 F. Supp. 3d 173, 202-03 (D. Mass. 2016) (holding that company was entitled to preliminary injunction to avoid reputational harm and loss of goodwill).

59.    Nor could Robinhood avoid irreparable harm by seeking a sports-wagering license in Massachusetts or by ceasing to offer sports-related event contract trading in Massachusetts. Even if sports-related event contract trading were sports wagering—and it is not—and even if Robinhood could seek and be granted a Massachusetts sports-wagering license, which is by no means a certainty due to the discretionary nature of the review process, *see*

205 C.M.R. § 218.00 (sports wagering application requirements and procedures, including the factors the Massachusetts Gaming Commission considers when determining whether to exercise its discretion to grant a license), it would be entirely impracticable for Robinhood to be subject to the often conflicting regulations of each of the states in which it makes federally authorized event contract trading available to its customers.

60.    If Robinhood were to cease offering sports-related event contract trading in Massachusetts, Robinhood would forgo significant business in Massachusetts, resulting in loss of revenue.  These economic losses would be unrecoverable because sovereign immunity bars Robinhood from obtaining monetary damages for this impact on Robinhood's business.  *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999).  Damages that are unrecoverable due to sovereign immunity constitute irreparable harm.  *See, e.g.*, *Liu v. Noem*, 780 F. Supp. 3d 386, 403 (D.N.H. 2025) (holding that plaintiff established irreparable harm because of "the government's sovereign immunity with regard to a claim seeking money damages"); *Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325, 363 (D.N.H. 2024) (holding that the plaintiff showed irreparable harm because "sovereign immunity would bar plaintiff from obtaining a damages award").

61.    Abruptly discontinuing its Massachusetts customers' ability to open new sports-related event contract positions would also undermine customers' confidence in Robinhood and their reliance on its financial services, causing irreparable harm.  *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *7; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *7; *see also Ross-Simons*, 102 F.3d at 20.

62.    Further, taking a wait-and-see approach and defending any enforcement action Massachusetts decides to file would leave Robinhood with uncertainty about the future of

its sports-related event contracts business in Massachusetts and would inflict upon Robinhood the reputational harms noted above that would be associated with an enforcement action.

63.     Given the imminent threat that Massachusetts will attempt to enforce preempted state law against Robinhood, Robinhood has no way to avoid irreparable harm absent injunctive relief.

64.     There is an imminent likelihood that Defendants will violate the Supremacy Clause.  To prevent irreparable harm, Robinhood seeks declaratory and injunctive relief restraining Defendants from enforcing Massachusetts law to the extent it purports to regulate Robinhood's offering of sports-related event contracts traded on a DCM.

<u>**COUNT I**</u>
**(Supremacy Clause – Preemption By Commodity Exchange Act)**

65.     Robinhood restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

66.     The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

67.     The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government and to the extent state law conflicts with federal law.

68.    Congress preempted the regulation of commodity futures and swaps trading on CFTC-designated markets, leaving no room for parallel state regulation. Through the CEA, Congress granted the CFTC "exclusive jurisdiction" to regulate "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" "traded or executed on a contract market" designated by the CFTC. 7 U.S.C. § 2(a)(1)(A). This exclusive grant of jurisdiction includes transactions involving sports-related event contracts.

69.    Because federal law occupies the entire field of commodity futures and swaps trading on CFTC-designated markets and/or conflicts with state law, Defendants' threatened enforcement of Massachusetts sports-wagering laws is preempted by the CEA and the CFTC's regulations pursuant to the Supremacy Clause. By threatening to enforce Mass. Gen. Laws ch. 23N against Robinhood for its involvement in transactions involving sports-related event contracts traded on a DCM, Defendants are intruding on the CFTC's exclusive jurisdiction to regulate those transactions.

70.    Robinhood has suffered and continues to suffer irreparable harm as a result of the Defendants' actions and has no remedy at law to address the conduct complained of herein. The equities and public interest tilt strongly in Robinhood's favor because without relief, the harm to Robinhood will be significant, and by contrast, the Commonwealth and the public would suffer little to no harm if the requested relief is granted.

71.    To prevent further harm to Robinhood, the Court should enjoin Defendants from enforcing preempted Massachusetts law against Robinhood in contravention of the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Robinhood respectfully requests that the Court enter judgment in favor of Robinhood and against Defendants:

i.     Issuing an injunction prohibiting Defendants and their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing against Plaintiff Mass. Gen. Laws ch. 23N and any other Massachusetts law that attempts effectively to regulate Plaintiff's involvement in transactions involving event contracts traded on a DCM;

ii.    Awarding a declaration that using Mass. Gen. Laws ch. 23N and any other Massachusetts law in a manner effectively to regulate Plaintiff's involvement in transactions involving event contracts traded on a DCM violates the Supremacy Clause of the United States Constitution as applied to Plaintiff; and

iii.   Granting such other and further relief as the Court deems just and proper.

DATED:  September 15, 2025

Respectfully submitted,

By:    */s/ Nicholas J. Schneider*

**ECKERT SEAMANS CHERIN &
MELLOTT, LLC**
Craig Waksler (BBO No. 566087)
cwaksler@eckertseamans.com
Nicholas J. Schneider (BBO No. 688498)
nschneider@eckertseamans.com

2 International Place #1600
Boston, Massachusetts 02110
Telephone:  (617) 342-6800
Facsimile:  (617) 342-6899

**CRAVATH, SWAINE & MOORE LLP**
Kevin J. Orsini (*pro hac vice forthcoming*)
korsini@cravath.com
Antony L. Ryan (BBO No. 629971)
aryan@cravath.com
Brittany L. Sukiennik (*pro hac vice forthcoming*)
bsukiennik@cravath.com

375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700