**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

ROBINHOOD DERIVATIVES, LLC

*Plaintiff*,

v.                                                              Civil Action No. 1:25-cv-12578

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the
Commonwealth of Massachusetts, et al.,

*Defendants*.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF**</u>
<u>**ROBINHOOD'S MOTION FOR A PRELIMINARY INJUNCTION**</u>

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND .......................................................................................2

    A.    Event Contract Regulation by the CEA and CFTC ....................................2

    B.    Futures Commission Merchant Regulation by the CEA and CFTC.......................6

    C.    Robinhood, Event Contracts and Kalshi ..................................................7

    D.    The Massachusetts Lawsuit Against Kalshi ..............................................8

ARGUMENT .............................................................................................................8

I.    ROBINHOOD IS LIKELY TO SUCCEED ON THE MERITS.........................................8

    A.    The CEA Preempts Application of State Gaming Laws to Sports-Related Event Contract Trading on CFTC-Designated Exchanges. ...................................9

    B.    The CEA's Preemption of State Gaming Laws as Applied to Sports-Related Event Contracts Includes Those Opened on Robinhood's Platform...............................................................................................16

II.    ROBINHOOD WILL SUFFER IRREPARABLE HARM. ..............................................18

III.    THE EQUITIES AND PUBLIC INTEREST TILT STRONGLY IN ROBINHOOD'S FAVOR. ..................................................................................19

IV.    NO SECURITY—OR ONLY *DE MINIMIS* SECURITY—IS APPROPRIATE.............20

CONCLUSION .......................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alden v. Maine*, 527 U.S. 706 (1999) ........................................................................19

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147 (7th
    Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66
    F.3d 867 (7th Cir. 1995) ........................................................................3, 4, 14

*Arizona v. United States*, 567 U.S. 387 (2012) .............................................................15

*Ass'n of Am. Univs. v. Dep't of Energy*, No. 25-cv-10912-ADB, 2025
    WL 1414135 (D. Mass. May 15, 2025) ...............................................................8

*Bartels v. Int'l Commodities Corp.*, 435 F. Supp. 865 (D. Conn. 1977) .........................9

*BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755 (9th Cir. 2018)........................10

*Commonwealth of Massachusetts v. KalshiEx LLC*, No. 2584CV02525 (Mass.
    Super. Ct., Suffolk Cnty. Sept. 12, 2025) .......................................................1, 8, 18

*Commonwealth of Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115
    (2016) .......................................................................................................12

*Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363 (2000) ....................................9, 15

*Fed. Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001) ..............................13, 14

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141 (1982) .......................9, 15

*Get In Shape Franchise, Inc. v. TFL Fishers, LLC*, 167 F. Supp. 3d 173 (D. Mass.
    2016) ........................................................................................................19

*Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733 (N.D. Cal. 1978).........................9, 17

*Hunter v. Fed. Energy Reg. Comm'n*, 711 F.3d 155 (D.C. Cir. 2013)............................9

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ...........................................................14

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6
    (1st Cir. 1991).............................................................................................20

*Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213 (D. Kan. 1979)..........................9, 13

*KalshiEx LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257,
    2024 WL 4164694 (D.D.C. Sept. 12, 2024) .....................................................2, 3

*KalshiEx LLC v. Flaherty*, No. 25-1922 (3d Cir. July 31, 2025).......................................................1

*KalshiEx LLC v. Flaherty*, No. 25-cv-2152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) ...................................................................................................... passim

*KalshiEx LLC v. Martin*, No. 25-cv-1283-ABA, 2025 WL 2194908 (D. Md. Aug. 1, 2025) .................................................................................................12, 13

*KalshiEx, LLC v. Hendrick*, No. 25-00575, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) ...................................................................................................... passim

*K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907 (1st Cir. 1989) ............................................18

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)...................................................................15

*Liu v. Noem*, 780 F. Supp. 3d 386 (D.N.H. 2025) ........................................................................19

*Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 605 F. Supp. 1105 (N.D. Ga. 1985)................................................................................................................14

*Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22 (D. Me. 2022), *aff'd*, 51 F.4th 1 (1st Cir. 2022).........................................................................................20

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) .............................................................................16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982)......................15, 17

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992).........................................................18

*Nken v. Holder*, 556 U.S. 418 (2009) ..........................................................................................12

*Nw. Selecta, Inc. v. Sec'y of Dep't Agric. of Puerto Rico*, No. CV 22-1092 (RAM), 2022 WL 17985926 (D.P.R. Dec. 29, 2022)........................................................20

*Pineda v. Skinner Servs., Inc.*, 22 F.4th 47 (1st Cir. 2021)...........................................................20

*Prestwick Capital Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646 (7th Cir. 2013) ..................................................................................................................17

*Robinhood Derivatives, LLC v. Flaherty*, No. 1:25-cv-14723 (D.N.J. filed Aug. 29, 2025) .................................................................................................................2

*Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-01541 (D. Nev. filed Aug. 29, 2025) .................................................................................................................2

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) .......................18, 19

*Siembra Finca Carmen, LLC. v. Sec'y of Dep't of Agric. of Puerto Rico*, 437 F. Supp. 3d 119 (D.P.R. 2020)............................................................................................20

*Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580 (7th Cir. 2001) .........................................10

*United States v. Wilkinson*, 986 F.3d 740 (7th Cir. 2021) ............................................................11

*Vivo Cap. Surplus Fund VIII, L.P. v. 1Globe Cap. LLC*, No. 25-10914-MJJ, 2025
    WL 1796256 (D. Mass. June 30, 2025) ...................................................................................8

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .........................................................8, 18

*Witzel v. Chartered Sys. Corp. of N.Y., Ltd.*, 490 F. Supp. 343 (D. Minn. 1980).....................9, 13

**Statutes & Rules**

7 U.S.C. § 1a(19) ............................................................................................................................11

7 U.S.C. § 1a(28) .......................................................................................................................6, 17

7 U.S.C. § 1a(47) ............................................................................................................................11

7 U.S.C. § 2(a)(1)(A) ............................................................................................................. passim

7 U.S.C. § 2(e) ..................................................................................................................................4

7 U.S.C. § 6f .....................................................................................................................................6

7 U.S.C. § 7(a) ..................................................................................................................................4

7 U.S.C. § 7a-2(c) ................................................................................................................. passim

7 U.S.C. § 8(b) ..................................................................................................................................4

7 U.S.C. § 16(e)(1)(B)(i) ..................................................................................................................4

Dodd-Frank Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376......................................... passim

Mass. Gen. Laws ch. 23N ........................................................................................................18, 20

**Other Authorities**

17 C.F.R. pt. 38................................................................................................................................4

17 C.F.R. § 1.10 ...............................................................................................................................6

17 C.F.R. § 1.11 ...............................................................................................................................6

17 C.F.R. § 1.12 ...............................................................................................................................6

17 C.F.R. § 1.15 ...............................................................................................................................6

17 C.F.R. § 1.14 ...............................................................................................................................7

17 C.F.R. § 1.17 ...........................................................................................................6, 7

17 C.F.R. § 1.18 ..............................................................................................................7

17 C.F.R. § 1.55 ..............................................................................................................6

17 C.F.R. § 1.71 ..............................................................................................................7

17 C.F.R. § 3.10 ..............................................................................................................6

17 C.F.R. § 17.00 ............................................................................................................6

17 C.F.R. § 38.3 ..............................................................................................................4

17 C.F.R. § 38.151 ..........................................................................................................6

17 C.F.R. § 38.250 ..........................................................................................................6

17 C.F.R. § 40.2 ..............................................................................................................4

17 C.F.R. § 40.3 ..............................................................................................................4

17 C.F.R. § 40.11 ..................................................................................................4, 5, 15

17 C.F.R. § 155.3 ............................................................................................................6

120 Cong. Rec. 30,464 (1974) ...................................................................................3, 14

120 Cong. Rec. 34,736 (1974) .......................................................................................14

120 Cong. Rec. 34,997 (1974) .......................................................................................14

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) ...............................................14, 15

CFTC Brief, *KalshiEx LLC v. CFTC*, No. 24-5205, 2024 WL 4512583 (D.D.C. Oct. 16, 2024) ..........................................................................................................17

Hearings Before the Committee on Agriculture and Forestry, United States Senate, on S. 2485, S. 2587, S. 2837 and H.R. 13113, 93d Cong., 2d Sess. 685 (1974). .......................................................................................................................4, 14

H.R. 13113, 93d Cong., 2d Sess. 685 (1974) ..................................................................4

H.R. Rep. No. 93-975 (1974) ...................................................................................14, 15

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894 ...........................................................................................13

*KalshiEx LLC v. Flaherty*, No. 25-1922, ECF No. 66 (Brief of Amici Curiae
Seven Former Members of Congress in Support of Plaintiff-Appellee) (3d Cir.
July 31, 2025) ........................................................................................................15

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent
L. Rev. 657, 687-88 (1982)....................................................................................14

S. Rep. No. 93-1131 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843...........................................13

U.S. Const. art. VI, cl. 2.............................................................................................9

## PRELIMINARY STATEMENT

Robinhood Derivatives, LLC ("Robinhood") is a Commodity Futures Trading Commission ("CFTC")-registered futures commission merchant ("FCM") that offers approved users access to trade, among other things, sports-related event contracts through the Robinhood platform. While Robinhood, as a registered FCM, facilitates the placement and liquidation of event contracts for its users, the contracts themselves trade on KalshiEx LLC's ("Kalshi") exchange, which is registered with the CFTC as a designated contract market ("DCM").

On September 12, 2025, the Commonwealth of Massachusetts filed a lawsuit against Kalshi for allegedly "offering sports wagering without a license in violation of G.L. c. 23N, § 5 *et seq.*" *Commonwealth of Massachusetts v. KalshiEx LLC*, No. 2584CV02525, Dkt. 1 ¶ 1 (Mass. Super. Ct., Suffolk Cnty. Sept. 12, 2025) (hereinafter "*Massachusetts v. Kalshi*"). That same day, Massachusetts filed an Emergency Motion for a Preliminary Injunction seeking to enjoin Kalshi from "engaging in any activity in connection with sports wagering in the Commonwealth of Massachusetts" "until further order of the Court." *Id.*, Dkt. 4, Ex. A at 1-2. Massachusetts specifically refers to Robinhood in its lawsuit against Kalshi. *Id.*, Dkt. 1 ¶¶ 129-130. Kalshi noticed removal of that action to this Court. *Commonwealth of Massachusetts v. KalshiEx LLC*, No. 1:25-cv-12595 (D. Mass. filed Sept. 16, 2025).

As two other Federal courts have already held, however, state gaming law as applied to trading on CFTC-designated contracts markets is preempted by the Commodity Exchange Act's ("CEA") comprehensive federal framework for regulating commodity futures and swaps trading. Kalshi has twice won preliminary relief on this basis against state regulators seeking to enforce their gambling or gaming laws against its facilitation of transactions involving sports-related event contracts. *KalshiEx LLC v. Flaherty*, No. 25-cv-2152, 2025 WL 1218313, at *3-8 (D.N.J. Apr. 28, 2025) (hereinafter "*KalshiEx (D.N.J.)*"), *appeal filed*, No. 25-1922 (3d Cir. May 8,

2025); *KalshiEX, LLC v. Hendrick*, No. 25-00575, 2025 WL 1073495, at *8 (D. Nev. Apr. 9, 2025) (hereinafter "*KalshiEx (D. Nev.)*").  Robinhood also has ongoing litigation in these jurisdictions concerning the same issues and seeking similar relief.[1]

In light of Massachusetts's action against Kalshi, there is a real and imminent threat that Massachusetts will take enforcement action against Robinhood.[2]  Were it to do so, Robinhood would face an immediate threat of civil penalties and potentially criminal penalties as well, along with the attendant reputational harms.  Robinhood's Massachusetts customers would also face abruptly losing access to sports-related event contract trading through their Robinhood account. Robinhood respectfully requests a preliminary injunction.

## FACTUAL BACKGROUND

### A.    Event Contract Regulation by the CEA and CFTC

An event contract is a derivative that allows customers to trade on their predictions about the occurrence of future events.  *See KalshiEx LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257, 2024 WL 4164694, at *1-2 (D.D.C. Sept. 12, 2024).  Event contracts are typically structured as binary options posing a particular yes-or-no question.  A buyer takes the "yes" side

---

[1] In *Robinhood Derivatives, LLC v. Flaherty*, No. 1:25-cv-14723 (D.N.J. filed Aug. 29, 2025), the State agreed to a consent order maintaining the status quo pending the Third Circuit decision in *KalshiEx (D.N.J.)* (argued on appeal Sept. 10, 2025), and in *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-01541 (D. Nev. filed Aug. 29, 2025), the State agreed to a stipulation maintaining the status quo pending a decision on the preliminary injunction motion.

[2] The parties have met and conferred, and Massachusetts has represented that "it will refrain from filing an enforcement action pursuant to Mass. Gen. L. c. 23N against Robinhood during the pendency of any preliminary injunction motion in the above-captioned action, and during the pendency of any preliminary injunction motion in the Kalshi litigation."  In reliance on that representation, Robinhood is not seeking a temporary restraining order.  Robinhood does not, however, agree to wait to vindicate its rights until the resolution of Defendants' action involving Kalshi.  The parties were also unable to agree on a briefing schedule.  Robinhood therefore submits that any opposition to this Motion should be due on October 2, 2025 consistent with Local Rule 7.1(b)(2) and that Robinhood's reply should be due October 9, 2025.

and a seller takes the "no" side, and upon the expiration of the contract—typically, when the outcome of the future event in question becomes known—the value of the contract goes to the party who was right.  Until that time, buyers and sellers can trade the contract, and the price of the contract fluctuates based on the market's assessment of the probability that the event will occur.  *Id.* at *2.  Traders may use event contracts to mitigate risk (*e.g.*, an orange grower may buy a contract predicting an early frost to offset the risk of loss of income from frost damage) or simply to seek a financial return.  *Id*.

The CEA sets forth a comprehensive federal framework for regulating commodity futures and swaps trading.  *See KalshiEx (D.N.J.)*, 2025 WL 1218313, at *1-2; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *3.  In 1974, Congress established the CFTC, the federal agency that oversees and regulates commodity futures and swaps trading.  *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *1-2; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *3.  Congress centralized regulatory authority with the CFTC to avoid the "total chaos" that could ensue if states attempted to regulate the futures markets, thereby subjecting futures trading to different regulations.  Hearings Before Comm. on Agriculture and Forestry, United States Senate, on S. 2485, etc., 93d Cong., 2d Sess. 685 (1974) ("Senate Hearings") (statement of Sen. Clark); *see also Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992) (setting forth legislative history of the CFTC Act of 1974), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995).  Indeed, Congress considered adding but ultimately removed from the bill's final language a provision of the CEA that would have preserved parallel state authority over futures trading.  *See* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge).  As described below, the CEA was further amended by the Dodd-Frank Act of 2010,

Pub. L. No. 111-203, 124 Stat. 1376, which brought swaps within the coverage of the CEA and added a special rule about event contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

The CEA provides that the CFTC has "exclusive jurisdiction" over transactions involving event contracts—which, as described below, are swaps or contracts of sale of a commodity for future delivery—traded on registered exchanges (known as "designated contract markets"): "The Commission shall have exclusive jurisdiction . . . with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and *transactions involving swaps or contracts of sale of a commodity for future delivery* (including significant price discovery contracts), *traded or executed on a contract market designated pursuant to section 7 of this title . . . .*" 7 U.S.C. § 2(a)(1)(A) (emphasis added). The CEA expressly preserves state authority to regulate transactions "not conducted on or subject to the rules" of a CFTC-regulated exchange. *Id.* § 16(e)(1)(B)(i).

To receive the CFTC's designation as a contract market, an exchange must apply and set forth its ability to comply with CFTC rules and regulations. *Id.* §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The CFTC's comprehensive regulatory framework for contract markets, including a set of 23 "Core Principles," 17 C.F.R. pt. 38, is designed to ensure and protect the integrity of those markets. Status as a CFTC-designated contract market "imposes upon [an exchange] a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc.*, 977 F.2d at 1150-51. The CFTC is authorized to suspend or revoke an exchange's designation if it fails to comply with any of the provisions of the CEA or the CFTC's regulations. 7 U.S.C. § 8(b).

Kalshi is a CFTC-designated contract market. *KalshiEx (D.N.J.)*, 2025 WL 1218313, at \*2; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at \*1.

An exchange may submit new contracts to the CFTC for approval prior to listing; alternatively, it may self-certify the contracts as complying with CFTC requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). Generally, the CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B). The CEA contains a special rule relating to CFTC review and approval of event contracts, which was added by the Dodd-Frank Act of 2010. Pub. L. No. 111-203, § 745(b), 124 Stat. 1376, 1735-36. The CFTC may prohibit event contracts in specific categories if it determines them to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2). If an exchange self-certifies a new contract, the CFTC may initiate a review of that contract within 10 business days. *See* 7 U.S.C. § 7a-2(c)(2); *see also* 17 C.F.R. § 40.11(c) (permitting the CFTC to take an additional 90 days to review event contracts). If the CFTC does not act, the new contract is deemed approved and becomes effective. *See* 7 U.S.C. § 7a-2(c)(2). Kalshi self-certified and began listing sports-related event contracts on January 24, 2025. *KalshiEx (D.N.J.)*, 2025 WL 1218313, at \*2. Because the CFTC declined to review or prohibit Kalshi's sports-related event contracts, *KalshiEx (D.N.J.)*, 2025 WL 1218313, at \*2, they were deemed approved and became effective upon the expiration of the 10-day probationary period under 7 U.S.C. § 7a-2(c)(2) and are legal under federal law.

Fundamental differences in how contract markets and sportsbooks operate mean they are susceptible to different forms of risk to participants. Contract markets leverage the power and rigor of financial markets to provide traders with liquidity and transparency, and prices are set by market participants. Customers can manage risk by adjusting or exiting their positions up until

the contract expires, and prices respond accordingly.  These markets may be at risk of market manipulation and other market distortions and inefficiencies.  Sportsbooks, by comparison, have a line set by the house, which is typically set ahead of time and, once a bet is placed, does not change for that bet.  Gamblers bet directly against the house, and once a position is entered, gamblers typically do not have the option to exit their position.  Sportsbooks risk exploitation of gamblers due to the power imbalance between the house and the gambler.  Based on these different risks, it makes sense that contract markets and sportsbooks are subject to two different modes of regulation.  The federal regulations that govern commodity futures and swaps trading have as a major focus creating and maintaining fair and efficient markets for trading, *see* 17 C.F.R. §§ 38.250, 38.151, whereas sportsbooks are regulated by state law and subject to the police powers of the state to halt and remedy any exploitation of gamblers.

### B.    Futures Commission Merchant Regulation by the CEA and CFTC

Robinhood is registered with the CFTC as a futures commission merchant ("FCM").  Mackenzie Decl. ¶ 3.  As relevant here, an FCM is "an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of a commodity for future delivery; a security futures product; a swap" or certain other transactions and "in or in connection with [those activities], accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom."  7 U.S.C. § 1a(28) (subsection headings omitted).  FCMs must register with the CFTC unless they fall within certain exemptions.  *Id.* § 6f; 17 C.F.R. § 3.10(c).

Similar to a registered DCM (such as Kalshi), registered FCMs such as Robinhood must comply with a host of federal requirements.  FCMs are subject to reporting requirements to the CFTC, 17 C.F.R. §§ 1.10(b), 1.10(d), 17.00, disclosure requirements to the public, *id.* § 1.55, and minimum financial requirements, *id.* §§ 1.12, 1.17.  FCMs must "establish, maintain, and enforce

a system of risk management policies and procedures designed to monitor and manage the risks associated with the activities of the" FCM, *id.* § 1.11(c)(1), and CFTC regulations set forth elements that such a risk management program must include, *id.* § 1.11(e), as well as reporting requirements related to risk management, *see id.* § 1.15.  FCMs must "establish and enforce internal rules, procedures and controls to" ensure compliance with certain trading standards.  *Id.* § 155.3.  FCMs must also "adopt and implement written policies and procedures" to ensure that they and their employees comply with CFTC regulations concerning conflicts of interest.  *Id.* § 1.71.  The CFTC imposes recordkeeping requirements on FCMs.  *Id.* §§ 1.14, 1.18.  Failure to comply with these requirements could require the FCM to "transfer all customer accounts and immediately cease doing business as a futures commission merchant."  *Id.* § 1.17(a)(4).

### C.    Robinhood, Event Contracts and Kalshi

On March 17, 2025, Robinhood launched its prediction markets hub, through which its customers can place event contract trade orders.[3]  Mackenzie Decl. ¶ 4.  Robinhood intermediates its customers' event contract trades, including sports-related event contract trades, on Kalshi's exchange.  *Id.* ¶ 5.  Robinhood has entered into agreements with Kalshi that allow it to access Kalshi's contract market facilities for this purpose.  *Id.* ¶ 6.  Those agreements obligate Robinhood to ensure such access is secure and in compliance with all applicable laws, including the CEA and CFTC regulations; they also require Robinhood to comply with Kalshi's rules.  *Id.*

Thus, while Robinhood customers may place event contract orders in their Robinhood accounts, the *trades* occur on Kalshi's CFTC-regulated exchange.  *Id.* ¶ 5.  This is the same as a Kalshi customer placing an event contract order through a Kalshi account.  In each instance, the

---

[3] Robinhood began offering some limited event contract trading starting in October 2024. Mackenzie Decl. ¶ 4.  The only event contracts Robinhood offered in 2024 concerned the outcome of the presidential election; those contracts were not traded on Kalshi's exchange.  *Id.*

trades are executed on Kalshi's exchange and regulated by the CFTC.  When the customer opens

the order through Robinhood, that merely adds CFTC regulation of Robinhood as an FCM.  *Id.*

###    D.    The Massachusetts Lawsuit Against Kalshi

On September 12, 2025, the Commonwealth of Massachusetts, by and through its

Attorney General, filed a lawsuit against Kalshi for allegedly "offering sports wagering without a

license in violation of G.L. c. 23N, § 5 *et seq.*"  *Massachusetts v. Kalshi*, No. 2584CV02525,

Dkt. 1 ¶ 1.  Massachusetts seeks monetary relief and an order enjoining Kalshi "from engaging in

sports wagering without a license in violation of G.L. c. 23N".  *Id.* at 42.  Massachusetts also

filed an Emergency Motion for a Preliminary Injunction seeking to enjoin Kalshi from "engaging

in any activity in connection with sports wagering in the Commonwealth of Massachusetts".  *Id.*,

Dkt. 4, Ex. A at 1-2.  Notably, in its Complaint, Massachusetts mentions Robinhood explicitly,

including the fact that Robinhood's customer's sports-related event contracts trade on Kalshi's

exchange.  *Id.* ¶¶ 129-130.  Kalshi noticed removal of that action to this Court.  *Commonwealth*

*of Massachusetts v. KalshiEx LLC*, No. 1:25-cv-12595 (D. Mass. filed Sept. 16, 2025).

### ARGUMENT

Robinhood must show: "(1) a likelihood of success on the merits; (2) a likelihood of

irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the

movant's favor; and (4) that an injunction is in the public interest."  *Vivo Cap. Surplus Fund*

*VIII, L.P. v. 1Globe Cap. LLC*, No. 25-10914-MJJ, 2025 WL 1796256, at *6 (D. Mass. June 30,

2025) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  When the non-

movant is the government, the equities and the public interest factors merge.  *Ass'n of Am. Univs.*

*v. Dep't of Energy*, No. 25-cv-10912-ADB, 2025 WL 1414135, at *8 (D. Mass. May 15, 2025).

### I.    ROBINHOOD IS LIKELY TO SUCCEED ON THE MERITS.

Multiple federal courts have already held that Kalshi is likely to succeed in establishing

that the CFTC's exclusive jurisdiction over sports-related event contracts traded on Kalshi's

DCM preempts state gaming laws. *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *3-8; *KalshiEx

(D. Nev.)*, 2025 WL 1073495, at *3-8.[4]  The same event contract products are at issue here as

were at issue in *KalshiEx (D.N.J.)* and *KalshiEx (D. Nev.)*, and the same result should follow:

transactions involving sports-related event contracts traded on Kalshi's designated contract

market are subject to the CFTC's exclusive jurisdiction, and Massachusetts law is preempted.

A.    **The CEA Preempts Application of State Gaming Laws to Sports-Related Event Contract Trading on CFTC-Designated Exchanges.**

The Constitution and laws of the United States "shall be the supreme Law of the Land,"

U.S. Const. art. VI, cl. 2, and accordingly, "Congress has the power to preempt state law."

*Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Federal law can preempt state

law expressly, through a statement to that effect in the statute itself, or impliedly, through either

field preemption or conflict preemption.  Field preemption exists where Congress manifests an

intent to occupy exclusively an entire field of regulation.  *See Fidelity Fed. Sav. & Loan Ass'n v.

De la Cuesta*, 458 U.S. 141, 153 (1982).  Conflict preemption exists where compliance with

federal and state law is "a physical impossibility" or when "state law stands as an obstacle to the

---

[4] Numerous other courts have found that the CEA's grant of exclusive jurisdiction to the CFTC is broad and preempts other regulatory schemes, including both state and other federal statutes. *See, e.g.*, *Hunter v. Fed. Energy Reg. Comm'n*, 711 F.3d 155, 158-59 (D.C. Cir. 2013) (Federal Energy Regulatory Commission lacked jurisdiction in light of CFTC's exclusive jurisdiction); *Witzel v. Chartered Sys. Corp. of N.Y., Ltd.*, 490 F. Supp. 343, 347-48 (D. Minn. 1980) (preemption by CEA and CFTC regulations of Minnesota Securities Act); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) (claims arising under federal and state securities statutes barred in light of CFTC's exclusive jurisdiction); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) (recognizing that "[i]t is now established . . . that the SEC and other federal agencies are 'stripped' of authority to regulate commodities transactions and that state regulatory agencies are likewise preempted by the 'exclusive jurisdiction' of the CFTC" (internal citations omitted)); *Bartels v. Int'l Commodities Corp.*, 435 F. Supp. 865, 869 (D. Conn. 1977) (with "its own sphere," the CFTC displaced the Securities and Exchange Commission's previous authority over commodity options trading).

accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal

quotation omitted).   Here, as multiple district courts have already found, the statutory language

of the CEA, its legislative history and the comprehensive regulatory framework it sets out

demonstrate that Congress deliberately preempted state law.  Whether analyzed as express or

implied preemption, the scope of preemption is the field of commodity futures and swaps

trading, including event contract trading, on CFTC-designated exchanges.

    *First*, express preemption exists here:  the CEA provides expressly that the CFTC "shall

have exclusive jurisdiction" over commodity futures and swaps trading on CFTC-designated

exchanges.  7 U.S.C. § 2(a)(1)(A).  Express provisions of this type are regularly held to preempt

state law.[5]  *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 765-66

(9th Cir. 2018) (describing statute's grant of "exclusive" jurisdiction as a "broad and general"

preemption provision); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir.

2001) (holding that statute's "exclusive jurisdiction" provision preempts state law claims).  Here,

the express preemption covers the field of trading on CFTC-designated exchanges.

    This express preemption provision includes event contracts, which are "transactions

involving swaps or contracts of sale of a commodity for future delivery," over which the CFTC

has "exclusive jurisdiction" when "traded or executed on a [designated] contract market."

7 U.S.C. § 2(a)(1)(A).  The term "swap" includes "any agreement, contract, or transaction" that

(among other things) "provides for any purchase, sale, payment, or delivery (other than a

---

    [5] This express provision does more than define the scope of the CFTC's authority vis-à-vis
other federal agencies; it also defines the scope of its authority vis-à-vis the states.  The exclusive
jurisdiction section goes on to provide that "*[e]xcept as hereinabove provided*, nothing contained
in this section shall (I) supersede or limit the jurisdiction at any time conferred on the [SEC] or
other regulatory authorities under the laws of the United States *or of any State* . . . ."  7 U.S.C.
§ 2(a)(1)(A) (emphasis added).

dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii).  The term "swap" was added to the CEA in 2010 by the Dodd-Frank Act.  *See* Pub. L. No. 111-203, §§ 721(a)(21) (adding the definition of "swap" in 7 U.S.C. § 1a(47)), 722(a)(1)(D) (adding "swaps" to the exclusive jurisdiction provision in 7 U.S.C. § 2(a)(1)(A)), 124 Stat. 1376, 1666, 1672.

Alternatively, or in addition, event contracts may be considered transactions in a type of intangible commodity that the CEA calls an "excluded commodity."  *See United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021).  An "excluded commodity" includes "an occurrence, extent of an occurrence, or contingency (other than [certain exceptions]) that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence."  7 U.S.C. § 1a(19)(iv).

Sports-related event contracts are within these statutory definitions of swaps and transactions in excluded commodities because:  (i) they are binary contracts that pay out depending on the occurrence or non-occurrence of a future event that is beyond the control of the parties to the contract; and (ii) the underlying sporting events they concern have economic consequence.  *See KalshiEx (D.N.J.)*, 2025 WL 1218313, at *2, *6; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *5 n.3.  With respect to the latter requirement, wins and losses in sporting events have obvious, significant financial consequences for the players, the teams, the owners or the schools they represent, their communities, television networks and other stakeholders.  *See KalshiEx (D.N.J.)*, 2025 WL 1218313, at *6 ("Defendants argue that sporting events are without potential financial, economic, or commercial consequence. On the record before me, I disagree.").  For example, wins can increase franchise value, leading to more ticket sales, more

revenue from sponsorships, merchandise, parking, and food at games, and more TV viewership, as the Florida Panthers experienced after winning the 2024 Stanley Cup.  Orsini Decl. ¶ 3. Sporting events also generate economic boons for the cities in which they take place; the New York Knicks' 2025 postseason generated an estimated $195 million in economic activity from home playoff games.  *Id.* ¶ 4.  Sporting events also impact the advertising revenue to television networks that broadcast them; when this year's NBA Finals went the full seven games, ABC's sports viewership increased 17% the month the games took place.  *Id.* ¶ 5.

The CEA expressly grants the CFTC "exclusive jurisdiction" over all "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A).  The CEA also includes a separate provision entitled "Special rule for review and approval of event contracts and swaps contracts," which confirms that the CFTC has authority over "the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than [certain exemptions]), by a designated contract market or swap execution facility."  *Id.* § 7a-2(c)(5)(C)(i).  The "special rule," added by the Dodd-Frank Act of 2010, Pub. L. No. 111-203, § 745(b), 124 Stat. at 1735-36, makes clear that the CEA's grant of exclusive CFTC jurisdiction extends to event contracts.

For these reasons, multiple district courts correctly determined that the CEA expressly preempts state gambling laws as applied to sport-related event contracts on Kalshi's DCM.  *See KalshiEx (D.N.J.)*, 2025 WL 1218313, at *4; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *3-7.[6]

---

[6] One district court reached the opposite conclusion.  *KalshiEx LLC v. Martin*, No. 25-cv-1283-ABA, 2025 WL 2194908, at *1 (D. Md. Aug. 1, 2025), *appeal filed*, No. 25-1892 (4th Cir. Aug. 1, 2025).  That decision is inconsistent with the weight of authority, and its reasoning is unpersuasive.  Foremost, the decision does not address whether the CEA expressly preempts state law.  *Id.* at *5-13 (analyzing only implied field and conflict preemption).  As a result, the

*Second*, to the extent the text of the statute leaves any doubt about preemption, the legislative history of the 1974 amendment to the CEA that established the CFTC confirms that this grant of exclusive jurisdiction to regulate futures trading on DCMs was intended to establish broad field preemption.  As the Conference Committee explained, "[u]nder the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned.  Therefore, if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern.  In view of the broad grant of authority to the Commission to regulate the futures trading industry, the Conferees do not contemplate that there will be a need for any supplementary regulation by the States."  H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897; *see also Hofmayer*, 459 F. Supp. at 737 (finding field preemption from the CEA and dismissing claims brought under preempted federal and state statutes).  As the D.C. Circuit recognized, "the statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*.'"  *Fed. Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (quoting S. Rep. No. 93-1131, at 23 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5863) (emphasis in original).  "The

court wrongly applies a presumption against preemption, *id.* at *5-6, which has no place where "the statute contains an express pre-emption clause," *Commonwealth of Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016).  The court also assumes, wrongly and without analysis, that sports-related event contract trading is gambling, and that assumption colors the entire opinion.  *See, e.g.*, *Martin*, 2025 WL 2194908, at *6 ("Kalshi's burden with respect to its field preemption claim is to establish that Congress clearly and manifestly intended to strip states of their authority to regulate gambling").  The court also does not consider the conflict between application of state gambling laws and the Special Rule in 7 U.S.C. § 7a-2(c), namely Congress's decision in enacting the Special Rule that the CFTC would be the decisionmaker, not Massachusetts or the Massachusetts Gaming Commission.  *See id.* at *11-13.  This *Martin* decision thus lacks persuasive power.

passage of 7 U.S.C. § 2 is intended to clarify 'the preemption of all other would-be regulators at every level of government.'"  *Witzel*, 490 F. Supp. at 347 (quoting *Jones*, 466 F. Supp. at 219). Likewise, the history surrounding the "special rule" concerning event contracts in 2010 makes it clear that Congress intended the CFTC's exclusive jurisdiction to embrace event contracts.  *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sens. Lincoln and Feinstein).

Congressional statements about the creation of the CFTC confirm the intent for broad express or implied field preemption.  The 1974 amendments to the CEA were motivated by "concerns that states might regulate futures markets" themselves and create "conflicting regulatory requirements."  *Am. Agric. Movement, Inc.*, 977 F.2d at 1156; *see also Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 605 F. Supp. 1105, 1112 (N.D. Ga. 1985) ("The congressional hearings focused on the need for sole regulatory power of commodities to be placed in one federal agency . . . .").  Establishing the CFTC and endowing it with exclusive jurisdiction was meant to "avoid unnecessary, overlapping and duplicative regulation."  *Ken Roberts Co.*, 276 F.3d at 588 (quoting 120 Cong. Rec. 34,736 (1974) (remarks of House Agriculture Committee Chairman Poage)); *see also* 120 Cong. Rec. 34,997 (1974) (remarks of Sen. Curtis on behalf of Sen. Talmadge); Senate Hearings at 685 (statement of Sen. Clark) ("[D]ifferent State laws would just lead to total chaos.").  Accordingly, the CFTC was empowered to set forth uniform rules and regulations for "all exchanges and all persons in the industry." H.R. Rep. No. 93-975, at 79 (1974).[7]  Congressional statements concerning the event

---

[7] As further indication of Congressional intent that the CEA preempt broadly, during the amendment process for the 1974 amendments, the Senate considered adding but ultimately did not include a provision that retained the states' jurisdiction over futures trading.  *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 687-88 (1982); *see also* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge). Congress therefore could not have intended States to regulate futures trading in parallel with the CFTC.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory

contract "special rule," including by the drafters of the Dodd-Frank Act of 2010, are consistent with these earlier statements and reveal clear Congressional intent to vest exclusive jurisdiction over event contracts with the CFTC.  *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010); *see also KalshiEx LLC v. Flaherty*, No. 25-1922, ECF No. 66 (Brief of Amici Curiae Seven Former Members of Congress in Support of Plaintiff-Appellee) 15-23 (3d Cir. July 31, 2025).

*Third*, the CEA regulatory scheme, over which the CFTC has exclusive jurisdiction, is comprehensive as it relates to designated and registered entities, and the existence of this comprehensive scheme further evinces Congressional intent to preempt the field and foreclose parallel state regulation.  *See Arizona v. United States*, 567 U.S. 387, 401 (2012) (comprehensive statutory framework led to the conclusion that "the Federal Government has occupied the field" in the relevant area); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368-69 (1986).  The Supreme Court has confirmed that the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)).

In addition to express or implied field preemption, conflict preemption exists here with respect to the determination of *which* event contracts are permitted on CFTC-designated exchanges.  As noted above, the special rule relating to CFTC review of event contracts vests the CFTC with the power to approve or prohibit certain event contracts.  7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2).  If Massachusetts or the Massachusetts Gaming Commission were permitted *also* to make a determination about whether event contracts on a CFTC-regulated exchange were permitted, there would be a direct conflict between federal and state regulation

---

construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.").

because the CFTC has already impliedly approved these same event contracts. *See Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363, 380 (2000) (conflict preemption exists where state law "undermines the congressional calibration of force" and is "at odds with achievement of the federal decision about the right degree of pressure to employ"); *De la Cuesta*, 458 U.S. at 153. Here, the CFTC has allowed Kalshi's sports-related event contracts by taking no action in response to Kalshi's self-certification of those contracts, making them legal under federal law, but Massachusetts, in *Massachusetts v. Kalshi*, is attempting to preclude trading of those same event contracts by enforcing Massachusetts sports-wagering laws. The conflict is clear.

**B.    The CEA's Preemption of State Gaming Laws as Applied to Sports-Related Event Contracts Includes Those Opened on Robinhood's Platform.**

Given the broad, express preemptive language and clear Congressional intent, the District Courts' holdings that the CEA likely preempts New Jersey and Nevada gambling and gaming laws as applied to Kalshi's facilitation of sports-related event contracts trading were well founded. *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *4; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *3-7. The same result is required where, as here, the event contract positions are opened through Robinhood's interface.

*First*, Kalshi and Robinhood participate in transactions involving "swaps or contracts of sale of a commodity for future delivery" traded on a DCM, and these transactions therefore fall squarely within the statutory grant of exclusive jurisdiction to the CFTC. *See* 7 U.S.C. § 2(a)(1)(A) (granting CFTC "exclusive jurisdiction" over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC). Because it is the *transaction* on a regulated exchange over which the CFTC has exclusive jurisdiction, *see id.*, the CFTC must have jurisdiction over the *entire* transaction and all participants. This includes

16

entities like Robinhood that accept orders or otherwise facilitate transactions, as well as entities like Kalshi that execute transactions. *See id.* § 1a(28)(A) (CEA expressly envisions FCMs facilitating transactions in swaps and commodities for future delivery).

If states could regulate some but not all entities relevant to these transactions, such regulation would infringe on the CFTC's exclusive jurisdiction and fracture what Congress intended to be a uniform set of regulations for commodity futures and swaps trading. For the same reasons that the Districts of Nevada and New Jersey held that federal law preempts state enforcement against Kalshi, federal law similarly preempts state enforcement against an FCM (such as Robinhood) facilitating transactions on Kalshi's exchange. Indeed, as the CFTC itself recently explained to the D.C. Circuit, "due to federal preemption, event contracts *never violate state law when they are traded on a [designated contract market]*." CFTC Brief, *KalshiEx LLC v. CFTC*, No. 24-5205, at 27, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

*Second*, the conclusion that preemption applies equally to Robinhood's facilitation of these transactions as an FCM is further supported by the fact that Congress explicitly included FCMs such as Robinhood within the extensive set of federal regulatory requirements and CFTC oversight established to manage commodity derivatives trading. As noted above, FCMs such as Robinhood that are registered with the CFTC must comply with a multitude of requirements. *See supra* pp. 6-7. The "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex," *Curran*, 456 U.S. at 356 (internal quotation marks omitted), established by Congress includes FCMs that facilitate purchases and sales of commodities for future delivery and swaps. 7 U.S.C. § 1a(28)(A)(i)(I)(aa)(AA), (CC).

In short, the "oversight of futures commission merchants ('FCMs')" is an "important aspect" of the CFTC's oversight responsibility for futures trading. *Prestwick Capital Mgmt.,*

*Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 650 (7th Cir. 2013).  FCMs like Robinhood are

an integral part of the CEA's comprehensive regulatory scheme, and their activities in facilitating

trading on DCMs are equally subject to federal preemption as those of DCMs like Kalshi.

## II.    ROBINHOOD WILL SUFFER IRREPARABLE HARM.

A plaintiff must show that it is "likely to suffer irreparable harm in the absence of

preliminary relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  "A credible threat

of imminent prosecution for a state violation that conflicts with federal law can establish a

likelihood of irreparable harm."  *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *7; *see also Morales*

*v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are

imminent . . . there is no adequate remedy at law.").  Loss of business and goodwill can also

inflict irreparable injury.  *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20

(1st Cir. 1996); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989).

In light of Massachusetts's action against Kalshi, which includes allegations about

Robinhood, and specifically because Robinhood's customer's event contracts trade on Kalshi's

exchange, Robinhood faces the imminent threat of a similar enforcement action by

Massachusetts and/or the Massachusetts Gaming Commission seeking civil penalties as well as,

potentially, criminal penalties.  Mackenzie Decl. ¶¶ 7-8.  The sanctions for violation of the

Massachusetts statute that Massachusetts alleges Kalshi violated (Mass. Gen. Laws ch. 23N)

include "a civil penalty not to exceed $2,000 for each violation or $5,000 for violations arising

from the same series of events" and imprisonment and criminal fines, which escalate after the

first offense.  Mass. Gen. Laws ch. 23N, § 21.  The threat of prosecution is actual and imminent,

Mackenzie Decl. ¶¶ 7-8, especially in light of the fact that Massachusetts explicitly mentions

Robinhood in its action against Kalshi, *Massachusetts v. Kalshi*, No. 2584CV02525, Dkt. 1

¶¶ 129-130, and its request for emergency expedited relief, *id.*, Dkts. 4, 10; *see also id.*, Dkt. 5

at 10 ("Massachusetts law prohibits the facilitation of wagering for a fee, just as it prohibits the taking of a wager.").  The fact that the Commonwealth has proposed not to seek to enforce the preempted gaming laws until resolution of its proceedings against Kalshi changes nothing; Robinhood is entitled to protect its rights under Federal law in Federal Court.

The harm to Robinhood's reputation caused by enforcement proceedings also could not easily or quickly repaired.  *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *7; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *7-8; *see also Ross-Simons*, 102 F.3d at 20.  Abruptly discontinuing its Massachusetts customers' ability to open new sports-related event contract positions would undermine customers' confidence in Robinhood.  Mackenzie Decl. ¶ 13.  Robinhood thus stands to lose the goodwill of over 31,000 customers in Massachusetts.  Mackenzie Decl. ¶¶ 9-10.  This lost goodwill also constitutes irreparable harm.  *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *7; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *7; *see also Ross-Simons*, 102 F.3d at 20; *Get In Shape Franchise, Inc. v. TFL Fishers, LLC*, 167 F. Supp. 3d 173, 202-03 (D. Mass. 2016).

 Robinhood would also forgo significant business if it were to cease offering sports-related event contract trading in Massachusetts to avoid an enforcement action by Massachusetts or the Massachusetts Gaming Commission.  Mackenzie Decl. ¶ 12.  These losses would be unrecoverable because sovereign immunity bars Robinhood from obtaining monetary damages from Massachusetts.  *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999).  Unrecoverable damages constitute irreparable harm.  *See, e.g.*, *Liu v. Noem*, 780 F. Supp. 3d 386, 403 (D.N.H. 2025).

## III.    THE EQUITIES AND PUBLIC INTEREST TILT STRONGLY IN ROBINHOOD'S FAVOR.

"[T]he interests favor injunction" because Robinhood can demonstrate that Massachusetts law is likely preempted as to the transactions at issue involving sports-related event contract trades through Kalshi's CFTC-designated market.  *See KalshiEx (D.N.J.)*, 2025

19

WL 1218313, at *4; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *3-7.  With respect to

Robinhood, "[t]he balance of hardships tips in [movant's] favor given that [plaintiff] is facing

substantial monetary expenditures, reputational damage, or civil and criminal prosecution based

on the defendants' demands that the defendants likely cannot make because they are preempted."

*KalshiEx (D. Nev.)*, 2025 WL 1073495, at *7.  By contrast, the state of Massachusetts, and the

public generally, can have no interest in enforcing preempted state law against Robinhood.  *See*

*Nw. Selecta, Inc. v. Sec'y of Dep't Agric. of Puerto Rico,* No. CV 22-1092 (RAM), 2022

WL 17985926, at *6 (D.P.R. Dec. 29, 2022) ("[T]here is no convincing argument to explain why

a government agency's interests are harmed by the inability to continue enforcing preempted

laws." (internal quotation marks omitted)); *Me. Forest Prods. Council v. Cormier*, 586 F. Supp.

3d 22, 64 (D. Me. 2022), *aff'd*, 51 F.4th 1 (1st Cir. 2022); *Siembra Finca Carmen, LLC. v. Sec'y*

*of Dep't of Agric. of Puerto Rico*, 437 F. Supp. 3d 119, 137 (D.P.R. 2020).

## IV.    NO SECURITY—OR ONLY *DE MINIMIS* SECURITY—IS APPROPRIATE.

Whether to require a bond, and the amount of any such bond, is left to the discretion of

the Court.  *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st

Cir. 1991).  Here, no security is needed because Defendants will not suffer any non-speculative

harm.  *See Pineda v. Skinner Servs., Inc*., 22 F.4th 47, 57 (1st Cir. 2021).  Alternatively, any

bond should not exceed $100,000—the maximum relevant fine.  Mass. Gen. Laws ch. 23N, § 21.

## CONCLUSION

For the reasons set forth above, the Court should grant Robinhood's motion for a

preliminary injunction.

DATED:  September 18, 2025

Respectfully submitted,

By:   _/s/ Nicholas J. Schneider_

**ECKERT SEAMANS CHERIN &
MELLOTT, LLC**
Craig Waksler (BBO No. 566087)
cwaksler@eckertseamans.com
Nicholas J. Schneider (BBO No. 688498)
nschneider@eckertseamans.com

2 International Place #1600
Boston, Massachusetts 02110
Telephone:  (617) 342-6800
Facsimile:  (617) 342-6899

**CRAVATH, SWAINE & MOORE LLP**
Kevin J. Orsini (*pro hac vice*)
korsini@cravath.com
Antony L. Ryan (BBO No. 629971)
aryan@cravath.com
Brittany L. Sukiennik (*pro hac vice*)
bsukiennik@cravath.com

375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

***Counsel for Plaintiff
Robinhood Derivatives, LLC***

**CERTIFICATE OF SERVICE**

      I hereby certify that, on September 18, 2025, I electronically filed the foregoing Memorandum of Points and Authorities in Support of Plaintiff Robinhood's Motion for a Preliminary Injunction, together with declarations in support thereof and a proposed form of order, with the Clerk of the Court by using the Court's CM/ECF system, and accordingly served the parties who receive notice of the filing via the Court's CM/ECF system.

*/s/ Nicholas J. Schneider*

Nicholas J. Schneider