**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

ROBINHOOD DERIVATIVES, LLC,

          Plaintiff,

vs.

Civil Action No.:  1:25-CV-12578

ANDREA JOY CAMPBELL, et al.,

          Defendants.

---

**BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS, CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION, ARIZONA INDIAN GAMING ASSOCIATION, OKLAHOMA INDIAN GAMING ASSOCIATION, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, WASHINGTON INDIAN GAMING ASSOCIATION, SAN MANUEL GAMING AND HOSPITALITY AUTHORITY, AND 17 FEDERALLY RECOGNIZED INDIAN TRIBES AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS**

The Indian Gaming Association ("IGA"), National Congress of American Indians ("NCAI"), California Nations Indian Gaming Association ("CNIGA"), Arizona Indian Gaming Association ("AIGA"), Oklahoma Indian Gaming Association ("OIGA"), United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF"), Washington Indian Gaming Association ("WIGA"), San Manuel Gaming and Hospitality Authority ("SMGHA"), and 17 federally recognized Indian Tribes ("Amici Tribes")[1] (collectively, "Tribal Amici") respectfully

---

[1] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Elk Valley Rancheria; Enterprise Rancheria of Maidu Indians of California; Karuk Tribe; Kickapoo Traditional Tribe of Texas; Lytton Rancheria of California; Mashantucket Pequot Tribal Nation; Mooretown Rancheria of Maidu Indians of California; Otoe-Missouria Tribe; Picayune Rancheria of Chukchansi Indians; Pueblo of Sandia; Quechan Tribe of the Fort Yuma Reservation; Rincon Band of Luiseño Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract); and Yuhaaviatam of San Manuel Nation.

submit this brief in support of the Defendants' combined motion to dismiss and response to Robinhood Derivatives, LLC's ("Robinhood") motion for preliminary injunction.

## STATEMENT OF INTEREST

As described more fully in their Motion for Leave to File Amicus Brief, the Tribal Amici all have a shared, strong interest in this case because of its potential to have a significant impact on their or their member tribes' sovereign rights regarding gaming on Indian lands, as well as Indian gaming and tribal governmental revenue as a whole. Such revenue is vital and provides funding for essential government services, tribal programs, and economic development needed to reach the goals of self-governance and self-sufficiency.

## ARGUMENT

Indian tribes are sovereign nations with primary jurisdiction over their lands and the activities occurring on their lands. In accordance with this principle, both the United States Supreme Court and Congress have recognized tribes' inherent and exclusive sovereign right to conduct and regulate gaming on their Indian lands. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987); 25 U.S.C. § 2701(5). The Indian Gaming Regulatory Act ("IGRA") was enacted to provide a comprehensive federal regulatory framework for tribal gaming, including a mechanism for tribes and states to negotiate compacts governing Class III gaming, such as sports betting, subject to federal approval. *See* 25 U.S.C. §§ 2702, 2703(8), 2710(d)(3).

IGRA is intended to balance state, federal, and tribal interests. *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022). Some states have negotiated compacts wherein tribes are the exclusive operators of certain types of gaming within the state. *E.g.*, *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 718 (9th Cir.

2003).  This delicate balance of federal, tribal, and state interests has allowed tribes to generate substantial gaming revenue, which directly funds important tribal government services that benefit tribal citizens.

Robinhood Derivatives, LLC ("Robinhood") unlawfully and unfairly entered into the gaming market, which adversely impacts tribal gaming revenue and infringes upon the benefit of tribes' bargained-for compacts.  Additionally, by offering its so-called sports event contracts under the guise of commodity trading pursuant to the Commodity Exchange Act ("CEA"), Robinhood impedes tribes' inherent sovereign right to regulate gaming activity on Indian lands. Contrary to Robinhood's arguments: (1) the CEA does not exclusively govern its gaming-related sports event contracts; (2) such contracts are expressly prohibited by the CEA and Commodity Futures Trading Commission's ("CFTC") own regulations; (3) the CEA does not impliedly repeal IGRA; and (4) federal, state, and tribal gaming laws (including IGRA), therefore, apply to and govern its sports wagering activity.

Because Robinhood has failed to establish a likelihood of success on the merits, this Court should deny its motion for preliminary injunction.  In addition, this Court should grant the Defendants' motion to dismiss.

I.    **IGRA Governs Robinhood's Sports Betting Conduct on Indian Lands**

A.    **The CEA does not exclusively govern gaming-related sports event contracts**

Congress has been regulating commodity futures for more than a century, historically focusing on agricultural commodities.  *See Merrill Lynch v. Curran*, 456 U.S. 353, 357–63 (1982).  However, in 2010, Congress amended the CEA, in part, to allow for "event contracts" through the "Special Rule."  *See* 7 U.S.C. § 7a-2(c)(5)(C).  Recognizing the slippery slope of event contracts, Congress specifically authorized the CFTC to prohibit certain types of event

contracts, including those that involve gaming and other activity that is unlawful under federal or state law.  *Id.*

Shortly after Congress enacted the Special Rule, the CFTC adopted implementing regulations, whereby it exercised such discretion and explicitly prohibited the listing and trading of any event contract that "involves, relates to, or references … gaming, or an activity that is unlawful under any State or Federal law."  17 C.F.R. § 40.11(a)(1); *see also* 76 Fed. Reg. 44,776 (July 27, 2011).  Thus, in promulgating § 40.11(a)(1), the CFTC made the categorical determination that event contracts involving these specific activities are contrary to the public interest.[2]

Robinhood's sports betting operation rests entirely on an assumption that Kalshi, upon whose exchange Robinhood "facilitates" sports event contracts, has the preemptive authority to self-certify that its gaming activities do not violate the CEA, CFTC regulations, IGRA, or other federal statutes.  But it is inconceivable that Congress would have granted a private, for-profit entity the authority to conduct nationwide sports betting—including on Indian lands—without explicitly stating as much, especially in the face of comprehensive statutes and regulations governing gaming on Indian lands.  It is axiomatic that "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not,

---

[2] When announcing its rule, the CFTC clarified:

> [I]ts prohibition of…"gaming" contracts is consistent with Congress's intent [for the CEA's Special Rule] to "prevent gambling through the futures markets" and to "protect the public interest from gaming and other events contracts."

76 Fed. Reg. at 44,786 (citations omitted).

one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, <u>531 U.S. 457, 468</u> (2001).

Ignoring this history and longstanding principles of federal statutory interpretation, Robinhood now presents an alternate reality—one in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination of commodity pricing information, *see* <u>7 U.S.C. § 5(a)–(b)—</u>exclusively governs nationwide sports betting, including that which occurs on Indian lands, thereby repealing the comprehensive regulatory scheme set forth in IGRA. Clearly, this cannot be the case. Any preemptive effect that the CEA has only applies to lawful transactions that fall under the CFTC's exclusive jurisdiction. *See* <u>7 U.S.C. § 2(a)(1)(A)</u>. Robinhood's sports event contracts are neither.

1.  *The CEA does not give CFTC exclusive jurisdiction over gaming-related sports event contracts.*

Robinhood rests its case on its argument that the CEA grants "exclusive jurisdiction" to the CFTC "with respect to accounts, agreements, … and transactions involving swaps or contracts of sale of a commodity for future delivery …," *id.*, and therefore preempts state law and, by effect, repeals the applicability of IGRA. However, as will be discussed below, the gaming-related sports events contracts at issue here do not qualify as "swaps" and as a result, the CEA does not grant the CFTC exclusive jurisdiction over the contracts. Moreover, this exclusive jurisdiction is not universal; this same provision also provides a savings clause, which states, "[e] xcept as hereinabove provided, nothing contained in this section shall … supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission *or other regulatory authorities under the laws of the United States* or of any State …." *Id.* (emphasis added).

The CEA does not supersede IGRA or limit the jurisdiction of Tribes or the NIGC on Indian lands. Rather, the CEA's savings clause expressly reserves the authority of the NIGC and Tribal gaming authorities over gaming on Indian lands, in accordance with IGRA.

### 2. *The CFTC expressly prohibits Robinhood's sports event contracts*

Robinhood's sports event contracts are categorically prohibited by the CFTC as contrary to the public interest. *See* 17 C.F.R. § 40.11(a)(1). Robinhood is not authorized to offer such contracts under the CEA and its sports event contracts are therefore invalid and fall beyond the scope of the CFTC's "exclusive" jurisdiction.

The Special Rule grants the CFTC discretion to determine whether event contracts are "contrary to the public interest" if they involve gaming or unlawful activity under federal or state law. 7 U.S.C. § 7a-2(c)(5)(C)(i). When the CFTC makes such a determination, the CEA expressly prohibits those contracts. *Id.* § 7a-2(c)(5)(C)(ii). Here, the CFTC made such a determination when it promulgated 17 C.F.R. § 40.11(a)(1), wherein it categorically prohibited event contracts that "involve[], relate[] to, or reference[] … gaming, or an activity that is unlawful under any State or Federal law."[3]

The CFTC acted consistently with Congress's intent that the Special Rule prevent the usage of event contracts "to enable gambling," particularly sports betting. In fact, as Senator Lincoln—one of the principal architects of the Special Rule—explained:

---

[3] Robinhood assumes that the CFTC regulations entail a two-step process, whereby the event contract must first involve one of the prohibited activities under § 40.11(a)(1) and then the CFTC must separately conduct a 90-day review under § 40.11(c) to determine whether the contract is contrary to the public interest. *See* ECF No. 11 at 5. Not so. Instead, § 40.11(a)(1) imposes a categorical prohibition on event contracts involving gaming or unlawful activity. There is no two-step review process needed because the CFTC has *already* determined that such event contracts are contrary to the public interest.

> [It] is our intent … [that the Special Rule] prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts."  It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament.  These types of contracts would not serve any real commercial purpose.  Rather, they would be used solely for gambling.

156 Cong. Rec. S5906–7 (daily ed. July 15, 2010).[4]

Robinhood's sports event contracts involve both gaming and unlawful activity under state and federal law.  As such, they expressly violate 17 C.F.R. § 40.11(a)(1) and fall outside the scope of the CFTC's exclusive jurisdiction.

Because Robinhood's sports event contracts constitute sports betting, they necessarily involve gaming in violation of § 40.11(a)(1).  *See* Br. of Appellee at 17, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024), Doc. No. 2085055 ("An event contract … involves 'gaming' if it is contingent on a game or a game-related event—like the Kentucky Derby, *Super Bowl, or Masters golf tournament*, all of which were mentioned in the provision's only legislative history." (emphasis added)).  For the same reason, Robinhood's sports event contracts also violate various federal and state laws (as evidenced by the impetus for this litigation).  Robinhood allows users as young as 18 years old to purchase its sports event contracts anywhere nationwide, including on Indian lands.  The purchase and sale of these sports event contracts amount to speculative sports wagers, which constitutes gaming activity.  Robinhood's sports

---

[4] In an amicus brief filed in the Third Circuit, Senator Lincoln effectively re-affirmed this position, stating: "Congress intended for the CFTC to use the special rule to guard against gambling on the exchanges.  *And it contemplated that sports contracts would fall within this regulatory sweep.*"  Br. of Amici Curiae Former Members of Cong. in Supp. of Pl.-Appellee at 29, *KalshiEX, LLC v. Flaherty*, No. 25-1922 (3d Cir. July 31, 2025), ECF No. 66 (emphasis added).

event contracts do not comply with the requirements for gaming on Indian lands under IGRA. *See* 25 U.S.C. § 2710(d)(1). Robinhood's sports event contracts therefore involve unlawful activity under federal law.[5]

For these reasons, Robinhood's sports event contracts are not lawful transactions under the exclusive jurisdiction of the CFTC. Therefore, the CEA does not preempt or otherwise conflict with IGRA, and IGRA governs all sports event contracts offered on Indian lands.

> 3. *Robinhood's sports event contracts do not qualify as "swaps" or swaps based on "excluded commodities"*

Robinhood's sports event contracts do not qualify as "swaps" or swaps based on "excluded commodities" and, therefore, are not subject to the CFTC's exclusive jurisdiction. Robinhood presumes to offer its sports event contracts as "swaps" that are based on "excluded commodities." Under the CEA, a "swap" is defined in relevant part as:

> [A]ny agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

---

[5] In addition to IGRA, Robinhood's sports event contracts also violate other federal laws, including the Wire Act, 18 U.S.C. § 1084, and UIGEA, 31 U.S.C. § 5361. In denying Kalshi's motion for preliminary injunction, the Maryland District Court ruled that Kalshi's proposed interpretation of the CEA "would necessarily entail at least a partial implied repeal of the IGRA and the Wire Act." *See Martin*, 2025 WL 2194908, at *10.

Furthermore, Kalshi's self-certifications are themselves violations of the CEA. Specifically, Kalshi's self-certifications are "written certification[s] that the new contract … complies with [the CEA] (including regulations under [the CEA])." 7 U.S.C. § 7a-2(c)(1). Because the sports event contracts do not comply with the CEA or the CFTC's regulations—because they involve gaming—Kalshi's self-certifications (upon which Robinhood relies to "facilitate" sports event contracts) attesting otherwise are incorrect and therefore invalid.

7 U.S.C. § 1a(47)(A)(ii). Similarly, an "excluded commodity" means, among other things, "an occurrence, extent of an occurrence, or contingency … that is—(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv).

Robinhood's sports event contracts do not meet these definitions at least because they are not dependent on the *occurrence* or *nonoccurrence* of a sports event—i.e., whether the sports event occurs[6]—but rather on the *outcome* of the sports event—i.e., which team wins.[7] In fact, the U.S. District Court of the District of Nevada recently held that similar sports event contracts offered by Crypto.com were not "swaps" for, partially, this very reason. *See* Order, *North American Derivatives Exchange, LLC v. Dreitzer*, No. 2:25-cv-01541 (Oct. 14, 2025) (distinguishing between an "occurrence, nonoccurrence, or the extent of an occurrence" and "outcome," explaining that "Crypto's live presentation industry event contracts are not swaps because, as Crypto self-certified to the CFTC, these contracts turn on the outcome of the live event, not on the 'occurrence, nonoccurrence, or the extent of the occurrence' of a live event").

Further, although the parties to such contracts presumably have no direct control over which team wins, the contracts fail the second requirement because any "financial, commercial, or economic consequence" that may potentially be associated with Robinhood's sports event

---

[6] An example of what could arguably be a valid "sports event contract" would be: If bad weather is threatening to cause the cancellation of a football game, the owner of the stadium could purchase an event contract that the team will not play their game. This would allow the stadium owner to hedge against the loss of revenue in the event the football game does not occur. This type of contract is not dependent on the *outcome* of the game, but rather on the *occurrence* or *nonoccurrence* of the game.

[7] Ostensibly, Robinhood presumes that the act of a particular team winning a sports game is the "event" underlying its sports event contracts—not so. The "events" at the heart of *valid* sports event contracts are the sports games themselves.

contracts are related to the *outcome* of the games, not the *occurrence* or *nonoccurrence* of the games.[8]  Robinhood's sports event contracts are not hedging opportunities for interested parties to supplement the risk of a cancelled sporting event; instead, they are merely speculative wagers on the outcome of that sporting event or parts thereof.  They are, therefore, not dependent upon, or otherwise related to, any potential "financial, commercial, or economic consequence."

Moreover, the other provisions within the definitions of "swap" and "excluded commodity" provide further insight into Congress's intention when adding the terms to the CEA. *See* 7 U.S.C. §§ 1a(19)(i)–(iii), 1a(47)(A)(i), (iii)–(vi).  Specifically, under the canon of *noscitur a sociis*, the potential "financial, economic, or commercial consequence[s]" required under the definition of "swap" or "excluded commodity" must relate to rates, currencies, commodities, securities, instruments of indebtedness, indices, and other such quantitative measures. *Id.*  The outcome of a sporting event is not so limited.

> 4.  *The self-certification provisions of the CEA and CFTC regulations are invalid, and therefore Robinhood's sports event contracts offered pursuant thereto are invalid*

The CEA's self-certification provisions are invalid, rendering both the CFTC's implementing regulations allowing for self-certification and the contracts issued pursuant to those regulations invalid.  The statutory and regulatory framework governing new event contracts delegates sweeping authority to private entities to implement binding regulatory decisions without meaningful federal oversight.  This violates the private nondelegation doctrine,

---

[8] Robinhood and others do not limit their sports event contracts to simply who wins a particular sporting event, they also offer what are effectively "prop bets."  *See, e.g.*, Daniel O'Boyle, *Off And Running: Kalshi Lists Its First Player Prop Bets*, INGAME (Sept. 4, 2025), ***********.ingame.com/kalshi-lists-player-prop-bets/.  Even if this Court believes that, for example, Jared Goff completing a touchdown constitutes an "occurrence," there is no "financial, commercial, or economic consequence" associated with that particular touchdown.

which guards precisely the type of unchecked, privately exercised regulatory power that Robinhood relies on to list and trade its sports event contracts on Kalshi's exchange.

The CEA establishes a self-certification process that permits registered entities to introduce new financial instruments, including event contracts, without prior regulatory approval. This scheme permits private entities, like Kalshi, to exercise extraordinary regulatory authority—approving, implementing, and launching nationwide sports betting—without any meaningful federal oversight.

While the Supreme Court routinely upholds congressional delegations of power to federal agencies, it pays particular attention when those delegations are to private entities. *See, e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). Recently, in *FCC v. Consumers' Research*, 606 U.S. ___, 145 S. Ct. 2482 (2025), the Supreme Court reinforced its nondelegation precedent, finding that the permissibility of a private delegation depends upon whether the agency retains oversight and ultimate decision-making authority over the private entity's actions. In that case, the Supreme Court upheld the delegation to a private entity, determining that it played merely "an advisory role" and the final decision-making authority rested with the agency. *Id.* at 2508.

Here, the self-certification provisions empower private, for-profit entities (like Kalshi) to define, structure, and launch contracts, which affects the national economy and infringes upon tribal sovereignty.[9] Moreover, the self-certification provisions provide no mechanism for

---

[9] Relatedly, Robinhood's arguments also raise serious issues under the Major Questions Doctrine. *See, e.g.*, *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)) (explaining that Congress would not delegate powers of vast economic and political significance in a cryptic fashion); *Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024) (noting a two-prong framework to analyze the major questions doctrine). Robinhood's interpretation of the CEA would represent unheralded power for the CFTC and private entities to authorize gaming on Indian lands under a long-extant

advance public comment, requirement of CFTC findings or review, mandatory agency oversight, or standards by which the CFTC may implement its discretion whether to stay a self-certification. Given self-certified contracts may be listed for trading with virtually no review period, *see* 17 C.F.R. § 40.2(a), and neither Kalshi nor Robinhood is subject to any meaningful government supervision, these provisions are invalid and the CFTC abdicates its final decision-making authority.[10] This point is emphasized by the fact that Robinhood is not self-certifying its own sports event contracts, but rather relying on Kalshi's certifications as a DCM. Robinhood's gaming activity is therefore even further removed from government oversight.[11]

---

statute. This interpretation would also have both vast economic and political significance, given Congress's stated goal of facilitating tribal self-determination through regulated gaming on Indian lands *and* the fact that the tribal gaming industry generates more than $43 billion each year. *See* 25 U.S.C. § 2702(1); Press Release, NIGC Announces Record $43.9 Billion in FY2024 Gross Gaming Revenues (July 31, 2025), available at ***********.nigc.gov/nigc-announces-record-43-9-billion-in-fy-2024-gross-gaming-revenues/#:~:text=MILWAUKEE%2C%20WI.%2C%20July%2031,over%20the%20previous%20fiscal%20year.

[10] In her recent Farewell Address, CFTC Commissioner Kristin N. Johnson warned in her remarks that "we have too few guardrails and too little visibility into the prediction market landscape." Farewell Address of Commissioner Kristin N. Johnson (Sept. 3, 2025), available at ***********.cftc.gov/PressRoom/SpeechesTestimony/opajohnson25?utm_source=substack&utm_medium=email.

[11] In her Farewell remarks, Commissioner Johnson also warned about "rent or buy" licensing schemes that Robinhood and others have implemented:

> Finally, the 'rent or buy' my license in derivatives markets is booming as prediction markets promise to eclipse crypto markets in volumes of retail customers' cash captured. The Commission has recently witnessed a number of newly created and legacy firms seeking licenses to offer event contracts. In a number of instances, these businesses approach the Commission seeking licenses to offer traditional products, only to quickly shift once a license is in hand and seek to self-certify prediction market contracts. In other contexts, firms that have received a license quickly auction their newly minted license to others.

Because the self-certification provisions improperly delegate Kalshi the authority to perform a core governmental function without any clear guiding principles, standards, or limitations, Robinhood's sports event contracts offered pursuant thereto are invalid.

### B.    The CEA does not impliedly repeal IGRA

By arguing that the CFTC has exclusive jurisdiction over sports betting (including that which occurs on Indian lands), Robinhood effectively argues that the CEA impliedly repealed IGRA.  In a similar case before the Maryland District Court, Kalshi attempted to make this argument, stating that even if "IGRA's definition of 'gaming'" encompassed sports event contracts, "the CEA's exclusive jurisdiction provision would displace any attempt by tribes to regulate those contracts."  Pl.'s Reply in Supp. of Prelim. Inj. at 7, *KalshiEX LLC v. Martin*, No. 1:25-cv-01283-ABA (D. Md. May 19, 2025), ECF No. 29.  Ultimately, the court disagreed with Kalshi and denied its motion for preliminary injunction, which is now on appeal before the Fourth Circuit Court of Appeals.  *KalshiEX, LLC v. Martin*, No. 1:25-cv-01283-ABA, 2025 WL 2194908 (D. Md. Aug. 1, 2025).

Congress did not express the requisite intent for implied repeal.  In other words, if the Court accepts Robinhood's position that its sports event contracts—which constitute sports betting and Class III gaming under IGRA—are subject to the CFTC's exclusive jurisdiction, then the Court must also accept the underlying assumption that Congress intended to upend the entire federal framework for Indian gaming and repeal key provisions of IGRA.  *See, e.g.*, 25 U.S.C. § 2710(d)(1).  Additionally, IGRA's criminal provisions provide the United States Department of Justice ("DOJ") with "exclusive jurisdiction" over criminal prosecutions of applicable gambling laws in Indian country, unless a tribe agrees to transfer jurisdiction to the state.  18 U.S.C.

§ 1166(d).  Under Robinhood's theory, the CEA likewise impliedly repealed DOJ's jurisdiction over such criminal prosecutions.

If taken as true, Robinhood's argument—that the CTFC has exclusive jurisdiction over its sports betting, and that state or tribal gaming laws do not govern its activity—necessarily presumes that the CEA repeals IGRA.

The Supreme Court applies the "strong presumption that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute."  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citing *United States v. Fausto*, 584 U.S. 439, 452, 453 (1988)).  Congress's intent to repeal must be "clear and manifest."  *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936).  "[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974).  "[T]he only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."  *Id.* at 550 (citing *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 456–57 (1945)).  Further, "the specific governs the general," particularly where "a general permission or prohibition is contradicted by a specific prohibition or permission."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Finally, the Indian Canons of Construction[12] require courts to resolve statutory ambiguities in favor of tribes.  *Bryan v. Itasca County*, 426 U.S. 373, 392 (1976).

---

[12] As the Justice Blackmun has explained:

> Because Congress' authority to legislate unilaterally on behalf of the
> Indians derives from the presumption that Congress will act with
> benevolence, courts "have developed canons of construction that

In *Swinomish Indian Tribal Community v. BNSF Railway*, 951 F.3d 1142 (9th Cir. 2020), for example, the Court examined whether a broadly applicable statute regulating railways (the Interstate Commerce Commission Termination Act ("ICCTA")) repealed portions of an earlier statute that was specific to Indian tribes (the Indian Right of Way Act ("IRWA")).  There, a railroad operator was violating an easement issued under IRWA.  The railroad operator argued that the ICCTA repealed certain provisions of IRWA.  The Court noted that "[i]n the context of a statute that touches on federal Indian law, such as [IRWA], there is an additional canon of construction: [S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Id*. at 1156 (citation omitted).

The Court applied that canon and held that the ICCTA did not repeal the earlier IRWA on several grounds.  First, it found that IRWA expressly applied to railroads, and that Congress did not mention or reference rights-of-way on Indian lands when it enacted the ICCTA.  Second, it found that IRWA applied to a very specific circumstance—rights-of-way on Indian lands— whereas the ICCTA applied to railroad regulations broadly.  In the absence of clear intention by Congress, the Court held that "a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Id*. at 1160 (quoting *Mancari*, 417 U.S. at 550–51).

Thus, there is  a clear standard by which courts should evaluate whether a broad statute repeals or amends an earlier Indian statute by implication: they must construe ambiguity liberally

---

treaties and other federal action should when possible be read as protecting Indian rights and in a manner favorable to Indians."

*Hagen v. Utah*, 510 U.S. 399, 423 n.1 (1994) (Blackmun, J., dissenting) (quoting Felix Cohen, Handbook of Federal Indian Law 221 (1982 ed.)).

in favor of the Indians, and should not infer congressional intent to repeal an earlier, more specific statute governing activities on Indian lands without a clear statement from Congress.

Applying this principle to the CEA, there is no language suggesting that Congress intended to repeal IGRA's regulation of sports betting on Indian lands, let alone "clear and manifest" intent to repeal these key provisions of IGRA.  The CEA does not in any way mention gaming on Indian lands.  Rather, by the plain language of the CEA, it applies to the commodities trading market (focusing on the risk, discovery, and dissemination of commodity pricing information), *not* Indian gaming.  *See* 7 U.S.C. § 5(a)–(b).  Indeed, Congress went so far as to enact the Special Rule, which shows a clear Congressional intent to disallow any "gaming" activity on DCMs at all.  That the two only overlap here due to Robinhood's backdoor attempt to evade comprehensive gaming regulations only emphasizes this point.[13]

Moreover, the plain language of the CEA does not conflict with IGRA, except to the degree that Robinhood and others have unlawfully attempted to use it as a means of evading comprehensive gaming regulations.  Instead, compliance with both statutory regimes is entirely possible, and nothing within IGRA's requirements to offer Class III gaming on Indian lands obstructs or invalidates the provisions of the CEA.

At most, the definition of "swaps" upon which Robinhood relies is ambiguous as to whether it encompasses sports event contracts of the kind offered by Robinhood—i.e., sports

---

[13] Further, under Robinhood's theory, simply calling a sports wager a "swap"—regardless of whether it is, actually, a valid "swap"—and listing it for trade on a DCM automatically grants the CFTC exclusive jurisdiction, to the detriment of all other regulatory authorities.  What, then, would limit Robinhood or any other CFTC-registered entity from simply calling "contracts" on other traditional forms of gaming—such as roulette and lotteries—"swaps" and subjecting them to the exclusive jurisdiction of the CFTC?  According to Robinhood, CFTC inaction—despite the CFTC categorically banning "gaming" contracts via 17 C.F.R. § 40.11(a)—is all that is required to bless contracts blatantly designed for no other purpose than to enable gambling.

betting.  Ambiguity is not "clear and manifest" intent, and an ambiguous statutory provision cannot overcome the strong presumption against repeals by implication.  It also implicates the Indian canon of statutory construction that requires the ambiguous definition of "swaps" to be interpreted in favor of tribes to maintain IGRA and all its provisions.[14]  In the absence of explicit congressional intent, this Court should uphold IGRA's very clear, specific, and pervasive regulatory regime for gaming on Indian lands.

Further, the legislative history of the CEA reveals Congress's concern about event contracts facilitating sports betting.  As mentioned above, the Special Rule's principal drafter explained Congress intended to prevent gambling via event contracts.  156 Cong. Rec. S5906–7.  Rather than demonstrate a "clear and manifest" intent to repeal IGRA, this legislative history shows the exact opposite: Congress designed the Special Rule to *prevent* sports betting through supposed event contracts.

As to IGRA's criminal provisions, Congress likewise did not express a clear and manifest intent to repeal DOJ's authority.  In fact, Congress expressly disclaimed such a repeal in the text of the CEA.  7 U.S.C. § 16(e)(A) ("Nothing in this chapter shall supersede or preempt … criminal prosecution under any Federal criminal statute.").  It is impossible for the CFTC to exercise exclusive jurisdiction over sports event contracts while the DOJ exercises its exclusive jurisdiction over criminal prosecutions of violations of state gambling laws made applicable by IGRA to Indian lands.

---

[14] To the extent IGRA grants the NIGC regulatory authority over gaming on Indian lands, Congress likewise did not express its "clear and manifest" intent to repeal that authority.  In fact, as noted above, Congress expressly reserved it.  *See* 7 U.S.C. § 2(a)(1)(A).

The party arguing that two statues are irreconcilable bears the "heavy burden" of proving congressional intent to repeal.  *See Epic Sys. Corp.*, 584 U.S. at 510.  Robinhood cannot meet that heavy burden because there is a reasonable interpretation of the CEA that gives full effect to both statutes: sports event contracts are not subject to the CFTC's exclusive jurisdiction. Because these statutes are capable of coexistence, the court must read them in a way that gives effect to both.

### C.    Robinhood's sports event contracts constitute "Class III Gaming" under IGRA

IGRA advances the longstanding federal policy of promoting and sustaining tribal self-sufficiency.  *See* 25 U.S.C. § 2701(4).  In this regard, IGRA has been incredibly successful.[15] The revenue generated by tribal gaming supports thousands of jobs in hundreds of communities, and provides critical funding to state and local governments through revenue-sharing agreements, tax revenue, and economic stimulus.

IGRA establishes a three-tier regulatory structure for Class III gaming on Indian lands, providing that such gaming is only lawful if it is: (1) authorized by tribal ordinance or resolution; (2) located in a state that permits such gaming; and (3) conducted in accordance with a tribal-state gaming compact.  25 U.S.C. § 2710(d)(1).  IGRA also established the National Indian Gaming Commission ("NIGC") to oversee much of this regulatory regime.  25 U.S.C. § 2704. This regulatory regime is comprehensive, and occupies the entire field of gaming on Indian lands.  *See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians*, 63 F.3d 1030, 1033 (11th Cir. 1995) (IGRA was "intended to expressly preempt the field in the governance of gaming activities

---

[15] *See, e.g.*, Nat'l Indian Gaming Comm'n, FY 2023 Gross Gaming Revenue Report 4–5 (July 2024), available at **********nigc.gov/wp-content/uploads/2025/02/GGR23_Final.pdf.

on Indian lands" (quoting S. Rep. No. 100-446, at 6 (1988))); *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 544 (8th Cir. 1996).

IGRA's implementing regulations define "Class III Gaming" to expressly include "sports betting."[16] 25 C.F.R. § 502.4(c).  While the term "sports betting" is not defined therein, it is generally understood to mean:

> [T]he staking or risking by any person of something of value upon the outcome of … a sporting event … upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome.

31 U.S.C. § 5362(1)(A) (defining "bet or wager" under the Unlawful Internet Gambling Enforcement Act ("UIGEA")).[17]  This is precisely what Robinhood is offering: contracts that stake or risk something of value upon the outcome of a sporting event based on the understanding that the person will receive something of value based on that outcome. Robinhood does not deny this.  Instead, Robinhood ignores the fact that its sports event contracts are sports bets by another name, and maintains that the CFTC has exclusive jurisdiction over its sports event contracts as "swaps" or "excluded commodities" listed for trade on Kalshi's

---

[16] *See* Letter from Kevin Washburn, General Counsel, NIGC, to Joseph M. Speck, Nic-A-Bob Prods., re: WIN Sports Betting Game (Mar. 13, 2001), available at ***********.nigc.gov/wp-content/uploads/2025/03/WIN-Sports-Betting-Game-Class-III.pdf  ("Because sports betting does not fit into any of the specifically defined categories of Class II gaming set forth above, it is a Class III form of gaming.").

[17] Robinhood may argue, as it recently did, that the UIGEA's definition of "bet or wager" expressly excludes transactions on DCMs.  *See* Plaintiff Robinhood's [Proposed] Response to Brief of Amici Curiae, *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-01541, ECF No. 49 at *4–5 (Oct. 14, 2025).  But while that may generally be true, *see* 31 U.S.C. § 5362(1)(E), that exclusion is specific to the applicability of the UIGEA and does not change the core understanding of what "sports betting" means.  Moreover, IGRA contains no similar exclusion for Class III gaming, which expressly includes "sports betting."  25 C.F.R. § 502.4.

designated contract market ("DCM").  ECF No. 11 at 12, 16–17.  As previously discussed, this argument fails.

Regardless of Robinhood's preemption arguments, its sports event contracts clearly constitute Class III gaming.  Robinhood has not obtained a license to offer these bets pursuant to tribal ordinance or resolution; nor has Robinhood been authorized to conduct its sports betting pursuant to any tribal-state compact.  Across the board, Robinhood does not geographically restrict its sports event contracts and, therefore, offers such sports betting on Indian lands[18] without complying with IGRA.  Thus, each bet Robinhood facilitates on Indian lands violates IGRA, undermines tribal sovereignty, and reduces tribal gaming revenue and government funding.

---

[18] Robinhood may argue, again as it recently did, that its activity does not occur "on Indian lands" because its sports event contracts are only accessible on the internet.  *See* Plaintiff Robinhood's [Proposed] Response to Brief of Amici Curiae, *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-01541, ECF No. 49 at 2–3 (Oct. 14, 2025).  However, when an individual that is physically located on Indian lands places or initiates a bet or wager, even if that bet or wager is placed via the internet, that bet or wager takes place on Indian lands.  *See e.g.*, 31 U.S.C. § 5362(10)(A) ("The term 'unlawful internet gambling' means to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made."); *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 967 (9th Cir. 2018) (rejecting argument that "patron's action in selecting a wager … is [a] pre-gaming communication" and not a "gaming activity" under UIGEA because "[t]hat conduct is … subject to the provisions of the UIGEA as a 'bet or wager' that is initiated through the internet." (quoting 31 U.S.C. § 5362(1))).  Additionally, the IGRA implementing regulation at 25 C.F.R. § 293.26(c) requires consent of a Tribe to allow players to place bets from that Tribe's Indian lands, even if those bets are accepted on a server physically located on another Tribe's lands.

By the same logic, offering and trading "contracts" to those physically located on Indian lands is activity that occurs "on Indian lands" for purposes of IGRA, just as offering and trading such contracts to those physically located in Massachusetts is activity that occurs in Massachusetts for purposes of Massachusetts gaming laws.

## II.    Ignoring the Applicability of IGRA Raises Serious Policy Concerns and Violates Federal Indian Policy

Robinhood's sports event contracts violate well-established federal Indian policy.  The Supreme Court has "consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory.'" *Cabazon*, 480 U.S. at 207 (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)).  Additionally, "the Constitution grants Congress broad general powers to legislate in respect to Indian tribes," and those powers are "constantly described as plenary and exclusive." *United States v. Lara*, 541 U.S. 193, 200 (2004).  "And yet [Indian tribes] remain 'separate sovereigns pre-existing the Constitution.'" *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)).  "A key goal of the Federal Government is to render tribes more self-sufficient, and better positioned to fund their own sovereign functions, rather than relying on federal funding." *Id.* at 810 (Sotomayor, J., concurring) (citing 25 U.S.C. § 2702(1)).

Congress has declared its commitment to supporting Tribal self-determination and self-governance, stating:

> The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy … [and] to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities.

25 U.S.C. § 5302(b).  The Executive Branch has consistently affirmed this policy.  *See e.g.*, Exec. Order No. 13175, § 2(c), 65 Fed. Reg. 67,249 (Nov. 6, 2000); Exec. Order No. 13647, § 1(a), 78 Fed. Reg. 39,539 (June 26, 2013).

In *Cabazon*, the Supreme Court recognized the importance of "the congressional goal of Indian self-government, including its overriding goal of encouraging tribal self-sufficiency and economic development[,]" and noted that federal agencies "ha[ve] sought to implement these policies by promoting tribal bingo enterprises." 480 U.S. at 216–17 (internal quotations omitted).  It also acknowledged that tribal casinos often provide "the sole source of revenues for the operation of the tribal governments and the provision of tribal services" and that, in some instances, tribal casinos "are also the major sources of employment on the reservations."  *Id.* at 218–19.  Following *Cabazon*, Congress declared in IGRA that "[t]he purpose of [IGRA] is … to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments …."  25 U.S.C. § 2702(1).

Robinhood tramples upon established federal Indian policy by usurping the rights of tribes to regulate gaming on Indian land and benefit from such gaming.  IGRA mandates that tribes "have the exclusive right to regulate gaming on Indian lands," and that sports betting is "lawful on Indian lands only if … conducted in conformance with a Tribal-State compact…."  25 U.S.C. §§ 2701(5), 2710(d)(1)(C); *see* 25 C.F.R. § 502.4(c).  Robinhood violates this exclusive right.  Robinhood's intrusion is particularly dangerous because it does not comply with any gaming regulations that protect consumers, ensure fairness, or mitigate negative gaming impacts.[19]  In fact, Robinhood's sports event contracts are wholly unregulated by any gaming

---

[19] This lack of responsible gaming measures and consumer protections, which are required by *legal* gaming operations, is dangerous and contrary to the public interest.  However, in a recent panel at the National Council of Legislators from Gaming States, Josh Sterling (a former CFTC employee and the lawyer representing Kalshi in concurrent litigation) dismissed such responsible gaming concerns, stating: "People are adults, and they're allowed to spend their money however they want it, and if they lose their shirt, that's on them."  Jessica Welman, *Kalshi's lawyer goes*

authority.  Robinhood not only violates IGRA, but strikes at the heart of tribal sovereignty and federal Indian policy by offering what is effectively unregulated nationwide online sports betting.  Robinhood's sports event contracts offered on Indian lands, therefore, diminish tribal bargaining power in compact negotiations and the value of the tribes' bargained-for benefits.

Finally, Robinhood is siphoning revenue from tribal governments in violation of federal Indian policy.  IGRA requires all revenues from tribal gaming be used for governmental or charitable purposes.  25 U.S.C. § 2710(b)(2)(B).  As Justice Sotomayor explained in *Bay Mills*: "[T]ribal gaming operations cannot be understood as mere profit-making ventures that are wholly separate from the Tribes' core governmental functions."  572 U.S. at 810 (Sotomayor, J., concurring).  Many tribes have come to rely on gaming revenue because destructive former federal policies "left a devastating legacy" on tribes that are "largely unable to obtain substantial revenue by taxing tribal members … [because] there is very little income, property, or sales [that tribal governments] could tax."  *Id.* at 812–13 (quoting Matthew L.M. Fletcher, *In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue*, 80 N.D. L. Rev. 759, 774 (2004)).  If Robinhood continues to offer illegal nationwide online sports betting, the impact on tribal governments will be devastating.

## CONCLUSION

For the foregoing reasons, the Tribal Amici respectfully request that the Court deny Robinhood's motion for preliminary injunction and grant the Defendants' motion to dismiss.

---

*hard at state-regulated gambling*, SBCAmericas, (July 11, 2025), available at ********sbcamericas.com/2025/07/11/kalshi-nclgs-sports-contract-debate/?amp.

Dated this 16th day of October, 2025.

/s/ Kathleen B. Carr_____
Kathleen B. Carr (BBO# 564138)
FENNEMORE CRAIG, P.C.
One Marina Park Drive, Suite 1410
Boston, MA 02210
Telephone: (617) 927 – 9925
kbcarr@fennemorelaw.com


/s/ Joseph H. Webster_____
Joseph H. Webster (*pro hac vice* to be filed)
Elizabeth Bower (*pro hac vice* to be filed)
Jens W. Camp (*pro hac vice* to be filed)
Hobbs, Straus, Dean & Walker LLP
1899 L Street NW, Ste. 1200
Washington, DC 20036
Telephone: (202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com
jcamp@hobbsstraus.com


/s/ Scott Crowell_____
Scott Crowell (*pro hac vice* to be filed)
Crowell Law Office
Tribal Advocacy Group PLLC
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Telephone: (425) 802-5369
scottcrowell@clotag.net

/s/ Bryan Newland_____
Bryan Newland (*pro hac vice* to be filed)
Powers, Pyles, Sutter & Verville PC
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
Telephone: (202) 349-4265
Bryan.Newland@Powerslaw.com

*Attorneys for Tribal Amici*

/s/ Michael Hoenig_____
Michael Hoenig (*pro hac vice* to be filed)
Yuhaaviatam of San Manuel Nation
422 1st Street SE
Washington, DC 20003
Telephone: (909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

*Attorney for Yuhaaviatam of San Manuel Nation*