## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ROBINHOOD DERIVATIVES, LLC

*Plaintiff,*

v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the
Commonwealth of Massachusetts, et al.,

*Defendants.*

Civil Action No. 1:25-cv-12578

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF ROBINHOOD'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION

## ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT.................................................................................1

FACTUAL BACKGROUND .................................................................................4

    A.    Event Contract Regulation by the CEA and CFTC .................................4

    B.    Futures Commission Merchant Regulation by the CEA and CFTC .......................7

    C.    Robinhood's Event Contracts ...................................................8

    D.    The Massachusetts Lawsuit Against Kalshi......................................8

ARGUMENT ....................................................................................9

I.    ROBINHOOD IS LIKELY TO SUCCEED ON THE MERITS.........................................9

    A.    The CEA Preempts Application of State Gaming Laws to Sports-Related Event Contract Trading on CFTC-Designated Exchanges. ...................................10

    B.    The CEA's Preemption of State Gaming Laws as Applied to Sports-Related Event Contracts Includes Those Opened on Robinhood's Platform....................................16

II.    ROBINHOOD WILL SUFFER IRREPARABLE HARM. .................................................18

III.    THE EQUITIES AND PUBLIC INTEREST TILT STRONGLY IN ROBINHOOD'S FAVOR. .................................................19

IV.    NO SECURITY—OR ONLY *DE MINIMIS* SECURITY—IS APPROPRIATE. .............20

CONCLUSION....................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alden v. Maine*,
  527 U.S. 706 (1999)...................................................................................19

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147 (7th
  Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66
  F.3d 867 (7th Cir. 1995) ....................................................................4, 5, 15

*Arizona v. United States*,
  567 U.S. 387 (2012).................................................................................15

*Ass'n of Am. Univs. v. Dep't of Energy*, No. 25-cv-10912-ADB, 2025 WL 1414135
  (D. Mass. May 15, 2025) ...........................................................................9

*Blue Lake Rancheria v. Kalshi Inc.*,
  No. 25-cv-06162-JSC, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025), *appeal filed*,
  No. 25-7504 (9th Cir. Nov. 25, 2025).......................................................2, 9

*BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*,
  904 F.3d 755 (9th Cir. 2018) ....................................................................11

*Commonwealth of Massachusetts v. KalshiEx LLC*,
  No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Sept. 12, 2025)................. passim

*Commonwealth of Puerto Rico v. Franklin Cal. Tax-Free Trust*,
  579 U.S. 115 (2016)...................................................................................2

*Crosby v. Nat. Foreign Trade Council*,
  530 U.S. 363 (2000)..............................................................................10, 16

*Fed. Trade Comm'n v. Ken Roberts Co.*,
  276 F.3d 583 (D.C. Cir. 2001) ...............................................................14, 15

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*,
  458 U.S. 141 (1982)..............................................................................10, 16

*Hofmayer v. Dean Witter & Co.*,
  459 F. Supp. 733 (N.D. Cal. 1978) .........................................................9, 14

*Hunter v. Fed. Energy Reg. Comm'n*,
  711 F.3d 155 (D.C. Cir. 2013)...................................................................9

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987)...................................................................................15

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*,
    925 F.2d 6 (1st Cir. 1991) ...........................................................................20

*K-Mart Corp. v. Oriental Plaza, Inc.*,
    875 F.2d 907 (1st Cir. 1989) .......................................................................18

*KalshiEx LLC v. Commodity Futures Trading Comm'n*,
    No. CV 23-3257, 2024 WL 4164694 (D.D.C. Sept. 12, 2024) ....................................4

*KalshiEx LLC v. Flaherty*,
    No. 25-cv-2152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025), *appeal filed*, No. 25-1922
    (3d Cir. May 8, 2025) .......................................................................... passim

*KalshiEx LLC v. Martin*,
    No. 25-cv-1283-ABA, 2025 WL 2194908 (D. Md. Aug. 1, 2025), *appeal filed*, No.
    25-1892 (4th Cir. Aug. 1, 2025) ...................................................................2

*KalshiEx, LLC v. Hendrick*,
    No. 25-00575, 2025 WL 1073495 (D. Nev. Apr. 9, 2025), *abrogated on other
    grounds by KalshiEx (D. Nev.)*, ECF No. 237 (D. Nev. Nov. 24, 2025), *appeal filed*,
    No. 25-cv-7516 (9th Cir. Nov. 25, 2025) ...................................................... passim

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)...................................................................................16

*Liu v. Noem*,
    780 F. Supp. 3d 386 (D.N.H. 2025)...............................................................19

*Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    605 F. Supp. 1105 (N.D. Ga. 1985) ..............................................................15

*Me. Forest Prods. Council v. Cormier*,
    586 F. Supp. 3d 22 (D. Me. 2022), *aff'd*, 51 F.4th 1 (1st Cir. 2022)..........................20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982).............................................................................16, 18

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)...................................................................................18

*Nw. Selecta, Inc. v. Sec'y of Dep't Agric. of Puerto Rico*,
    No. CV 22-1092 (RAM), 2022 WL 17985926 (D.P.R. Dec. 29, 2022).....................20

*Pineda v. Skinner Servs., Inc.*,
    22 F.4th 47 (1st Cir. 2021).........................................................................20

*Prestwick Capital Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*,
    727 F.3d 646 (7th Cir. 2013) .......................................................................18

iii

*Robinhood Derivatives, LLC v. Dreitzer*,
  No. 2:25-cv-01541 (D. Nev. filed Aug. 29, 2025), *appeal filed*, No. 25-cv-07831
  (9th Cir. Dec. 12, 2025) ...........................................................................................3

*Robinhood Derivatives, LLC v. Flaherty*,
  No. 1:25-cv-14723 (D.N.J. filed Aug. 29, 2025) .........................................................3

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  102 F.3d 12 (1st Cir. 1996) .................................................................................18, 19

*Slaney v. Int'l Amateur Athletic Fed'n*,
  244 F.3d 580 (7th Cir. 2001) .................................................................................11

*United States v. Wilkinson*,
  986 F.3d 740 (7th Cir. 2021) .................................................................................11

*Vivo Cap. Surplus Fund VIII, L.P. v. 1Globe Cap. LLC*,
  No. 25-10914-MJJ, 2025 WL 1796256 (D. Mass. June 30, 2025) ...............................9

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..............................................................................................9, 18

*Witzel v. Chartered Sys. Corp. of N.Y., Ltd.*,
  490 F. Supp. 343 (D. Minn. 1980) .........................................................................9, 14

**Statutes & Rules**

7 U.S.C. § 1a(19)(iv) ...........................................................................................12

7 U.S.C. § 1a(28) ...........................................................................................7, 18

7 U.S.C. § 1a(47) ...........................................................................................11

7 U.S.C. § 2(a)(1)(A) ........................................................................................ passim

7 U.S.C. § 7a-2(c) ...........................................................................2, 5, 6, 13, 16

7 U.S.C. § 8(b) ...................................................................................................5

Dodd-Frank Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 ............................... passim

Mass. Gen. Laws ch. 23N ................................................................................... passim

**Other Authorities**

17 C.F.R. pt. 38 ...................................................................................................5

17 C.F.R. § 1.10 ...................................................................................................7

17 C.F.R. § 3.10(c)....................................................................................7

17 C.F.R. § 17.00.......................................................................................7

17 C.F.R. § 38.151....................................................................................7

17 C.F.R. § 38.250....................................................................................7

17 C.F.R. § 38.3(a)....................................................................................5

17 C.F.R. § 40.11 ...............................................................................5, 6, 16

17 C.F.R. § 40.2(a)....................................................................................5

17 C.F.R. § 40.3(a)....................................................................................5

120 Cong. Rec. 30,464 (1974).............................................................4, 15

120 Cong. Rec. 34,736 (1974)...................................................................15

120 Cong. Rec. 34,997 (1974)...................................................................15

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010)...................................14

Brief for Appellant, *Robinhood v. Dreitzer*, No. 25-CV-07831 (9th Cir. Jan. 9, 2026) ...12

*Concept Release on the Appropriate Regulatory Treatment of Event Contracts*,
    73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008)........................................12

CFTC Brief, *KalshiEx LLC v. CFTC*, No. 24-5205, at 27, 2024 WL 4512583
    (D.C. Cir. Oct. 16, 2024) ....................................................................17

Hearings Before Comm. on Agriculture and Forestry, United States
    Senate, on S. 2485, etc., 93d Cong., 2d Sess. 685 (1974)............................4

H.R. Rep. No. 93-975 (1974)...............................................................15, 16

H.R. Rep. No. 93-1383 (1974)...................................................................14

Brief of Amici Curiae Seven Former Members of Congress in Support of Plaintiff
    Appellee, *KalshiEx LLC v. Flaherty*, No. 25-1922, ECF No. 66
    (3d Cir. July 31, 2025) ......................................................................14

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58
    Chi.-Kent L. Rev. 657, 687-88 (1982).....................................................15

S. Rep. No. 93-1131 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843...............14

U.S. Const. art. VI, cl. 2...........................................................................10

## PRELIMINARY STATEMENT

Robinhood Derivatives, LLC ("Robinhood") is a Commodity Futures Trading Commission ("CFTC")-registered futures commission merchant ("FCM") that offers approved users access to trade sports-related event contracts through the Robinhood platform. While Robinhood, as a registered FCM, facilitates the placement and liquidation of event contracts for its users, the contracts trade on exchanges operated by KalshiEx, LLC ("Kalshi") and ForecastEx, LLC ("ForecastEx"), which are registered with the CFTC as designated contract markets ("DCM").

On September 12, 2025, Massachusetts filed a lawsuit against Kalshi for allegedly "offering sports wagering without a license in violation of G.L. c. 23N, § 5 *et seq.*" *Commonwealth of Massachusetts v. KalshiEx LLC*, No. 2584CV02525, Dkt. 1 ¶ 1 (Mass. Super. Ct., Suffolk Cnty. Sept. 12, 2025) (hereinafter "*KalshiEx (Mass.)*"). That same day, Massachusetts filed an Emergency Motion for a Preliminary Injunction seeking to enjoin Kalshi from "engaging in any activity in connection with sports wagering in the Commonwealth of Massachusetts" "until further order of the Court." *Id.*, Dkt. 4, Ex. A at 1-2. Massachusetts specifically refers to Robinhood in its lawsuit against Kalshi. *Id.*, Dkt. 1 ¶¶ 129-130. On November 18, 2025, Kalshi moved to dismiss the action. *Id.*, Dkt. 40. On January 20, 2026, the Superior Court granted Massachusetts's motion for a preliminary injunction and denied Kalshi's motion to dismiss. *See id.*, Dkt. 47. The Court has not yet issued the preliminary injunction.

In addition to its enforcement action against Kalshi, Massachusetts has confirmed its position that offering sports-related event contracts trading is contrary to Massachusetts law. On November 13, 2025, the Massachusetts Gaming Commission (the "Commission") sent a letter (the "November 13 Letter") to its sports-wagering licensees stating that licensees are "prohibited from offering sports-related event contracts in Massachusetts." Declaration of Adam Hickerson in Support of Plaintiff Robinhood's Renewed Motion for a Preliminary Injunction ("Hickerson

Decl."), Ex. G.  The November 13 Letter underscores the risk of an enforcement action to Robinhood, which is currently engaged in the exact conduct Massachusetts asserts is prohibited.

As multiple Federal courts have already held, however, state gaming law as applied to trading on CFTC-designated contracts markets is preempted by the Commodity Exchange Act's ("CEA") comprehensive federal framework for regulating commodity futures and swaps trading. *KalshiEx LLC v. Flaherty*, No. 25-cv-2152, 2025 WL 1218313, at *3-8 (D.N.J. Apr. 28, 2025) (hereinafter "*KalshiEx (D.N.J.)*"), *appeal filed*, No. 25-1922 (3d Cir. May 8, 2025); *see also KalshiEx, LLC v. Hendrick*, No. 25-00575, 2025 WL 1073495, at *8 (D. Nev. Apr. 9, 2025) (hereinafter "*KalshiEx (D. Nev.)*"), *abrogated on other grounds by KalshiEx (D. Nev.)*, ECF No. 237 (D. Nev. Nov. 24, 2025), *appeal filed*, No. 25-cv-7516 (9th Cir. Nov. 25, 2025); *Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162-JSC, 2025 WL 3141202, at *7 (N.D. Cal. Nov. 10, 2025), *appeal filed*, No. 25-7504 (9th Cir. Nov. 25, 2025).[1]  Kalshi has won preliminary relief on this basis against New Jersey state regulators seeking to enforce their gambling or gaming laws against its facilitation of transactions involving sports-related event contracts.  *See KalshiEx*

---

[1] Two courts have reached the opposite conclusion.  *KalshiEx LLC v. Martin*, No. 25-cv-1283-ABA, 2025 WL 2194908, at *1 (D. Md. Aug. 1, 2025), *appeal filed*, No. 25-1892 (4th Cir. Aug. 1, 2025); *KalshiEx (Mass.)*, No. 2584CV02525, Dkt. 47, at 1.  Those decisions are inconsistent with the weight of authority, and their reasoning is flawed.  Foremost, the decisions do not address whether the CEA expressly preempts state law.  *Martin*, 2025 WL 2194908, at *5-13 (analyzing only implied field and conflict preemption); *KalshiEx (Mass.)*, Dkt. 47 at 7-14 (same).  As a result, the courts wrongly apply a presumption against preemption, *Martin*, 2025 WL 2194908, at *5-6; *KalshiEx (Mass.)*, Dkt. 47 at 8, which has no place where "the statute contains an express pre-emption clause," *Commonwealth of Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016).  The courts also assume (incorrectly) that sports-related event contract trading is gambling, and that assumption colors both opinions.  *See, e.g.*, *Martin*, 2025 WL 2194908, at *6; *KalshiEx (Mass.)*, Dkt. 47 at 3.  The courts also do not consider the conflict between application of state gambling laws and the Special Rule in 7 U.S.C. § 7a-2(c), namely Congress's decision in enacting the Special Rule that the CFTC would be the decisionmaker, not states or state gaming commissions.  *See Martin*, 2025 WL 2194908 at *11-13; *KalshiEx (Mass.)*, Dkt. 47 at 11.  The *Martin* and *KalshiEx (Mass.)* decisions are unpersuasive.

*(D.N.J.)*, 2025 WL 1218313 at \*3-8.  In Nevada, a district court similarly granted Kalshi preliminary relief on the grounds that the CEA preempts state law, a holding on preemption which was not disturbed by the subsequent dissolution of the injunction.[2]  *See KalshiEx (D. Nev.)*, ECF No. 237, at 5; *see also* 7 U.S.C. § 2(a)(1)(A).  Robinhood also has ongoing litigation concerning the same issues and seeking similar relief.[3]

In light of Massachusetts's action against Kalshi and the November 13 Letter, there is a real and imminent threat that Massachusetts will take enforcement action against Robinhood.[4] Were it to do so, Robinhood would face an immediate threat of civil penalties and potentially criminal penalties, along with the attendant reputational harms.  Robinhood's Massachusetts customers would also face abruptly losing access to sports-related event contract trading through their Robinhood account.  Robinhood respectfully renews its request for a preliminary injunction.

---

[2] The Nevada district court later dissolved the preliminary injunction, concluding that event contracts are not swaps, but it did not disturb its earlier (correct) finding that the CEA preempts the application of Nevada gaming laws to swaps traded on DCMs.  This Motion cites the decision granting the preliminary injunction for propositions that were left undisturbed by the subsequent dissolution of the injunction.  For the reasons set forth below, pp. 11-13, event contracts are indeed swaps and thus fall under the exclusive jurisdiction of the CFTC, despite the Nevada district court's contrary conclusion, which is on appeal.

[3] In *Robinhood Derivatives, LLC v. Flaherty*, No. 1:25-cv-14723 (D.N.J. filed Aug. 29, 2025), the State agreed to a consent order maintaining the status quo pending the Third Circuit decision in *KalshiEx (D.N.J.)* (argued on appeal Sept. 10, 2025), and in *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-01541 (D. Nev. filed Aug. 29, 2025), Robinhood has appealed the district court's denial of its motion for a preliminary injunction.  *See Robinhood v. Dreitzer*, No. 25-cv-07831 (9th Cir. filed Dec. 12, 2025).

[4] Massachusetts previously represented that it would refrain from filing an enforcement action pursuant to Mass. Gen. L. c. 23N against Robinhood during the pendency of any preliminary injunction motion in the above-captioned action, and during the pendency of any preliminary injunction motion in the Kalshi litigation.  The parties have reached a similar agreement to cover the pendency of Robinhood's renewed motion for a preliminary injunction. In reliance on that agreement, Robinhood is not seeking a temporary restraining order.

## FACTUAL BACKGROUND

### A.    Event Contract Regulation by the CEA and CFTC

An event contract is a derivative that allows customers to trade on their predictions about the occurrence of future events.  *See KalshiEx LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257, 2024 WL 4164694, at *1-2 (D.D.C. Sept. 12, 2024).  Event contracts are typically structured as binary options posing a particular yes-or-no question.  A buyer takes the "yes" side and a seller takes the "no" side, and upon the expiration of the contract—typically, when the outcome of the future event in question becomes known—the value of the contract goes to the party who was right.  Until that time, buyers and sellers can trade the contract, and the price of the contract fluctuates based on the market's assessment of the probability that the event will occur. *Id.* at *2.  Traders may use event contracts to mitigate risk or simply to seek a financial return*. Id.*

The CEA sets forth a comprehensive federal framework for regulating commodity futures and swaps trading.  *See KalshiEx (D.N.J.)*, 2025 WL 1218313, at *1-2.  In 1974, Congress established the CFTC, the federal agency that oversees and regulates commodity futures and swaps trading.  *See id.* at *1-2.  Congress centralized regulatory authority with the CFTC to avoid the "total chaos" that could ensue if states attempted to subject the futures markets to different regulations.  Hearings Before Comm. on Agriculture and Forestry, United States Senate, on S. 2485, etc., 93d Cong., 2d Sess. 685 (1974) ("Senate Hearings") (statement of Sen. Clark); *see also Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992) (setting forth legislative history of the CFTC Act of 1974), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995).  Indeed, Congress considered adding but ultimately removed from the bill's final language a provision of the CEA that would have preserved parallel state authority over futures trading.  *See* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge).  As described below, the CEA was further amended by the Dodd-

Frank Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376, which brought swaps within the coverage of the CEA and added a special rule about event contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

The CEA provides that the CFTC has "exclusive jurisdiction" over transactions involving event contracts—which, as described below, are swaps or contracts of sale of a commodity for future delivery—traded on registered exchanges ("designated contract markets"): "The Commission shall have exclusive jurisdiction … with respect to accounts, agreements … , and *transactions involving swaps or contracts of sale of a commodity for future delivery … , traded or executed on a contract market designated pursuant to section 7 of this title* …." 7 U.S.C. § 2(a)(1)(A) (emphasis added). The CEA expressly preserves state authority to regulate transactions "not conducted on or subject to the rules" of a CFTC-regulated exchange. *Id.* § 16(e)(1)(B)(i).

To receive the CFTC's designation as a contract market, an exchange must apply and set forth its ability to comply with CFTC rules and regulations. *Id.* §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The CFTC's comprehensive regulatory framework for contract markets, including a set of 23 "Core Principles," 17 C.F.R. pt. 38, is designed to ensure and protect the integrity of those markets. Status as a CFTC-designated contract market "imposes upon [an exchange] a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc.*, 977 F.2d at 1150-51. The CFTC may suspend or revoke an exchange's designation if it fails to comply with any rules or regulations. 7 U.S.C. § 8(b). Kalshi and ForecastEx are each CFTC-designated contract markets.

An exchange may submit new contracts to the CFTC for approval prior to listing, or it may self-certify the contracts as complying with CFTC requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). Generally, the CFTC "shall approve a new contract" unless

the CFTC finds that it would violate the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B).  The CEA contains a special rule relating to CFTC review and approval of event contracts, which was added by the Dodd-Frank Act of 2010.  Pub. L. No. 111-203, § 745(b), 124 Stat. 1376, 1735-36.  The CFTC may prohibit event contracts in specific categories if it determines them to be "contrary to the public interest."  7 U.S.C. § 7a- 2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2).   If an exchange self-certifies a new contract, the CFTC may initiate a review of that contract within 10 business days.  *See* 7 U.S.C. § 7a-2(c)(2); *see also* 17 C.F.R. § 40.11(c) (permitting the CFTC to take an additional 90 days to review event contracts).  If the CFTC does not act, the new contract is deemed approved and becomes effective. *See* 7 U.S.C. § 7a-2(c)(2).  For example, Kalshi self-certified and began listing sports-related event contracts on January 24, 2025.  *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *2.  ForecastEx also self-certified its sports-related event contracts and began listing them shortly thereafter.  (Compl. ¶ 27.)  Because the CFTC declined to review or prohibit these event contracts, they were deemed approved and became effective upon the expiration of the 10-day probationary period under 7 U.S.C. § 7a-2(c)(2) and are legal under federal law.

Fundamental differences in how contract markets and sportsbooks operate mean they are susceptible to different forms of risk to participants.  Contract markets leverage the power and rigor of financial markets to provide traders with liquidity and transparency, and prices are set by market participants.  Customers can manage risk by adjusting or exiting their positions up until the contract expires, and prices respond accordingly.  These markets may be at risk of market manipulation, distortions, and inefficiencies.  Sportsbooks, by comparison, have a line set by the house, which is typically set ahead of time and, once a bet is placed, does not change for that bet.  Gamblers bet against the house, and gamblers typically do not have the option to exit their position.  Sportsbooks risk exploitation of gamblers due to the power imbalance between the house and the

gambler. Based on these different risks, it makes sense that contract markets and sportsbooks are subject to two different modes of regulation. The federal regulations that govern commodity futures and swaps trading have as a major focus creating and maintaining fair and efficient markets for trading, *see* 17 C.F.R. §§ 38.250, 38.151, whereas sportsbooks are regulated by state law and subject to the police powers of the state to halt and remedy any exploitation of gamblers.

### B.    Futures Commission Merchant Regulation by the CEA and CFTC

Robinhood is registered with the CFTC as a futures commission merchant ("FCM"). Hickerson Decl. ¶ 3. As relevant here, an FCM is "an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of a commodity for future delivery; a security futures product; a swap" or certain other transactions and "in or in connection with [those activities], accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. § 1a(28) (subsection headings omitted). FCMs must register with the CFTC unless they fall within certain exemptions. *Id.* § 6f; 17 C.F.R. § 3.10(c).

Similar to registered DCMs, registered FCMs such as Robinhood must comply with a host of federal requirements. FCMs are subject to reporting requirements to the CFTC, 17 C.F.R. §§ 1.10(b), 1.10(d), 17.00, disclosure requirements to the public, *id.* § 1.55, and minimum financial requirements, *id.* §§ 1.12, 1.17. FCMs must "establish, maintain, and enforce a system of risk management policies and procedures designed to monitor and manage the risks associated with the activities of the" FCM, *id.* § 1.11(c)(1), and CFTC regulations set forth elements that such a risk management program must include, id. § 1.11(e), as well as reporting requirements related to risk management, *see id.* § 1.15. FCMs must "establish and enforce internal rules, procedures and controls to" ensure compliance with certain trading standards. *Id.* § 155.3. FCMs must also "adopt and implement written policies and procedures" to ensure that they or their employees comply

with CFTC regulations concerning conflicts of interest. *Id.* § 1.71. The CFTC imposes recordkeeping requirements on FCMs. *Id.* §§ 1.14, 1.18. Failure to comply with these requirements could require the FCM to "transfer all customer accounts and immediately cease doing business as a futures commission merchant." *Id.* § 1.17(a)(4).

### C.    Robinhood's Event Contracts

On March 17, 2025, Robinhood launched its prediction markets hub, through which its customers can place event contract trade orders. Hickerson Decl. ¶ 4. Robinhood intermediates its customers' event contract trades, including sports-related event contract trades, on Kalshi's and ForecastEx's exchanges. *Id.* ¶¶ 4-5. Robinhood has entered into agreements with Kalshi and ForecastEx that allow it to access each DCM's contract market facilities for this purpose. *Id.* ¶¶ 7-8. Those agreements obligate Robinhood to ensure such access is secure and in compliance with all applicable laws, including the CEA and CFTC regulations; they also require Robinhood to comply with Kalshi's and ForecastEx's respective rules. *Id.* Thus, while Robinhood customers may place event contract orders in their Robinhood accounts, the trades occur on CFTC-regulated exchanges. *Id.* ¶ 6. When a customer opens a position through Robinhood, rather than through a DCM such as Kalshi, that merely adds CFTC regulation of Robinhood as an FCM. *Id.*

### D.    The Massachusetts Lawsuit Against Kalshi

On September 12, 2025, Massachusetts, by and through its Attorney General, filed a lawsuit against Kalshi for allegedly "offering sports wagering without a license in violation of G.L. c. 23N, § 5 *et seq.*" *Massachusetts v. Kalshi*, No. 2584CV02525, Dkt. 1 ¶ 1. Massachusetts seeks monetary relief and an order enjoining Kalshi "from engaging in sports wagering without a license in violation of G.L. c. 23N." *Id.* at 42. Massachusetts also filed an Emergency Motion for a Preliminary Injunction seeking to enjoin Kalshi from "engaging in any activity in connection with sports wagering in the Commonwealth of Massachusetts." *Id.*, Dkt. 4, Ex. A at 1-2. In its

Complaint, Massachusetts mentions Robinhood explicitly. *Id.* ¶¶ 129-130. On November 18, 2025, Kalshi moved to dismiss the action. *Id.*, Dkt. 40. On January 20, 2026, the Superior Court granted Massachusetts's motion for a preliminary injunction and denied Kalshi's motion to dismiss. *See id.*, Dkt. 47. The Court has not yet issued the preliminary injunction.

## ARGUMENT

Robinhood must show: "(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction is in the public interest." *Vivo Cap. Surplus Fund VIII, L.P. v. 1Globe Cap. LLC*, No. 25-10914-MJJ, 2025 WL 1796256, at *6 (D. Mass. June 30, 2025) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). When the non-movant is the government, the equities and the public interest factors merge. *Ass'n of Am. Univs. v. Dep't of Energy*, No. 25-cv-10912-ADB, 2025 WL 1414135, at *8 (D. Mass. May 15, 2025).

## I.    ROBINHOOD IS LIKELY TO SUCCEED ON THE MERITS.

Multiple federal courts have already recognized that the CFTC's exclusive jurisdiction over trades made on DCMs preempts state gaming laws as applied to CFTC-regulated products. *See KalshiEx (D.N.J.)*, 2025 WL 1218313, at *3-8; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *3-8 (finding that the CEA's "exclusive jurisdiction" language preempts the application of state law as to swaps); *see also Blue Lake Rancheria*, 2025 WL 3141202, at *7 (holding that the court lacked jurisdiction to determine whether event contracts violate the CEA because the CFTC has "exclusive jurisdiction" over its contract markets).[5] The same event contract products are at issue

---

[5] Numerous other courts have found that the CEA's grant of exclusive jurisdiction to the CFTC is broad and preempts other regulatory schemes, including both state and other federal statutes. *See, e.g., Hunter v. Fed. Energy Reg. Comm'n*, 711 F.3d 155, 158-59 (D.C. Cir. 2013) (Federal Energy Regulatory Commission lacked jurisdiction in light of CFTC's exclusive jurisdiction); *Witzel v. Chartered Sys. Corp. of N.Y., Ltd.*, 490 F. Supp. 343, 347-48 (D. Minn. 1980) (preemption by CEA and CFTC regulations of Minnesota Securities Act); *Hofmayer v.*

here as were at issue in *KalshiEx (D.N.J.)*, *KalshiEx (D. Nev.)*, and *Blue Lake Rancheria*, making those courts' determinations of exclusive jurisdiction of the CFTC equally applicable here. Transactions involving sports-related event contracts traded on DCMs are subject to the CFTC's exclusive jurisdiction, and Massachusetts law is preempted.

> **A.    The CEA Preempts Application of State Gaming Laws to Sports-Related Event Contract Trading on CFTC-Designated Exchanges.**

The Constitution and laws of the United States "shall be the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and accordingly, "Congress has the power to preempt state law." *Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law expressly, through a statement to that effect in the statute itself, or impliedly, through either field preemption or conflict preemption. Field preemption exists where Congress manifests an intent to occupy exclusively an entire field of regulation. *See Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982). Conflict preemption exists where compliance with federal and state law is "a physical impossibility" or when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation omitted). Here, as multiple district courts have already found, the statutory language of the CEA, its legislative history and the comprehensive regulatory framework it sets out demonstrate that Congress deliberately preempted state law. Whether analyzed as express or implied preemption, the scope of preemption is the field of commodity futures and swaps trading, including event contract trading, on CFTC-designated exchanges.

*First*, express preemption exists here: the CEA provides expressly that the CFTC "shall have exclusive jurisdiction" over commodity futures and swaps trading on CFTC-designated

---

*Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) (claims arising under federal and state securities statutes barred in light of CFTC's exclusive jurisdiction).

exchanges.  7 U.S.C. § 2(a)(1)(A).  Express provisions of this type are regularly held to preempt state law.[6]  *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 765-66 (9th Cir. 2018) (describing statute's grant of "exclusive" jurisdiction as a "broad and general" preemption provision); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir. 2001) (holding that statute's "exclusive jurisdiction" provision preempts state law claims).  Here, the express preemption covers the field of trading on CFTC-designated exchanges.

This express preemption provision includes event contracts, which are "transactions involving swaps or contracts of sale of a commodity for future delivery," over which the CFTC has "exclusive jurisdiction" when "traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A).  The term "swap" includes "any agreement, contract, or transaction" that (among other things) "provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  *Id.* § 1a(47)(A)(ii).  The term "swap" was added to the CEA in 2010 by the Dodd-Frank Act.  *See* Pub. L. No. 111-203, §§ 721(a)(21) (adding the definition of "swap" in 7 U.S.C. § 1a(47)), 722(a)(1)(D) (adding "swaps" to the exclusive jurisdiction provision in 7 U.S.C. § 2(a)(1)(A)), 124 Stat. 1376, 1666, 1672.

Alternatively, or in addition, event contracts may be considered transactions in a type of intangible commodity that the CEA calls an "excluded commodity."  *See United States v.*

---

[6] This express provision does more than define the scope of the CFTC's authority vis-à-vis other federal agencies; it also defines the scope of its authority vis-à-vis the states.  The exclusive jurisdiction section goes on to provide that "*[e]xcept as hereinabove provided*, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the [SEC] or other regulatory authorities under the laws of the United States or of any State . . . ."  7 U.S.C. § 2(a)(1)(A) (emphasis added).

*Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021). An "excluded commodity" includes "an occurrence, extent of an occurrence, or contingency (other than [certain exceptions]) that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).

Sports-related event contracts are within these statutory definitions of swaps and transactions in excluded commodities because: (i) they are binary contracts that pay out depending on the occurrence or non-occurrence of a future event that is beyond the control of the parties to the contract; and (ii) the underlying sporting events they concern have economic consequence.[7] *See KalshiEx (D.N.J.)*, 2025 WL 1218313, at *2, *6. With respect to the latter requirement, wins and losses in sporting events have obvious, significant financial consequences for the players, the teams, the owners or the schools they represent, their communities, television networks, and other stakeholders. *See KalshiEx (D.N.J.)*, 2025 WL 1218313, at *6 ("Defendants argue that sporting events are without potential financial, economic, or commercial consequence. On the record before me, I disagree."). For example, wins can increase franchise value, leading to more ticket

---

[7] Only one district court has concluded that sports-related event contracts are not swaps, *KalshiEx (D. Nev.)*, ECF No. 237, and that opinion is unpersuasive. To conclude that event contracts are not swaps, the Nevada district court made two fundamental errors. First, it created a novel and unnecessary distinction between an "event," a word used in 7 U.S.C. § 1a(47)(A)(ii), and an "outcome," a word not used in the statute, suggesting that outcomes are not events. *KalshiEx (D. Nev.)*, ECF No. 237, at 5-6. This runs contrary to dictionary definitions and common understandings of the word "event," which includes outcomes, and creates endless interpretative challenges (*e.g.*, whether there is Game 7 of the World Series—an event under the Nevada district court's strained reading—is also an "outcome" of the previous games). *See* Brief for Appellant at 35-39, *Robinhood v. Dreitzer*, No. 25-CV-07831 (9th Cir. Jan. 9, 2026). Indeed, CFTC statements confirm that event contracts include contracts that "pay out when an outcome either occurs or does not occur," CFTC, *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008). Second, the Nevada district court also imposed a requirement—found nowhere in the statutory definition of swap—that the swaps have "inherent" financial consequence. *KalshiEx (D. Nev.)*, ECF No. 237, at 14. That is atextual and simply not the law. To the extent Massachusetts advances this argument, Robinhood will respond in greater detail.

sales, more revenue from sponsorships, merchandise, parking, and food at games, and more television viewership, as the Florida Panthers experienced after winning the 2024 Stanley Cup. Declaration of Kevin J. Orsini in Support of Plaintiff Robinhood's Renewed Motion for a Preliminary Injunction ("Orsini Decl."), ¶ 3.  Sporting events also generate economic boons for the cities in which they occur; the New York Knicks' 2025 postseason generated an estimated $195 million in economic activity from home playoff games. *Id.* ¶ 4.  Sporting events also impact the advertising revenue to TV networks; when this year's NBA Finals went the full seven games, ABC's sports viewership increased 17% the month the games took place. *Id.* ¶ 5.

The CEA expressly grants the CFTC "exclusive jurisdiction" over all "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A).  The CEA also includes a separate provision entitled "Special rule for review and approval of event contracts and swaps contracts," added by the Dodd-Frank Act of 2010, Pub. L. No. 111-203, § 745(b), 124 Stat. at 1735-36, which confirms that the CFTC has authority over "the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than [certain exemptions]), by a designated contract market or swap execution facility." *Id.* § 7a-2(c)(5)(C)(i).  One of the categories the "special rule" permits the CFTC to prohibit if the CFTC finds a contract is "contrary to the "public interest" is one that involves "gaming." *Id.*  Because an event contract does not fall within the "special rule" in the first place—and falls within the CFTC's "public interest" discretion—unless it is a "swap" or transaction in "excluded commodities," the "special rule" makes clear that the CEA's grant of exclusive CFTC jurisdiction extends to event contracts.

*Second*, to the extent the text of the statute leaves any doubt about preemption, the legislative history of the 1974 amendment to the CEA that established the CFTC confirms that this grant of exclusive jurisdiction to regulate futures trading on DCMs was intended to establish broad field preemption. As the Conference Committee explained:

> Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned. Therefore, if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern. In view of the broad grant of authority to the Commission to regulate the futures trading industry, the Conferees do not contemplate that there will be a need for any supplementary regulation by the States.

H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897; *see also Hofmayer*, 459 F. Supp. at 737 (finding field preemption from the CEA and dismissing claims brought under preempted federal and state statutes). As the D.C. Circuit recognized, "the statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*.'" *Fed. Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (quoting S. Rep. No. 93-1131, at 23 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5863) (emphasis in original). "The passage of 7 U.S.C. § 2 is intended to clarify 'the preemption of all other would-be regulators at every level of government.'" *Witzel*, 490 F. Supp. at 347 (quoting *Jones*, 466 F. Supp. at 219). Likewise, the history surrounding the "special rule" concerning event contracts in 2010 makes it clear that Congress intended the CFTC's exclusive jurisdiction to embrace event contracts. *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sens. Lincoln and Feinstein).[8]

---

[8] Congressional statements concerning the "special rule," including by the drafters of the Dodd-Frank Act of 2010, similarly reveal Congress's intent to vest exclusive jurisdiction over event contracts with the CFTC. *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010); *see also*

Congressional statements about the creation of the CFTC confirm the intent for broad express or implied field preemption. The 1974 amendments to the CEA were motivated by "concerns that states might regulate futures markets" themselves and create "conflicting regulatory requirements." *Am. Agric. Movement, Inc.*, 977 F.2d at 1156; *see also Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 605 F. Supp. 1105, 1112 (N.D. Ga. 1985) (emphasizing "the need for sole regulatory power of commodities to be placed in one federal agency"). Establishing the CFTC and endowing it with exclusive jurisdiction was meant to "avoid unnecessary, overlapping and duplicative regulation." *Ken Roberts Co.*, 276 F.3d at 588 (quoting 120 Cong. Rec. 34,736 (1974) (remarks of House Agriculture Committee Chairman Poage)); *see also* 120 Cong. Rec. 34,997 (1974) (remarks of Sen. Curtis on behalf of Sen. Talmadge); Senate Hearings at 685 (statement of Sen. Clark) ("[D]ifferent State laws would just lead to total chaos."). Accordingly, the CFTC was empowered to set forth uniform rules and regulations for "all exchanges and all persons in the industry." H.R. Rep. No. 93-975, at 79 (1974).[9]

*Third*, the CEA regulatory scheme, over which the CFTC has exclusive jurisdiction, is comprehensive as it relates to designated and registered entities, and the existence of this comprehensive scheme further evinces Congressional intent to preempt the field and foreclose parallel state regulation. *See Arizona v. United States*, 567 U.S. 387, 401 (2012) (comprehensive

---

Brief of Amici Curiae Seven Former Members of Congress in Support of Plaintiff Appellee, *KalshiEx LLC v. Flaherty*, No. 25-1922, ECF No. 66 (3d Cir. July 31, 2025).

[9] As further indication of Congressional intent that the CEA preempt broadly, during the amendment process for the 1974 amendments, the Senate considered adding but ultimately did not include a provision that retained the states' jurisdiction over futures trading. *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 687-88 (1982); *see also* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge). Congress therefore could not have intended States to regulate futures trading in parallel with the CFTC. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.").

statutory framework led to the conclusion that "the Federal Government has occupied the field" in the relevant area); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368-69 (1986).  The Supreme Court has confirmed that the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)).

In addition to express or implied field preemption, conflict preemption exists here with respect to the determination of which event contracts are permitted on CFTC-designated exchanges.  As noted above, the special rule relating to CFTC review of event contracts vests the CFTC with the power to approve or prohibit certain event contracts.  7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2).  If Massachusetts or the Commission were permitted *also* to make a determination about whether event contracts on a CFTC-regulated exchange were permitted, there would be a direct conflict between federal and state regulation because the CFTC has already impliedly approved these same event contracts.  *See Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363, 380 (2000) (conflict preemption exists where state law "undermines the congressional calibration of force" and is "at odds with achievement of the federal decision about the right degree of pressure to employ"); *De la Cuesta*, 458 U.S. at 153.  Here, the CFTC has allowed Kalshi's (and ForecastEx's) sports-related event contracts by taking no action in response to the self-certification of those contracts, making them legal under federal law, but Massachusetts is attempting to preclude trading of those same event contracts by enforcing Massachusetts sports-wagering laws against offerors of sports-related event contracts.  The conflict is clear.

### B.    The CEA's Preemption of State Gaming Laws as Applied to Sports-Related Event Contracts Includes Those Opened on Robinhood's Platform.

Given the broad, express preemptive language and clear Congressional intent, the District Courts' holdings that the CEA likely preempts state gambling and gaming laws were well founded.

16

*KalshiEx (D.N.J.)*, 2025 WL 1218313, at *4; *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *3-7.  The same result is required where, as here, Robinhood is the CFTC-regulated entity rather than Kalshi.

*First*, Robinhood participates in transactions involving "swaps or contracts of sale of a commodity for future delivery" traded on a DCM, and these transactions therefore fall squarely within the statutory grant of exclusive jurisdiction to the CFTC.  *See* 7 U.S.C. § 2(a)(1)(A) (granting CFTC "exclusive jurisdiction" over all "accounts, agreements … , and transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC).  Because it is the *transaction* on a regulated exchange over which the CFTC has exclusive jurisdiction, *see id.*, the CFTC must have jurisdiction over the entire transaction and all participants.  This includes entities like Robinhood that accept orders or otherwise facilitate transactions, as well as designated contract markets (*e.g.*, Kalshi and ForecastEx) that execute transactions.  *See id.* § 1a(28)(A) (CEA expressly envisions FCMs facilitating transactions in swaps and commodities for future delivery).

If states could regulate some but not all entities relevant to these transactions, such regulation would infringe on the CFTC's exclusive jurisdiction and fracture what Congress intended to be a uniform set of regulations for commodity futures and swaps trading.  Indeed, as the CFTC recently explained to the D.C. Circuit, "due to federal preemption, event contracts *never violate state law when they are traded on a [designated contract market]*."  CFTC Brief, *KalshiEx LLC v. CFTC*, No. 24-5205, at 27, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

*Second*, the conclusion that preemption applies equally to Robinhood's facilitation of these transactions as an FCM is further supported by the fact that Congress explicitly included FCMs within the extensive set of federal regulatory requirements and CFTC oversight established to manage commodity derivatives trading.  The "comprehensive regulatory structure to oversee the

volatile and esoteric futures trading complex," *Curran*, 456 U.S. at 356 (internal quotation marks omitted), established by Congress includes FCMs that facilitate purchases and sales of commodities for future delivery and swaps.  7 U.S.C. §§ 1a(28)(A)(i)(I)(aa)(AA), (CC).

In short, the "oversight of futures commission merchants" is an "important aspect" of the CFTC's oversight responsibility for futures trading.  *Prestwick Capital Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 650 (7th Cir. 2013).  FCMs like Robinhood are an integral part of the CEA's comprehensive regulatory scheme, and their activities in facilitating trading on DCMs are equally subject to federal preemption as those of DCMs.

## II.    ROBINHOOD WILL SUFFER IRREPARABLE HARM.

A plaintiff must show that it is "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  "A credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm."  *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *7; *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  Loss of business and goodwill can also inflict irreparable injury.  *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989).

In light of Massachusetts's action against Kalshi, which includes allegations about Robinhood, and the November 13 Letter, Robinhood faces the imminent threat of an enforcement action by Massachusetts and/or the Commission seeking civil penalties as well as, potentially, criminal penalties.  Hickerson Decl. ¶¶ 9-11.  The sanctions for violation of the Massachusetts statute that Massachusetts alleges Kalshi violated (Mass. Gen. Laws ch. 23N) include "a civil penalty not to exceed $2,000 for each violation or $5,000 for violations arising from the same series of events" and imprisonment and criminal fines, which escalate after the first offense.  Mass. Gen. Laws ch. 23N, § 21.  The threat of prosecution is actual and imminent, Hickerson Decl.

¶¶ 10-11, especially in light of the fact that Massachusetts explicitly mentions Robinhood in its action against Kalshi, *Massachusetts v. Kalshi*, No. 2584CV02525, Dkt. 1 ¶¶ 129-130, and its request for emergency expedited relief, *id.*, Dkts. 4, 10; *see also id.*, Dkt. 5 at 10 ("Massachusetts law prohibits the facilitation of wagering for a fee, just as it prohibits the taking of a wager.").  The fact that the Commonwealth has proposed not to seek to enforce the preempted gaming laws until resolution of its proceedings against Kalshi changes nothing; Robinhood is entitled to protect its rights under federal law in federal court.

The harm to Robinhood's reputation caused by enforcement proceedings also could not be easily or quickly repaired.  *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *7; *see also Ross-Simons*, 102 F.3d at 20.  Abruptly discontinuing its Massachusetts customers' ability to open new sports-related event contract positions would undermine customers' confidence in Robinhood.  Hickerson Decl. ¶ 16.  Robinhood thus stands to lose the goodwill of over 41,000 customers in Massachusetts. *Id.* ¶ 12.  This lost goodwill also constitutes irreparable harm.  *KalshiEx (D.N.J.)*, 2025 WL 1218313, at *7; *see also Ross-Simons*, 102 F.3d at 20.

Robinhood would also forgo significant business if it were to cease offering sports-related event contract trading in Massachusetts to avoid an enforcement action.  Hickerson Decl. ¶ 15. These losses would be unrecoverable because sovereign immunity bars Robinhood from obtaining monetary damages.  *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999).  Unrecoverable damages constitute irreparable harm.  *See, e.g., Liu v. Noem*, 780 F. Supp. 3d 386, 403 (D.N.H. 2025).

## III.    THE EQUITIES AND PUBLIC INTEREST TILT STRONGLY IN ROBINHOOD'S FAVOR.

"[T]he interests favor injunction" because Robinhood can demonstrate that Massachusetts law is likely preempted as to sports-related event contract trades through CFTC-designated contract markets.  *See KalshiEx (D.N.J.)*, 2025 WL 1218313, at *4.  With respect to Robinhood,

"[t]he balance of hardships tips in [movant's] favor given that [plaintiff] is facing substantial monetary expenditures, reputational damage, or civil and criminal prosecution based on the defendants' demands that the defendants likely cannot make because they are preempted." *KalshiEx (D. Nev.)*, 2025 WL 1073495, at *7.  By contrast, Massachusetts and the public can have no interest in enforcing preempted state law against Robinhood.  *See Nw. Selecta, Inc. v. Sec'y of Dep't Agric. of Puerto Rico*, No. CV 22-1092 (RAM), 2022 WL 17985926, at *6 (D.P.R. Dec. 29, 2022) ("[T]here is no convincing argument to explain why a government agency's interests are harmed by the inability to continue enforcing preempted laws."); *Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 64 (D. Me. 2022), *aff'd*, 51 F.4th 1 (1st Cir. 2022).

## IV.    NO SECURITY—OR ONLY *DE MINIMIS* SECURITY—IS APPROPRIATE.

Whether to require a bond, and the amount of any such bond, is left to the discretion of the Court.  *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991).  Here, no security is needed because Defendants will not suffer any non-speculative harm. *See Pineda v. Skinner Servs., Inc.*, 22 F.4th 47, 57 (1st Cir. 2021).  Alternatively, any bond should not exceed $100,000—the maximum relevant fine.  Mass. Gen. Laws ch. 23N, § 21.

## CONCLUSION

For the reasons set forth above, the Court should grant Robinhood's renewed motion for a preliminary injunction.

DATED:  January 20, 2026

Respectfully submitted,

By:  _/s/ Nicholas J. Schneider_____

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
Craig Waksler (BBO No. 566087)
cwaksler@eckertseamans.com
Nicholas J. Schneider (BBO No. 688498)
nschneider@eckertseamans.com

2 International Place #1600
Boston, Massachusetts 02110
Telephone: (617) 342-6800
Facsimile: (617) 342-6899

**CRAVATH, SWAINE & MOORE LLP**
Kevin J. Orsini (pro hac vice)
korsini@cravath.com
Antony L. Ryan (BBO No. 629971)
aryan@cravath.com
Brittany L. Sukiennik (*pro hac vice*)
bsukiennik@cravath.com

375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

***Counsel for Plaintiff***
***Robinhood Derivatives, LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 20, 2026, I electronically filed the foregoing Memorandum of Points and Authorities in Support of Plaintiff Robinhood's Motion for a Preliminary Injunction, together with declarations in support thereof and a proposed form of order, with the Clerk of the Court by using the Court's CM/ECF system, and accordingly served the parties who receive notice of the filing via the Court's CM/ECF system.

*/s/ Nicholas J. Schneider*

Nicholas J. Schneider