## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ROBINHOOD DERIVATIVES, LLC, | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:25-cv-12578-RGS |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts, et al., | |
| *Defendants*. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF ROBINHOOD'S OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS OR STAY PROCEEDINGS AND REPLY IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

FACTUAL BACKGROUND................................................................................3

OPPOSITION TO MOTION TO DISMISS...........................................................4

    I.      ROBINHOOD'S CLAIM IS JUSTICIABLE...........................................4

           A.     Robinhood Has Standing Because There Is a Credible Threat of Enforcement Against It. ..........................................................................5

           B.     Robinhood's Claim Is Ripe...........................................................9

           C.     Robinhood's Injury Is Traceable to All Defendants. .................................14

    II.     ROBINHOOD STATES A FEDERAL CLAIM UNDER *EX PARTE YOUNG* TO ENFORCE PREEMPTION UNDER THE SUPREMACY CLAUSE. ..........15

    III.    THE COURT SHOULD NOT ABSTAIN FROM ADJUDICATING ROBINHOOD'S CLAIM OR OTHERWISE DISMISS OR STAY THE CASE. ...............................................................................................17

PRELIMINARY INJUNCTION ARGUMENT........................................................20

    I.      ROBINHOOD IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM............................................................................................20

           A.     The CEA Expressly Preempts State Gambling Law as Applied to DCM Trading.............................................................................21

           B.     Congress Preempted the Field of Derivatives Trading on DCMs. ............24

           C.     Applying Massachusetts Laws to Transactions on DCMs Conflicts with the CEA's Goal of Uniform Regulation and the Special Rule. .........27

    II.     ROBINHOOD WILL BE IRREPARABLY HARMED IF DEFENDANTS ARE PERMITTED TO ENFORCE PREEMPTED STATE GAMBLING LAWS. ...............................................................................................28

    III.    DEFENDANTS AND THE PUBLIC HAVE NO INTEREST IN THE ENFORCEMENT OF PREEMPTED STATE LAWS..........................................30

CONCLUSION.................................................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 280 F. Supp. 3d 118
(D.D.C. 2017) ....................................................................................................................29

*AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586 (D. Md. 2007) ...........................22

*Alden v. Maine*, 527 U.S. 706 (1999) ..........................................................................................29

*Arizona v. United States*, 567 U.S. 387 (2012)............................................................................25

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)................................................8

*Bankart v. Ho*, 60 F. Supp. 3d 242 (D. Mass. 2014) ...................................................................19

*Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942) ............................................................17

*Brokamp v. James*, 573 F. Supp. 3d 696 (N.D.N.Y. 2021) ..........................................................14

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001)....................................................23

*Capron v. Off. of Att'y Gen.*, 944 F.3d 9 (1st Cir. 2019) ........................................................27, 28

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,* 162 F.4th 631 (6th
Cir. 2025) .......................................................................................................................29

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .....................................................................8

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
48 F.3d 618 (1st Cir. 1995)................................................................................................30

*Coinbase Fin. Markets, Inc. v. Ford*,
No. 2:26-cv-0256 (D. Nev. Feb. 7, 2026) ...........................................................................19

*Colo. River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976).......................................................................................................1, 19

*Colonial Penn Grp., Inc. v. Colonial Deposit Co.*,
834 F.2d 229 (1st Cir. 1987)..............................................................................................16

*Consumer Data Indus. Ass'n v. King*, 678 F.3d 898 (10th Cir. 2012)............................................5

*DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, No. 01 Civ. 11602 (RWS),
2002 WL 31356362 (S.D.N.Y. Oct. 17, 2002)......................................................................28

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) ......................................................................18, 19

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018)...........................................................................27

*Ex parte Young*, 209 U.S. 123 (1908).............................................................................14, 16

*FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232 (1980) ...............................................................29

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) ...............................................................23

*Green v. Mansour*, 474 U.S. 64 (1985)...........................................................................17

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .......................................................................24

*Int'l Paper Co. v. Ouellette,* 479 U.S. 481 (1987)...........................................................25

*Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18 (1st Cir. 2025)................................12, 13

*KalshiEx LLC v. Flaherty*, No. 25-cv-2152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) .......21, 22

*KalshiEx LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ...........................................................................................16, 21, 28, 30

*KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1 (1st Cir. 2003)....................................19

*Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318 (1st Cir. 2016) ............10

*Lichoulas v. City of Lowell*, 555 F.3d 10 (1st Cir. 2009)................................................17

*Loc. Union No. 12004 v. Massachusetts*, 377 F.3d 64 (1st Cir. 2004) .........................................17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................14

*Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33 (1st Cir. 2012)................................................18, 19

*McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63 (1st Cir. 2003)...................................................5

*Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014) ............................................27

*Morton v. Mancari*, 417 U.S. 535 (1974) ..................................................................27

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983)................................20

*Murphy v. NCAA*, 584 U.S. 453 (2018) ..................................................................24

*N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38 (1st Cir. 2021) .......................................9, 11, 12, 13

*Nazario-Lugo v. Caribevision Holdings, Inc.*, 670 F.3d 109 (1st Cir. 2012) ..............................18

*One & Ken Valley Hous. Grp. v. Me. State Hous. Auth.*, 716 F.3d 218 (1st Cir. 2013)................18

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015)........................................................25

*Padgett v. Surface Transp. Bd.*, 804 F.3d 103 (1st Cir. 2015)......................................................22

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202 (N.D. Ala. 1981) ...........21

*Planned Parenthood Ariz., Inc. v. Brnovich*, 172 F. Supp. 3d 1075 (D. Ariz. 2016)....................14

*Pop Warner Little Scholars, Inc. v. N.H. Youth Football & Spirit Conf.*, No. 06-CV-98-SM, 2006 WL 2728593 (D.N.H. Sept. 25, 2006) ......................................................................19

*PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467 (4th Cir. 2014)...............................................25

*Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36 (1st Cir. 2024)..............................................12, 13

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237 (1952)................................................17

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115 (2016) ................................................22

*R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26 (1st Cir. 1999)..............................8, 11, 13

*Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017)........................................................................9, 10

*Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008) ...........................................................25

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983).....................................................................16

*Siembra Finca Carmen, LLC v. Sec'y of Dep't of Agric. of P.R.*, 437 F. Supp. 3d 119 (D.P.R. 2020) ......................................................................................................................30

*Somyk v. City Pers., Inc.*, No. 18-164-JJM-PAS, 2018 WL 4936004 (D.R.I. Oct. 11, 2018) .................................................................................................................19

*Steffel v. Thompson*, 415 U.S. 452 (1974) .................................................................................8

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).......................................................5, 8, 9

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ...................................................................5, 8

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635 (2002) ...................................16, 17

*Washington v. FEMA*, No. 25-12006-RGS, 2025 WL 3551751 (D. Mass. Dec. 11, 2025)..........13

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) ...................................................................17, 18

*Younger v. Harris*, 401 U.S. 37 (1971)....................................................................................18

**Statutes**

7 U.S.C. § 2(a)(1)(A) .......................................................................................................21, 22, 23

7 U.S.C. § 7a-2(c)(5)(B) ..............................................................................................24

7 U.S.C. § 7a-2(c)(5)(C) ..............................................................................................24

7 U.S.C. § 7a-2(c)(5)(C)(i) ......................................................................................26, 28

7 U.S.C. § 16(e)(1)(B) ..................................................................................................21

7 U.S.C. § 16(e)(2) ..................................................................................................22, 23

15 U.S.C. §§ 3001 *et seq.* ..........................................................................................26

15 U.S.C. § 3002(3) ......................................................................................................27

18 U.S.C. §§ 1081 *et seq.* ..........................................................................................26

18 U.S.C. § 1084(a) ......................................................................................................27

25 U.S.C. §§ 2701 *et seq.* ..........................................................................................27

28 U.S.C § 1331 ............................................................................................................17

31 U.S.C. §§ 5361 *et seq.* ..........................................................................................26

31 U.S.C. § 5362(10) ....................................................................................................26

Mass. Gen. Laws ch. 23N ....................................................................................... passim

## Other Authorities

*In re MGM Springfield Potential Noncompliance Incident*, Massachusetts Gaming
    Commission (July 21, 2023) ..................................................................................6,7

Press Release, Massachusetts Gaming Commission, Encore Boston Harbor Fined for
    Sports Wagering Catalog Noncompliance (July 25, 2023) .......................................7

## PRELIMINARY STATEMENT

Robinhood Derivatives, LLC ("Robinhood") submits this combined brief in opposition to Defendants' Motion to Dismiss the Amended Complaint (ECF No. 101) and in support of its Renewed Motion for Preliminary Injunction (ECF No. 90) ("Motion" or "Mot.").[1]

Defendants want to avoid a decision from this Court on the federal preemption issue raised by Robinhood's claim. To that end, they raise numerous jurisdictional arguments in the hope that one might stick. But none of those arguments has merit, and this Court therefore should exercise its "virtually unflagging obligation" to adjudicate Robinhood's federal-law claim. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

*First*, Robinhood's claim is justiciable. The Court previously dismissed this suit because it concluded Robinhood's ability to operate in Massachusetts depended on its ability to facilitate trading through KalshiEX LLC's ("Kalshi") designated contract market ("DCM"). Following dismissal, Robinhood began offering trading on ForecastEx LLC's ("ForecastEx") exchange, and the Court granted reconsideration on that basis. (*See* Order Granting Motion for Reconsideration, ECF No. 86.) ForecastEx has since ceased offering sports-related event contracts, but that does not impact the ripeness analysis. This is because, among other reasons, Robinhood is actively working to expand its offering of sports-related event contracts through one or more additional DCMs, including Rothera Exchange and Clearing LLC ("Rothera"), by June 2026. In short, Robinhood is committed to operating in Massachusetts. There is a substantial risk of enforcement against Robinhood, and the purely legal question this action raises is fit for adjudication.

*Second*, Defendants' attempt to manufacture a ripeness issue by entering into a temporary

---

[1] Robinhood refers to Defendants' Combined Memorandum in Support of Defendants' Motion to Dismiss the Amended Complaint or in the Alternative to Stay Proceedings and in Response to Plaintiff's Renewed Motion for Preliminary Injunction (ECF No. 102) as the "MTD."

non-enforcement stipulation fails under controlling Supreme Court and First Circuit precedent; Defendants expressly retain their ability to prosecute Robinhood once their action against Kalshi is resolved and have intimated to state sports-wagering licensees that they intend to target those licensees that have relationships with entities offering sports-related event contracts. *Third*, Robinhood has adequately pleaded its *Ex parte Young* claim. *Fourth*, the abstention doctrines Defendants invoke are all inapposite.

With these meritless arguments cleared away, Robinhood requests the Court to grant its Preliminary Injunction Motion. *First*, Robinhood is likely to succeed on the merits of its claim that Massachusetts sports-wagering laws, as applied to swaps and regulated derivatives traded on Commodity Futures Trading Commission ("CFTC")-designated contract markets, are preempted by the Commodity Exchange Act ("CEA"). This results under each of express, field and conflict preemption. The CFTC itself takes this view, recently explaining that "[s]tates cannot invade the CFTC's exclusive jurisdiction over CFTC-regulated designated contract markets … by re-characterizing swaps trading on DCMs as illegal gambling." Amicus Brief of CFTC, ECF No. 38-2 ("CFTC Amicus Br."), *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), at 2. Further, contrary to another argument from Defendants, federal sports-gambling statutes are both irrelevant here and easily reconciled with the CEA. And contrary to Defendants' strawman argument, Robinhood does not contend that the CEA preempts ***all*** application of state sports-wagering laws (nor has the CFTC taken that position). Rather, the CEA preempts state law only with respect to event contracts traded on CFTC-registered DCMs, and the Massachusetts sports-wagering law continues to apply to casinos and sportsbooks. *Second*, Robinhood will be irreparably harmed by the enforcement of preempted state law. *Third*, as Defendants and the public cannot be harmed by an inability to enforce preempted state law, the equities tip sharply in

Robinhood's favor.

## FACTUAL BACKGROUND

Robinhood incorporates the factual background in its Motion (ECF No. 90). There have been four major developments since the Court dismissed Robinhood's original complaint on November 13, 2025. *First*, the same day Robinhood's first complaint was dismissed, the MGC published a letter (the "November 13 Letter") stating that licensees "are prohibited from offering sports-related event contracts in Massachusetts directly or via an affiliate … or directing patrons to such event contracts being offered in Massachusetts." (Decl. of Kevin J. Orsini in Support of Plaintiff Robinhood's Motion for Reconsideration ("Orsini Decl."), ECF No. 76, Ex. A at 1.) In the months since sending that letter, the Massachusetts Gaming Commission ("MGC") has sent additional letters to licensees probing their relationships with entities offering sports-related event contracts. (Decl. of Nicholas Lin ("Lin Decl."), ECF No. 103 ¶¶ 4-6.) *Second*, on November 17, 2025, Robinhood began offering sports-related event contracts through a DCM called ForecastEx LLC ("ForecastEx"). (Decl. of Adam Hickerson ("Hickerson Decl."), ECF No. 104 ¶ 4.) ForecastEx has since ceased offering sports-related event contracts, but Robinhood is working to be able to offer sports-related contracts on one or more additional DCMs by June 2026. (*Id.* ¶¶ 4-5, 8) *Third*, on February 6, 2026, the state court entered a preliminary injunction against Kalshi, which prohibits Kalshi from "[o]ffering … or otherwise facilitating any contract, instrument or product that is a wager on sporting events … as defined by [Massachusetts General Law Chapter 23N, § 3], to any person located in Massachusetts." *Commonwealth of Massachusetts v. KalshiEx LLC*, No. 2584-CV-02525 ("*Kalshi*" or the "Kalshi Action") (Mass. Super. Ct.), Dkt. 57, at 1. Kalshi had 30 days to comply, *id.*, and has noticed an appeal, *Kalshi*, Dkt. No. 58. On February 17, 2026, the Massachusetts Appeals Court stayed the injunction pending Kalshi's appeal. *Commonwealth of Massachusetts v. KalshiEx LLC*, No. 2026-J-0143 (Mass. App. Ct. Feb. 17,

2026).  *Fourth*, the CFTC has publicly shared its views on relevant issues in an amicus brief on the appeal of a similar federal-court action, including that it has "exclusive jurisdiction over federally registered DCMs and transactions conducted on those exchanges, displacing state gambling laws that would otherwise apply."  CFTC Amicus Br. at 21.

## OPPOSITION TO MOTION TO DISMISS

## I.    ROBINHOOD'S CLAIM IS JUSTICIABLE.

In its previous dismissal order, the Court held that Robinhood's claim was contingent on the outcome of the Kalshi enforcement action because at the time Robinhood offered sports-related event contracts only through Kalshi's DCM.  (*See* Order Granting Motion to Dismiss, ECF No. 69.)  Subsequently, Robinhood began offering sports-related event contracts on ForecastEx's exchange, as the Court acknowledged in granting Robinhood's motion for reconsideration.  (*See* Order Granting Motion for Reconsideration, ECF No. 86.)  ForecastEx has since ceased offering sports-related event contracts, but even so, Robinhood's claim remains justiciable.  The fact that Robinhood has proven its ability to operate in Massachusetts without Kalshi is not, as Defendants claim, "immaterial."  (MTD at 5.)[2]  Rather, it demonstrates Robinhood's claim is ripe because it does not depend at all on what happens with Kalshi, which is just one of 24 DCMs.  *See* CFTC Amicus Br. at 5.  Indeed, Robinhood recently acquired an indirect ownership stake in another DCM, Rothera, and plans to launch a new partnership with Rothera by June 2026.  (Hickerson Decl. ¶ 6.)  Once it does so, Robinhood anticipates that a significant portion of its event contract volume will be redirected to Rothera.  (*Id*. ¶ 7.)  Robinhood is also working to be able to offer sports-related event contracts on additional DCMs.  (*Id*. ¶ 5.)

---

[2] The fact that Robinhood has offered sports-related event contracts on multiple DCMs, including Kalshi and ForecastEx, and is now likely to partner with at least a third DCM, Rothera, illustrates the dynamic nature of this industry in which Robinhood has plainly demonstrated an intent to participate.  Robinhood is entitled to a ruling on this ripe controversy.

Defendants argue Robinhood's claim is non-justiciable because: (1) Robinhood's fear of enforcement is "speculative" because Robinhood is not a DCM like Kalshi (MTD at 6), and (2) the non-enforcement stipulation removes any "real and immediate" threat of enforcement (*id.* at 7 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159-61 (2014) ("*SBA List*"))). The first argument concerns standing ("who" can sue) and the second concerns ripeness ("when" one can sue). *See McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 69 (1st Cir. 2003). Both arguments fail. In a pre-enforcement challenge, standing and ripeness "boil down to the same question." *SBA List*, 573 U.S. at 157 n.5. Here, the question is whether there is a substantial risk that Massachusetts will enforce its sports-wagering law against Robinhood; the answer is clearly yes. Under Supreme Court and First Circuit precedent, Robinhood has standing and its claim is ripe.

### A.    Robinhood Has Standing Because There Is a Credible Threat of Enforcement Against It.

The parties agree that standing requires injury in fact, causation and redressability. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Defendants primarily dispute Robinhood's injury in fact.[3] In the context of a pre-enforcement challenge such as Robinhood's, injury in fact is established based on a "substantial risk" of future harm from enforcement. *SBA List*, 573 U.S. at 158. "[T]he existence of a statute implies the threat of its enforcement," and a plaintiff is therefore "entitled to bring a pre-enforcement challenge based on the probability of future injury" based entirely on the existence of that statute. *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012). Here, the threat of enforcement is palpable for reasons much more immediate than just the presence of a statute on the books. Massachusetts is currently enforcing against Kalshi and secured a preliminary injunction (now stayed)—while identifying

---

[3] Defendants challenge causation and redressability as to the MGC Chair and Commissioners (together, the "MGC Defendants"), arguments addressed in Section I.C. (MTD at 9-10, 12-14.)

Robinhood in that action. Like Kalshi, Robinhood is offering sports-related events contracts to customers in Massachusetts. A credible threat of enforcement exists.

Defendants contend Robinhood has no reason to fear enforcement because the Commonwealth has brought suit only against Kalshi (a DCM) and "Robinhood is not similarly situated" because it is a futures commission merchant ("FCM"). (MTD at 6.) Defendants do not explain why the distinction between a DCM and an FCM matters for purposes of their threat of enforcement. Robinhood, like Kalshi and other DCMs, offers sports-related event contracts to its customers, and that is the conduct at issue both here and in the Kalshi Action. In its complaint against Kalshi, the Commonwealth seeks to enjoin Kalshi from "offering" event contracts to Massachusetts residents.[4] (*Kalshi*, No. 2584-CV-02525, Dkt. 1, Compl. ¶ 6.) That is the same conduct in which Robinhood is engaged and which it seeks to enjoin Defendants from prosecuting. (Am. Compl., ECF No. 88, ¶ 69.) Indeed, the Commonwealth refers to Robinhood in its complaint against Kalshi, alleging that "[t]he availability of Kalshi's contracts are not limited to Kalshi's platform, but are also available on Robinhood." (*Kalshi* Compl. ¶ 129.) The Commonwealth has taken the unequivocal position that offering event contracts is prohibited under state law. (*Kalshi*, No. 2584-CV-02525, Dkt. 5, Mot. at 10-11 ("The central question is whether the offering of Kalshi's 'yes'/'no' event contracts … constitutes the offering [sic] sports wagering under state law. The answer is yes.").)[5] There is no difference between a DCM and an FCM as to whether

---

[4] The preliminary injunction against Kalshi, ordered by the state court on February 6, 2026, but now stayed, likewise enjoins Kalshi from "[o]ffering, listing, matching, executing, clearing, settling, or otherwise facilitating any contract, instrument or product that is a wager on sporting events … as defined by [Chapter 23N]." *Kalshi*, No. 2584-CV-02525, Dkt. 57, Order ¶ 1 (emphasis added).

[5] As further evidence of Massachusetts' view that merely connecting customers to the alleged prohibited activity is enough, the MGC has enforced against casino operators that connect customers to sportsbooks. *See, e.g.*, *In re MGM Springfield Potential Noncompliance Incident*,

their offers are covered by state law or whether that law is preempted.

If Defendants truly believed that FCMs like Robinhood may offer sports-related event contracts traded on DCMs in Massachusetts without violating Chapter 23N, they would simply and unequivocally say so. Instead, they have reserved their right to sue Robinhood (Am. Stip. of Non-Enforcement ("Am. Stip."), ECF No. 100, ¶ 7), and reiterated in the November 13 Letter that "offering sports-related event contracts in Massachusetts, directly or via an affiliate" is "prohibited" (Orsini Decl., Ex. A at 1). What is more, the MGC sent letters within the last three months directly to two vendor licensees with which Robinhood Markets, Inc., the parent company of Robinhood, has relationships, LexisNexis Risk Solutions FL Inc. ("LexisNexis") and Socure Inc. ("Socure"), inquiring about their relationships with entities that offer event contracts. (Lin Decl. ¶¶ 4-6.) These inquiries did not distinguish between DCMs and FCMs. Both LexisNexis and Socure have been informed that, as MGC licensees, they must "identify such entities and the products/services" that they provide (*Id.* Ex. A.) LexisNexis and Socure each provide Know Your Customer ("KYC") and Anti-Money Laundering ("AML") services to Robinhood's parent Robinhood Markets, Inc.—critical functions that Robinhood Markets and its subsidiaries are required to take to, among other things, verify customers' identities and prevent fraud and money laundering by monitoring transactions to prevent illegal activities. (Hickerson Decl. ¶ 9.)

Defendants take the position in this litigation that Robinhood has no reason to fear any enforcement, but they are simultaneously sending threatening letters seeking details about vendors' relationships with Robinhood. These letters reveal Defendants' aggressive enforcement

---

Massachusetts Gaming Commission (July 21, 2023), https://massgaming.com/wp-content/uploads/MGM-Noncompliance-Event-Decision.pdf; Press Release, Massachusetts Gaming Commission, Encore Boston Harbor Fined for Sports Wagering Catalog Noncompliance (July 25, 2023), https://massgaming.com/wp-content/uploads/23-069EBHswnoncompliance.pdf.

posture toward *all* entities that offer or facilitate the offering of sports-related event contracts and thus underscore the substantial risk of enforcement against Robinhood.  Kalshi may be the first enforcement target, but it is almost certain not to be the last.  Defendants have offered no reason to believe their next targets will all be DCMs rather than an FCM like Robinhood.  They hang their hat on the fact that Robinhood is an FCM because they hope to make this suit non-justiciable, but controlling precedent forecloses such a maneuver.

It is settled law that a plaintiff has standing to bring a pre-enforcement challenge based on prior enforcement against a party engaged in the conduct the state asserts is prohibited.  *See, e.g.*, *SBA List,* 573 U.S. at 166 (plaintiff had standing because it intended to engage in same conduct that led to enforcement against its co-plaintiff); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (petitioner had standing because fellow protestor had been prosecuted for same conduct).  In fact, even if a law has never been enforced against *anyone*, a plaintiff may still bring a claim if her conduct falls within the challenged statute's scope.  *See, e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) (criminal provision had not yet been applied but appellees still had "some reason in fearing prosecution" and thus standing); *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26 (1st Cir. 1999) ("[T]he Supreme Court repeatedly has found standing to mount pre-enforcement challenges to laws that had never been enforced.").  Robinhood offers sports-related event contracts in Massachusetts.  (Am. Compl. ¶¶ 1, 6.)  Many statements by Defendants—in the Kalshi Action and in letters to licensees—make clear that they will enforce Chapter 23N against event contract offerors.  These facts demonstrate a substantial risk of enforcement against Robinhood, and Robinhood therefore has an immediate and direct stake in

the adjudication of whether Chapter 23N is preempted.  Robinhood thus has standing.[6]

**B.    Robinhood's Claim Is Ripe.**

A claim is ripe if (1) it is "fit" for adjudication, and (2) the plaintiff will suffer "hardship" without resolution.  *See Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017).  *First*, Robinhood's claim is fit for adjudication because its preemption claim is "purely legal, and will not be clarified by further factual development."  *SBA List*, 573 U.S. at 167.  *Second*, Robinhood will experience hardship if its claim is not resolved by this Court because it will have to operate under a "dangling sword of indictment," *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 53 (1st Cir. 2021), not knowing when Massachusetts will bring an enforcement action against it.  Robinhood's claim is ripe regardless of Massachusetts' temporary promise not to enforce.

**1.    Robinhood's Claim Is Fit for Adjudication.**

The Court's prior dismissal order deemed the outcome of *Kalshi* a further factual development that rendered Robinhood's claim unripe.  (*See* Order Granting Motion to Dismiss, ECF No. 69, at 4 (noting if Kalshi were enjoined, "Robinhood would lose its existing Massachusetts sports event platform").)  Robinhood subsequently began offering contracts on ForecastEx.  Although ForecastEx no longer offers sports-related event contracts, the point stands: Robinhood's ability to operate in Massachusetts does not rise and fall with Kalshi's, and the dynamic nature of the prediction market space is evidenced by Robinhood's imminent partnership

---

[6] Defendants try to cast doubt on the imminence of Robinhood's injury by citing to *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), and *TransUnion*, 594 U.S. 413 (2021).  (*See, e.g.*, MTD at 8.)  Neither case is on point.  In *Clapper*, the Supreme Court held that the plaintiffs' fear of future surveillance was too speculative to support pre-enforcement standing because they had no reason to believe they would be the targets of such surveillance.  568 U.S. at 411.  Here, Massachusetts has demonstrated an intent to enforce sports-wagering laws against offerors of sports-related event contracts by enforcing against Kalshi and sending threatening letters.  *TransUnion* was not a pre-enforcement challenge; the Court's holding that some plaintiffs lacked a cognizable injury in that case is irrelevant to whether Robinhood has alleged a credible fear of future enforcement.  *See* 594 U.S. at 417-18, 423-24.

with one or more additional DCMs.

*Reddy*, 845 F.3d at 493, on which the Court relied in its prior dismissal order, confirms that Robinhood's claim is fit for adjudication.   In *Reddy*, the plaintiffs brought a pre-enforcement challenge to a New Hampshire statute that allowed (but did not require) reproductive health care facilities to demarcate 25-foot zones around their facilities.  *Id.* at 495-96.  No facility had sought to demarcate a buffer zone in the two-and-a-half years since the law's passage.  *See id.* at 498, 502. For this reason, the First Circuit held that the challenge to the statute was unripe, as the demarcation of a zone was "both a precondition to enforcement and an event whose occurrence is speculative at present."  *Id.* at 502.  The facts here are entirely different from those in *Reddy*.  Robinhood offers sports-related event contract trading in Massachusetts, and Massachusetts has repeatedly taken the position that offering such contracts violates state law.  Unlike in *Reddy*, every "precondition to enforcement" has been met, and the threat of enforcement is not "speculative," as evidenced by the action against Kalshi, the November 13 Letter and the letters to LexisNexis and Socure.

## 2.    Robinhood Will Suffer Hardship.

Defendants rely on *Labor Relations Division v. Healey* to argue that Robinhood's hardship is "contingent" and therefore insufficiently "direct and immediate" to render its claim ripe.  (*See* MTD at 5 (citing *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326, 330 (1st Cir. 2016)).)  But Robinhood's harm bears no relation to the "contingent" harm in *Labor Relations*.   In that case, the First Circuit held that the plaintiffs' pre-enforcement federal preemption challenge to the Massachusetts Earned Sick Time Law ("ESTL") was unripe because a claim of preemption under the relevant federal statute required an atypical, fact-specific inquiry into the provisions of a particular collective bargaining agreement.  *Id.* at 329-30.  The court was careful to note that a claim of preemption of the relevant federal statute in that case was "[u]nlike *a typical claim of field preemption*" and "[did] not involve purely legal questions, where the matter

10

c[ould] be resolved solely on the basis of the state and federal statutes at issue." *Id.* at 327 (emphasis added). For this unusual reason, the pre-enforcement challenge in *Labor Relations* was unfit for adjudication, as the court could not "perform the requisite *claim-specific* preemption analysis." *Id.* at 328 (emphasis added). That situation is absent here, as Robinhood makes a typical claim of express and implied field preemption, which can be resolved as a matter of law.

The harm to Robinhood from a future enforcement proceeding is not contingent on any additional factual development; it depends only on Massachusetts bringing an enforcement action against it. That "contingency" is a feature of *every* pre-enforcement challenge and does not affect ripeness. Until this Court decides preemption, Robinhood must operate under a "dangling sword of indictment," *Rosen*, 986 F.3d at 53, and balance the substantial risk of enforcement against investing in its business. Under First Circuit law, that is hardship.

### 3.    The Non-Enforcement Stipulation Cannot Defeat Ripeness.

In an attempt to avoid having a federal court answer a federal question, Defendants have filed a new stipulation that delays enforcement against Robinhood until Kalshi's state-court appeal is resolved. (Am. Stip. ¶ 7.) By relying on this stipulation, Defendants wrongly argue that a state can immunize itself from federal judicial review by bringing a state enforcement action against one target (Kalshi) and offering a temporary promise not to enforce against another potential target (Robinhood) pending resolution of litigation against its chosen target—sidelining all other similarly situated parties to suffer the uncertainty without legal remedy. But a state's decision to enforce first against one target rather than another does not make the latter's claim unripe.

Numerous controlling First Circuit cases demonstrate that the Court should allow Robinhood's pre-enforcement challenge and bar Defendants' transparent attempts to moot it. *See Rhode Island Association of Realtors v. Whitehouse*, 199 F.3d 26, 36 (1st Cir. 1999) ("[T]o allow the government to render a pre-enforcement challenge to an unambiguous state statute moot simply

11

by declaring a case-specific amnesty would effectively insulate unconstitutional state statutes from pre-enforcement review.").[7]  For example, in *Rosen*, 986 F.3d 38 (1st Cir. 2021), a state lottery commission and its private partner filed suit to challenge a DOJ memorandum interpreting the Wire Act of 1961 (the "Wire Act"), the enforcement of which would arguably have prohibited selling lottery tickets online.  986 F.3d at 44.  After the lawsuit was filed, the DOJ issued a second memorandum claiming that its prior interpretation "did not address whether the Wire Act applies to State lotteries and their vendors," and that once it did so, a 90-day forbearance period would begin so that state lotteries would have time to unwind their online operations before any enforcement occurred.  *Id.* at 47.  Although the federal government had not yet applied the Wire Act to state lotteries, the First Circuit held that the dispute in *Rosen* was ripe.  There was a "substantial controversy over the meaning of the Wire Act, as it applies to the plaintiffs," and there was no plausible way to read the DOJ's interpretation of the statute to shield the plaintiffs from the risk of future enforcement.  *Id.* at 53 (internal quotation omitted).  The First Circuit rejected the DOJ's attempt to moot the case, explaining that the temporary forbearance actually "exacerbate[d] the threat" of enforcement against the plaintiffs "by limiting its professed forbearance to ninety days from whatever date it decides to opine." *Id.* at 49, 52.  The First Circuit concluded that the plaintiffs readily demonstrated hardship because they "should not have to operate under a dangling sword of indictment" while the defendant considered "the purely legal question it had apparently already answered and concerning which it offers no reason to expect an answer favorable to the plaintiffs."  *Id.* at 53; *see also Pub. Int. Legal Found. v. Bellows*, 92 F.4th

---

[7] Defendants try to avoid *Whitehouse* by claiming that the First Circuit rejected the case-specific amnesty in that case only because it was "equivocal."  (MTD at 8.)  That view is foreclosed by the *Whitehouse* opinion itself, in which the First Circuit made clear that its holding would apply "[e]ven [if] these representations [were] unequivocal."  199 F.3d at 36.

36, 50 (1st Cir. 2024) (finding standing and ripeness despite non-enforcement disclaimer).

Since the Court's dismissal order (ECF No. 69), the First Circuit has provided additional certainty that Robinhood's claim is ripe. In *Jensen v. Rhode Island Cannabis Control Commission*, 160 F.4th 18 (1st Cir. 2025), Jensen brought a pre-enforcement challenge to the Rhode Island Cannabis Act, which sets restrictions on who can apply for a retail cannabis business license in the state. *Id.* at 21-22. The district court dismissed her case as unripe because the relevant commission had not yet promulgated rules and regulations regarding such licenses, precluding the possibility of immediate enforcement. *Id.* at 23. The First Circuit reversed and held that the forthcoming rules or regulations did not make Jensen's claims unripe because "her challenges [were] to provisions of the Act." *Id.* at 24. "She sought prospective injunctive and declaratory relief to prevent the Commission from enforcing the statute against her. … In such a situation, 'a litigant does not have to await the consummation of threatened injury to obtain preventive relief.'" *Id.* at 24-25 (citation omitted). This Court cited *Jensen* favorably in a recent decision. *See Washington v. FEMA*, No. 25-12006-RGS, 2025 WL 3551751, at *2 (D. Mass. Dec. 11, 2025) (Stearns, J.) (holding states' pre-enforcement challenge to termination of FEMA program was ripe).

Under *Whitehouse*, *Rosen*, *Bellows* and *Jensen*, Defendants' promise of temporary non-enforcement actually extends Robinhood's ongoing hardship, as Robinhood would be forced to "operate under a dangling sword of indictment" during and after the pendency of the non-enforcement stipulation. *Rosen*, 986 F.3d at 53. The threat against Robinhood will not dissipate no matter how the Kalshi Action resolves; thus, the non-enforcement stipulation is nothing more than a tactical delay. As in *Whitehouse*, Defendants must not be allowed to issue a case-specific amnesty to insulate state law from constitutional review. *See* 199 F.3d at 36. And as in *Jensen*, Robinhood's claim concerns the applicability of a statute itself and thus no uncertain or contingent

events affect its ripeness.  *See Jensen*, 160 F.4th at 24.  Robinhood's claim is ripe notwithstanding Defendants' attempt to manufacture a ripeness issue by delaying enforcement.

### C. Robinhood's Injury Is Traceable to All Defendants.

The MGC Defendants assert that Robinhood's injury in fact is not fairly traceable to them because "[a]n *Ex parte Young* action requires a real enforcement nexus."  (MTD at 12-14.)  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (plaintiff's injury must "be fairly trace[able] to the challenged action of the defendant").  The MGC Defendants' attempt to downplay the MGC's role in a future enforcement action against Robinhood fails for three reasons.

*First*, the MGC Defendants assume that Robinhood brings this action against them only because of the November 13 Letter.  (MTD at 13.)  That is incorrect.  Robinhood named the MGC Defendants in its original complaint, two months before the MGC sent the November 13 Letter.  (*See* Compl., ECF No. 1, ¶¶ 9-13.)  Robinhood did so because the MGC has statutory authority to enforce the preempted state sports wagering law at issue.  *See* Mass. Gen. Laws ch. 23N, § 4(g) (2025) (noting the commission "shall have the authority to enforce this chapter" and "may request that the attorney general bring an action to enforce this chapter").  Indeed, the MGC requested that the Attorney General ("AG") bring the Kalshi Action.  (*See Kalshi*, No. 2584-CV-02525, Dkt. 1, Compl. ¶ 156.)  The MGC Defendants' argument that the MGC has no "enforcement nexus" is squarely contradicted by the MGC's statutory authority, which it exercised in *Kalshi*.[8]

*Second*, the MGC Defendants argue the November 13 Letter should have no bearing on

---

[8] A proper defendant under *Ex parte Young* need only have "some connection with the enforcement of" the challenged statute.  209 U.S. 123, 157 (1908).  It is permissible and common to assert a federal-law claim against both an attorney general and state agency officials responsible for enforcing relevant law.  *See, e.g.*, *Brokamp v. James*, 573 F. Supp. 3d 696, 708-09, n.7 (N.D.N.Y. 2021) (*Ex parte Young* action properly asserted against attorney general, state education commissioner and state board of mental health practitioner); *Planned Parenthood Ariz., Inc. v. Brnovich*, 172 F. Supp. 3d 1075, 1093-96 (D. Ariz. 2016) (*Ex parte Young* action properly asserted against attorney general and state medical board members).

14

Robinhood's fear of enforcement because it was "directed only to sports wagering licensees." (MTD at 13.)  But the MGC Defendants want this Court to ignore what the letter actually says. The November 13 Letter is a warning that "offering sports-related event contracts in Massachusetts" and "partnering with entities in the prediction market space" puts licensees at risk of license revocation and other penalties.  (Orsini Decl., Ex. A at 1.)  It would be naive to believe that the MGC would allow Robinhood to offer sports-related event contracts while forbidding its licensees from partnering with Robinhood, especially where the MGC has already taken action against another non-licensee, Kalshi, and inquired about licensees' relationships with entities offering event contracts without distinguishing between FCMs and DCMs.  (Lin Decl. ¶¶ 4-6.)

*Third*, the MGC Defendants argue the non-enforcement stipulation supports their assertion that Robinhood faces "no risk from the MGC" (MTD at 13), but the non-enforcement stipulation only *confirms* the MGC Defendants are properly named in this action.  Defendants stipulate that the MGC will forbear from requesting that the AG bring an enforcement action until the stipulation expires and will not enforce directly against Robinhood unless and until Robinhood obtains a sports wagering license.  (Am. Stip. ¶ 9.)  The stipulation limits the MGC's participation in a future enforcement action no more than it limits the AG's—both are limited only temporally.  The causal connection between an MGC request for the AG to commence an enforcement action and a future enforcement action against Robinhood is obvious, as demonstrated by the Kalshi Action.

## II.    ROBINHOOD STATES A FEDERAL CLAIM UNDER *EX PARTE YOUNG* TO ENFORCE PREEMPTION UNDER THE SUPREMACY CLAUSE.

Defendants contend that even if Robinhood's claim is justiciable, Robinhood's amended complaint fails because it asserts a Supremacy Clause claim, which purportedly provides no cause of action.  (MTD at 14-15.)  That is incorrect because Robinhood has asserted a proper cause of action for injunctive and declaratory relief under *Ex parte Young*, 209 U.S. 123 (1908).  The

Supreme Court has repeatedly affirmed a federal right of action for preemption claims like this. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *see also KalshiEx LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *6 (M.D. Tenn. Feb. 19, 2026) (holding *Ex parte Young* authorized pre-enforcement challenge to state sports wagering law based on CEA preemption).

Defendants ignore the long line of cases affirming the *Ex parte Young* doctrine and instead rely on the Supreme Court's holding in *Armstrong v. Exceptional Child Center, Inc.* that the Supremacy Clause does not confer a direct right of action, separate from *Ex parte Young*. (MTD at 14-15 (citing 575 U.S. 320 (2015)).) But Defendants conflate mandatory injunctions with prohibitory injunctions. In *Armstrong*, the Court held that plaintiffs seeking to enforce compliance with federal law (*i.e.*, seeking a *mandatory* injunction) could not do so under the Supremacy Clause because the Constitution does not "*require*[] Congress to permit the enforcement of its laws by private actors." *Id.* at 326. *Armstrong* is inapposite because Robinhood seeks a *prohibitory* injunction against enforcement of preempted state law. *Armstrong* did not disturb the *Ex parte Young* doctrine, which confirms a federal right of action exists where, as here, a plaintiff "seek[s] to declare the state statutory regulations invalid on the basis of federal pre-emption." *Colonial Penn Grp., Inc. v. Colonial Deposit Co.*, 834 F.2d 229, 237 (1st Cir. 1987); *see Armstrong*, 575 U.S. at 326 (acknowledging "long recognized" *Ex parte Young* doctrine). Here, Robinhood is suing state officials in their official capacities because the CEA preempts state sports-wagering laws as applied to trading on DCMs, and there is a credible threat of enforcement, which would violate federal law. (Am. Compl. ¶¶ 64, 69.) The requested relief is prospective. (*Id.* at 27.)

These facts satisfy the requirements of *Ex parte Young*.  *See, e.g.*, *Verizon*, 535 U.S. at 645-46.[9]

## III.    THE COURT SHOULD NOT ABSTAIN FROM ADJUDICATING ROBINHOOD'S CLAIM OR OTHERWISE DISMISS OR STAY THE CASE.

Defendants request various forms of abstention, on the basis that this case could "interfere with" the Kalshi Action.  That premise is specious; this case cannot possibly interfere with a separate proceeding in state court to which Robinhood is not a party and in which the Commonwealth has already obtained preliminary relief.

*First*, Defendants argue the Court should decline to exercise jurisdiction under the *Wilton/Brillhart* doctrine.  (MTD at 16-17.)  In both *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995), and *Brillhart v. Excess Insurance Company of America*, 316 U.S. 491 (1942), the Supreme Court held that relief under the Declaratory Judgment Act ("DJA") is discretionary.  Defendants' invocation of *Wilton/Brillhart* fails, as it rests on the false assumption that the federal-law claim asserted here is the DJA.  To the contrary, the claim is brought under *Ex parte Young*, which "gives life to the Supremacy Clause."[10]  *Green v. Mansour*, 474 U.S. 64, 68 (1985).  *See supra* Section II.  Defendants cite no case suggesting that *Wilton/Brillhart* discretion applies to *Ex parte Young* actions, nor is Robinhood aware of any.

---

[9] Further, because *Ex parte Young* confers a federal right of action, the *Wycoff* rule does not bar Robinhood's suit.  (*See* MTD at 15.)  The *Wycoff* rule instructs that a declaratory plaintiff cannot establish federal jurisdiction under 28 U.S.C § 1331 if the "coercive" suit (*i.e.*, the inverse of the declaratory suit, in which the declaratory defendant sued the declaratory plaintiff) would not raise a federal-law issue.  *See Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 248 (1952).  The Supreme Court and First Circuit have held that federal courts have jurisdiction in cases where a preemption claim is asserted under *Ex parte Young*, notwithstanding *Wycoff*.  *See Verizon*, 535 U.S. at 642; *Shaw*, 463 U.S. at 96 n.14; *Loc. Union No. 12004 v. Massachusetts*, 377 F.3d 64, 75 (1st Cir. 2004) (in cases where *Ex parte Young* and *Wycoff* may conflict, *Ex parte Young* governs).

[10] The fact that Robinhood asserts a claim under the Supremacy Clause, not the DJA, makes *Lichoulas*, which Defendants cite to suggest courts have discretion to exercise jurisdiction over injunctive relief claims, inapplicable.  (MTD at 16 (citing *Lichoulas v. City of Lowell*, 555 F.3d 10, 13 (1st Cir. 2009)).)  *Lichoulas* was not an *Ex parte Young* action, and simply recognized that relief under the DJA is discretionary.

Moreover, the factors courts consider under *Wilton/Brillhart* support exercising jurisdiction here:  (1) whether there is pending action in which all matters in controversy may be fully adjudicated; (2) whether federal court might be "gratuitous[ly] interfer[ing]" with state-law issues; and (3) whether plaintiff forum shopped.  *See Wilton*, 515 U.S. at 277, 281-83.  Here, while there is a pending action, all matters in controversy cannot be fully adjudicated in it as there is no adequate remedy available to Robinhood in *Kalshi* as a non-party.   There is no gratuitous interference with state-law issues as Robinhood raises a federal preemption claim, and a state-court action against a different party is no reason to decline jurisdiction.  *See Nazario-Lugo v. Caribevision Holdings, Inc.*, 670 F.3d 109, 114 (1st Cir. 2012) ("[T]here is nothing unusual about parallel litigation resolving similar controversies in both state and federal court.").  Robinhood did not forum shop to circumvent *Kalshi*, which will not bind Robinhood (nor do Defendants accuse Robinhood of doing so); it filed this suit to vindicate its federal rights and resolve a legal question hinging on interpretation of federal law.[11]  *See One & Ken Valley Hous. Grp. v. Me. State Hous. Auth.*, 716 F.3d 218, 224-25 (1st Cir. 2013).

*Second*, Defendants argue that the Court should dismiss pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), because of the action against Kalshi.  (MTD at 16-17.)  *Younger* requires the same parties in the federal and state actions, which is plainly lacking here.  *See Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 41-42 (1st Cir. 2012) ("*Younger* does not typically apply where the federal-court plaintiff is not itself a party to the state-court proceedings" as "[d]istinct parties are typically treated separately for purposes of *Younger* abstention.").  *Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975), is instructive.  In *Doran*, three bars challenged, in federal court, an obscenity law.  *Id.* at

---

[11] If anyone is forum shopping, it is Defendants.  Their attempts to moot this case by amending their stipulation, *see supra* Section I.B.3, and thus attempting to link Robinhood's fate to *Kalshi* even though Robinhood is not a party to that case, are efforts to avoid federal court adjudication.

924. One bar had previously decided not to comply with the law and was charged in state court; the two others had complied and had not been charged. *Id.* at 924-25. The Court held that *Younger* abstention applied only to the non-compliant bar that was charged in state court, but not the other two bars. *Id.* at 928-31. Because the state and federal actions here lack identical parties, and Defendants do not suggest that Robinhood and Kalshi are so closely related as to upend the general rule,[12] *Younger* abstention is inappropriate.

*Third*, Defendants' argue for abstention under *Colorado River*, 424 U.S. 800 (1976). This argument should also be rejected because *Kalshi* is not a "parallel" case to this action. *Colorado River* requires the concurrent cases to include substantially "the same parties and substantially identical claims and issues." *Bankart v. Ho*, 60 F. Supp. 3d 242, 248 (D. Mass. 2014). As discussed, the cases here do not involve substantially the same parties, so *Colorado River* abstention is unavailable. *See Pop Warner Little Scholars, Inc. v. N.H. Youth Football & Spirit Conf.*, No. 06-CV-98-SM, 2006 WL 2728593, at *3 (D.N.H. Sept. 25, 2006). The issues are also not substantially identical, as they involve "different causes of action, and require different elements to prove." *Somyk v. City Pers., Inc.*, No. 18-164-JJM-PAS, 2018 WL 4936004, at *2 (D.R.I. Oct. 11, 2018) (declining to abstain even where allegations were "virtually identical").

Further, *Colorado River* counsels against abstention because there is a "heavy presumption

---

[12] In dicta, the *Doran* Court contemplated that "there plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them." 422 U.S. at 928-29. This requires common "ownership, control, and management"—more than the parties having "common counsel, and hav[ing] similar business activities and problems." *Id.*; *see also Mass. Delivery Ass'n*, 671 F.3d at 45. As noted, Defendants do not suggest that Robinhood and Kalshi share such commonality, nor could they, as there is no common ownership, control or management.

The recent Coinbase action on which Defendants rely (MTD at 17 n.3) is plainly inapplicable because there, Coinbase was a party in both the state and federal proceedings. *See Coinbase Fin. Markets, Inc. v. Ford*, No. 2:26-cv-0256 (D. Nev. Feb. 7, 2026) (ECF No. 24).

favoring the exercise of jurisdiction." *KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 10 (1st Cir. 2003) (internal quotation omitted). Here, Robinhood asserts a single claim of federal preemption, which is also a "major consideration weighing against" *Colorado River* abstention. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983).

## PRELIMINARY INJUNCTION ARGUMENT

## I.     ROBINHOOD IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM.

Robinhood is likely to succeed on the merits of its claim that the CEA preempts Massachusetts sports-wagering laws as applied to sports-related event contracts traded on DCMs and offered by FCMs. Defendants fail to offer any compelling argument against preemption under any of the three preemption frameworks (express, field and conflict).

Faced with Congress's clear intent to expressly preempt the entire field of derivative trading on DCMs, Defendants try to shift the focus of the analysis to whether Congress specifically and directly discussed the preemption of state gaming laws. As a matter of law, that is the wrong question to ask. The issue is whether Congress intended to preempt the entire field of regulation of trading on DCMs—it did. Once that Congressional intent is established, the result is that *all* state laws are preempted as applied to trading on DCMs. Binding federal preemption law establishes that no state statute-by-statute analysis is necessary in applying preemption doctrine. *See infra* pp. 24-25; CFTC Amicus Br. at 21 (explaining that the CEA "preempts application of state gambling laws to event contracts trading on DCMs governed by the CEA").

Defendants' sweeping contention that Robinhood's position would render the CFTC the sole nationwide regulator of all gambling is equally misplaced. Robinhood does not argue that the CEA (or any of its amendments) preempts state sports gambling laws as applied to bets and wagers placed at casinos and sportsbooks. The CEA covers *tradeable* products. *See* CFTC, *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,217, 48,248 (Aug. 13, 2012) (describing swaps as

instruments "traded on organized markets and over the counter" and distinguishing swaps from other products on the basis that the latter are not traded).  Sports wagers are *not* tradeable and thus are not regulated derivatives.  Defendants fail to identify any CFTC enforcement action arising from bets placed with a sportsbook or any statement by the CFTC suggesting it would view such bets as within its authority.[13]  The CFTC recently submitted an amicus brief in the Ninth Circuit supporting a DCM's argument that Nevada law—like Massachusetts law—is preempted by the CEA.  The entire focus of that brief is on the CFTC's interest in preserving its jurisdiction over trading *on DCMs*.  The specter of the CFTC displacing all state gaming regulators with respect to *off*-DCM trading is nothing more than a rhetorical scare tactic designed to obfuscate the CFTC's actual focus and actual jurisdiction.[14]

### A.    The CEA Expressly Preempts State Gambling Law as Applied to DCM Trading.

Despite Defendants' contentions, the CEA expressly preempts the application of all state

---

[13] Moreover, 7 U.S.C. § 16(e)(1)(B) confirms that the CEA does not displace states' regulatory power over transactions that are not conducted on DCMs.  Nor does the CEA "displace state authority to regulate purely intrastate conduct or transactions."  (CFTC Amicus Br. at 25.)

[14] Multiple federal courts have correctly held that state gaming law as applied to trading on DCMs is preempted by the CEA.  *See Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 205-06 (N.D. Ala. 1981) (preempting state gambling law purporting to void all futures transactions in which delivery of the commodity was not intended); *KalshiEx LLC v. Flaherty*, No. 25-cv-2152, 2025 WL 1218313, at *5-6 (D.N.J. Apr. 28, 2025) (field preemption applies); *Orgel*, 2026 WL 474869, at *10 (conflict preemption applies).  Defendants' references to recent decisions in other district courts fall flat.  (MTD at 19-20.)  In *KalshiEx, LLC v. Hendrick*, the court found preemption, but later dissolved the injunction based on the threshold question of whether sports-related event contracts constitute swaps or transactions in excluded commodities—an argument Defendants do not raise here.  No. 25-00575, 2025 WL 1073495, at *8 (D. Nev. Apr. 9, 2025), *abrogated on other grounds*, 2025 WL 3286282 (D. Nev. Nov. 24, 2025), *appeal filed*, No. 25-cv-7516 (9th Cir. Nov. 25, 2025).  In the field preemption analysis in *KalshiEx LLC v. Martin*, the court mistakenly asked whether Congress intended to occupy the field of gambling (rather than trading on DCMs).  793 F. Supp. 3d 667, 677 (D. Md. 2025).  Moreover, that court did not address whether Section 2(a) *expressly* preempts state law (because it found the issue was not raised in that case), therefore wrongly applying a presumption against preemption.  *Id.* at 676; *see infra* p. 22 (discussing Supreme Court holding in *Franklin*).

laws to trading on DCMs through its "exclusive jurisdiction" provision.  7 U.S.C. § 2(a)(1)(A).

The CEA's "exclusive jurisdiction" provision plainly reserves the relevant area of regulation—derivatives that trade on DCMs—for the CFTC alone.  7 U.S.C. § 2(a)(1)(A).  The First Circuit, and various other courts, have repeatedly held that Congress's decision to confer "exclusive jurisdiction" on a federal regulatory agency constitutes express preemption.  *See Padgett v. Surface Transp. Bd.*, 804 F.3d 103, 105 (1st Cir. 2015) (state law remedies preempted where agency "jurisdiction is exclusive"); *AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586, 598 (D. Md. 2007) (agency's "*exclusive authority* to approve or deny an application" amounted to an "express preemption clause") (emphasis in original).  Because there is express preemption, Defendants' contention that the presumption against preemption applies here misses the mark.  (MTD at 26-27.)  The presumption against preemption has no place where "the statute contains an express pre-emption clause."  *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (internal quotation omitted); *see* CFTC Amicus Br. at 27.

Congress's intent to expressly preempt state law is also demonstrated by the CEA's savings clause, which provides that Section 2(a) does not "supersede or limit the jurisdiction" of other regulators "*[e]xcept* as hereinabove provided."  7 U.S.C. § 2(a)(1)(A) (emphasis added); *see also Flaherty*, 2025 WL 1218313 at *5-6; CFTC Amicus Br. at 24-26 ("The 'savings clause' preserves traditional, non-conflicting state powers, but does not empower states to use state powers against transactions on CEA-governed markets.").

Defendants contend that the use of different express preemption language in other parts of the CEA indicate Congress did not intend for Section 2(a) to expressly preempt state gaming law.

(MTD at 23 (citing 7 U.S.C. § 16(e)(2)).) That is incorrect.[15] The express preemption provision found in Section 2(a) of the CEA vests the CFTC with "exclusive jurisdiction" over trading on DCMs. 7 U.S.C. § 2(a)(1)(A). The other preemption provisions cited by Defendants apply to trading of certain derivatives that occur *off* DCMs. For example, because Section 2(a)'s exclusive jurisdiction provision applies only to on-exchange transactions, when the Commodity Futures Modernization Act of 2000 permitted certain off-exchange trading, Congress amended what is now Section 16(e)(2) to also "preempt the application of any State or local law that prohibits or regulates gaming" as to transactions that occur *off* DCMs. Thus, while Section 2(a) expressly preempts *on*-DCM trading, Section 16(e)(2) extends preemption to certain *off*-DCM transactions. The CEA's various preemption provisions are therefore complementary and not inconsistent with the conclusion that Section 2(a) expressly preempts state law as applied to trading on DCMs.

Defendants also contend that "even assuming the CEA grants exclusive federal jurisdiction over trading on DCMs for certain purposes," sports-related event contracts are still subject to "generally applicable state gambling and consumer protection laws." (MTD at 25.) That makes no sense. "Exclusive" jurisdiction means precisely what it says: exclusive. Because the CEA vests the CFTC, and only the CFTC, with the jurisdiction to regulate trading on DCMs, there is no room for state regulations to apply—whether through state sports-wagering laws, consumer protection laws (other than general antifraud statutes under 7 U.S.C. § 13a-2(7)) or otherwise. That is the very nature of preemption.

---

[15] The presence of (other) narrower express preemption provisions also do not foreclose the application of either implied field preemption or conflict preemption in the alternative. The Supreme Court has repeatedly held that "neither an express pre-emption provision nor a saving clause 'bar[s] the ordinary working of conflict pre-emption principles.'" *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001) (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000)).

23

**B.      Congress Preempted the Field of Derivatives Trading on DCMs.**

In the alternative, Massachusetts' attempt to regulate sports-related event contracts is also precluded by the doctrine of field preemption.  As Robinhood set forth in its opening papers, Congressional intent to preempt the field of regulation of trading on DCMs is made clear by the CEA's comprehensive scheme for regulation by the CFTC since 1974.  (Mot. at 15 (discussing 1974 amendments to the CEA).)  The Congressional intent to preempt the field is further confirmed by Dodd-Frank, which added "swaps," which include event contract under Section 1a(47)(A)(ii), to the "exclusive jurisdiction" provision in Section 2(a).  The legislative history confirms that, as part of the comprehensive scheme of regulation, the proponents of the bill intended to vest the CFTC—and the CFTC alone—with the power to decide whether event contracts based on sports should be banned from DCMs as contrary to the public interest.  *See* 7 U.S.C. § 7a-2(c)(5)(B)-(C) ("[T]he Commission may determine that such agreements, contracts, or transactions are contrary to the public interest ...."); 156 Cong. Rec. S5906-07 (statements of Senators Lincoln and Feinstein) (discussing the importance of granting the CFTC discretion to identify and ban sports-related event contracts).  Defendants' various arguments to the contrary fail.

*First*, Defendants (erroneously) contend only a "detailed scheme of federal sports wagering regulation" could displace state sports-wagering laws and that no such scheme exists because of *Murphy v. NCAA*, 584 U.S. 453 (2018).  (MTD at 25-26.)  Defendants have it backwards—the Court must first identify the field that *Congress* intended to occupy (derivatives transactions traded on DCMs), not the regulatory focus of preempted state laws (sports "bets" and "wagers").  As the Supreme Court has noted, "[e]very Act of Congress occupies some field, but we must know the boundaries of that field before we can say that it has precluded a state from the exercise of any power reserved to it by the Constitution.  To discover the boundaries we look to the *federal statute itself* ...."  *Hines v. Davidowitz*, 312 U.S. 52, 78-79 (1941) (emphasis added).  Any contrary

argument "not only ignores the basic premise of field preemption—that States may not enter, in any respect, an area the Federal Government has reserved for itself—but also is unpersuasive on its own terms." *Arizona v. United States*, 567 U.S. 387, 402 (2012). Courts thus are not required to apply a "case-by-case analysis" of whether Congress specified that a specific category of state laws were to be preempted. *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 475 (4th Cir. 2014) (citation omitted); *see also Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491 (1987) ("[I]t is not necessary for a federal statute to provide explicitly that particular state laws are pre-empted.").

Thus, the contours of the field are set by the CEA, not by Massachusetts sports-wagering laws, and any regulatory mismatch between state sports-wagering laws and the CEA is irrelevant. Because the scope of preemption is driven by congressional intent, federal laws often preempt state laws that on their face target distinct areas. *See, e.g.*, *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008) (Maine law concerning tobacco delivery to minors preempted by the Federal Aviation Administration Authorization Act); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989) (state anti-"plug moulding" statute concerning duplication of boat hulls preempted by federal patent laws). Thus, the existence of federal gambling laws is simply irrelevant to whether the CEA—which regulates the field of trading on DCMs—preempts state law. *See* CFTC Amicus Br. at 22 ("For decades courts have recognized that the CEA preempts application of other federal or state laws to instruments trading on CFTC-regulated markets.").[16]

*Second,* Defendants attempt to distract the Court by wrongly contending that the Special Rule incorporates state law, such that there could be no field (or conflict) preemption. (MTD at

---

[16] Defendants misread *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015). (MTD at 27.) There, the Court considered the "target at which the state law aims" in seeking to answer whether the challenged state law fell within the already identified federally preempted field. *Id.* at 385-86. In other words, the Court *first* determined the field Congress intended to occupy and *then* looked to the target of the state law to determine whether it fell within the preempted field. *Id.*

24.)  Defendants misread the Special Rule.  The Special Rule expressly states the CFTC "*may*

*determine*" certain transactions proposed for trading on DCMs are "contrary to the public interest"

if they involve "activity that is unlawful under any Federal or State law" or "gaming".  7 U.S.C.

§ 7a-2(c)(5)(C)(i) (emphasis added); 17 C.F.R. § 40.11(c) (implementing regulation providing that

the CFTC "may determine" that an event contract is based upon an activity that is unlawful under

state law).  By using permissive "may" language, the Special Rule gives the CFTC discretion to

consider such laws in making its public-interest determinations.  CFTC, *Provisions Common to*

*Registered Entities*, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011) (adopting 17 C.F.R. § 40.11).

Thus, the Special Rule does not incorporate state (or other federal) law, but merely acknowledges

the CFTC may consider state law in making its own public interest determinations.

     *Third,* Defendants are also wrong in arguing that a finding of express or implied field

preemption would mean the CEA conflicts with federal sports-gambling laws.  The Unlawful

Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5361-5367, cannot conflict with

the CEA.  UIGEA covers online gaming between states and on tribal lands that is unlawful in one

location (where the bet is made or received) but not another, 31 U.S.C. § 5362(10), and expressly

carves out from its scope "any transaction conducted on" a CFTC-designated exchange, *id.*

§ 5362(1)(E)(ii).  With the UIGEA carveout, Congress expressly reconciled the two statutes.

Similarly, federal sports-gambling statutes, such as the Wire Act, the Interstate Horseracing Act

and the Indian Gaming Regulatory Act ("IGRA"), are irrelevant.  The Wire Act, 18 U.S.C.

§§ 1081-1084, passed in 1961 as part of an effort to combat organized crime, and the Interstate

Horseracing Act, 15 U.S.C. §§ 3001-3007, designed to protect struggling horseracing tracks,

remain intact and are irrelevant to the conduct at issue here because event contracts do not involve

placing "bets or wagers" under UIGEA and other statutes.  18 U.S.C. § 1084(a); *see also* 15 U.S.C.

§ 3002(3) (defining "interstate off-track wager").  Because the CEA does not concern sports wagers, which are not traded on DCMs, there is no conflict between the CEA and these statutes. *See Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("When two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").  Unlike the CEA, these federal sports-gambling statutes regulate non-tradeable interstate sports bets or wagers that take place *off* DCMs.  Similarly, IGRA, 25 U.S.C. §§ 2701-2721, regulates conduct on Indian lands only; online conduct is covered by other federal statutes like the UIGEA, which, as noted, expressly excludes transactions on DCMs.  *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) (IGRA provides tools "to regulate gaming on Indian lands, and nowhere else").

Accordingly, none of the federal laws cited by Defendants was impliedly repealed by the CEA.  *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow") (internal citation omitted).  In any event, if there is any potential overlap between the CEA and these federal laws, the CEA's "exclusive jurisdiction" provision explicitly directs that the CEA controls.

**C.    Applying Massachusetts Laws to Transactions on DCMs Conflicts with the CEA's Goal of Uniform Regulation and the Special Rule.**

While the Court need not reach this issue because of express and implied field preemption, Massachusetts gaming laws are also conflict preempted as applied to trading of sports-related event contracts on DCMs as enforcement of state gaming laws would frustrate Congress's purpose.

The essence of conflict preemption "is that the federal government would want a federal measure to be preemptive of any state law that stands as an obstacle to the accomplishment and execution of the full purposes and objectives of that federal measure."  *Capron v. Off. of Att'y*

*Gen.*, 944 F.3d 9, 26 (1st Cir. 2019) (internal quotations omitted).  By granting the CFTC "exclusive jurisdiction" over transactions on DCMs, Congress excluded all other attempts to regulate transactions on those exchanges.  *See DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, No. 01 Civ. 11602 (RWS), 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002) ("When application of state law would directly affect trading on or the operation of a futures market, it … is preempted.").  Allowing the application of state gaming laws would thus frustrate Congress's purpose in avoiding patchwork regulation.  *See Orgel*, 2026 WL 474869, at *10 (holding that state law "stands as an obstacle to the accomplishment of the CEA's primary objective: uniform regulation of the derivatives market").  Here, "[i]t is hard to see how a federally regulated nationwide derivatives exchange could function" under such disparate state regulation.  *Id.*

The Special Rule gives the CFTC authority to consider the public interest and decide whether to prohibit event contracts that involve gaming or activity unlawful under state law, and the CFTC has decided not to use that authority to prohibit sports-related event contracts.  7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1).  Congress gave the public interest decision to the CFTC, not the MGC and 49 other state gaming regulators.  If Defendants are permitted to enforce Massachusetts sports-wagering laws against Robinhood for offering contracts authorized by the CFTC, there would be a direct conflict between federal and state regulation.

## II.    ROBINHOOD WILL BE IRREPARABLY HARMED IF DEFENDANTS ARE PERMITTED TO ENFORCE PREEMPTED STATE GAMBLING LAWS.

Given the threat that Defendants will enforce preempted state law against Robinhood, Robinhood cannot avoid irreparable harm without a preliminary injunction.  *See Orgel*, 2026 WL 474869, at *10-11 (finding Kalshi had demonstrated irreparable harm due to costs of compliance, the threat of civil and criminal enforcement and reputational injuries).  The threatened enforcement creates a Catch-22:  If Robinhood continues to offer event contracts in Massachusetts, it remains

threatened with enforcement.  And if Robinhood stops offering event contracts, it will lose the business and goodwill of Massachusetts customers who use Robinhood's services.  Reputational losses cannot readily be remedied with damages, and sovereign immunity bars Robinhood from collecting lost profits from Massachusetts.  *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999).

Moreover, Robinhood's decision to continue offering sports-related event contracts is not a "self-imposed" harm (MTD at 29), but instead a good-faith decision to engage in conduct it believes to be lawful.  Defendants' claim to the contrary presupposes (incorrectly) that the CEA does not preempt Massachusetts sports-wagering laws.  Defendants' reasoning would mean that any party seeking to bring a pre-enforcement challenge on preemption grounds has "self-imposed" its harm where it chooses not to comply with the unconstitutional law.  It is also not the case that future enforcement of preempted state laws cannot be irreparable harm and is merely part of the "social burden of living under government."  (MTD at 31 (citing *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980), and *12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 280 F. Supp. 3d 118 (D.D.C. 2017)).)[17]  Being compelled to comply with a preempted law constitutes irreparable harm.  *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,* 162 F.4th 631, 635 (6th Cir. 2025) (finding irreparable injury where state's attempt to enforce a state wagering law against an out-of-state wagering platform was preempted).

---

[17]  In *Standard Oil*, which is not a preemption case, an oil company argued irreparable harm from defending itself in adjudicatory proceedings.  *Standard Oil*, 449 U.S. at 244.  The Court explained "the expense and annoyance of litigation is part of the social burden of living under government."  *Id* (internal quotation omitted)*.*  Defendants use this to argue that the *risks* of litigation (*i.e.*, outcome) are part of this social burden, but that is not *Standard Oil*'s holding*.*  Further, unlike the injunction in *12 Percent Logistics*, where there was the "mere possibility" of future enforcement for violations "yet to occur," 280 F. Supp. 3d at 122, the alleged violation here has already occurred and is ongoing.

**III.    DEFENDANTS AND THE PUBLIC HAVE NO INTEREST IN THE ENFORCEMENT OF PREEMPTED STATE LAWS.**

The equities tip sharply in Robinhood's favor.  Defendants and the public can have no interest in enforcing preempted state law.  "Just as a government has no interest in enforcing an unconstitutional law, the public interest is harmed by the enforcement of [unconstitutional] laws." *Siembra Finca Carmen, LLC v. Sec'y of Dep't of Agric. of P.R.*, 437 F. Supp. 3d 119, 137 (D.P.R. 2020); *see Orgel*, 2026 WL 474869, at *11 (equities tip in Kalshi's favor because "Kalshi faces substantial expenses and reputational harm if it complies with [the state's] demands, or civil and criminal enforcement if it does not," but the state "is likely to face no harm" because of preemption).  Moreover, the public interest weighs in favor of maintaining the status quo.  *See CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995).

As it stands, Robinhood's customers in Massachusetts gain access to event contacts on DCMs by placing orders on Robinhood's platform.  Robinhood's customers' trading activity is conducted pursuant to (and in reliance on) the centralized regulatory regime Congress enacted in the CEA, under which Robinhood is a registered FCM regulated by the CFTC.  Through that framework, Congress brought event contracts under a unified set of regulations to avoid "the possibility that another State would have different rules than not only [] the CFTC, but other States." *Hendrick,* 2025 WL 1073495, at *7.  By enacting the CEA, Congress decided that the public interest is best served by exclusive CFTC regulation of transactions on DCMs, and state laws purporting to prohibit FCMs from offering such transactions are preempted.

## CONCLUSION

The Court should deny Defendants' motion to dismiss and grant Robinhood's Motion.

DATED: March 3, 2026

Respectfully submitted,

By: ___*/s/ Nicholas J. Schneider*_____

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**

Craig Waksler (BBO No. 566087)
cwaksler@eckertseamans.com
Nicholas J. Schneider (BBO No. 688498)
nschneider@eckertseamans.com

2 International Place #1600
Boston, Massachusetts 02110
Telephone: (617) 342-6800
Facsimile: (617) 342-6899

**CRAVATH, SWAINE & MOORE LLP**

Kevin J. Orsini (*pro hac vice*)
korsini@cravath.com
Antony L. Ryan (BBO No. 629971)
aryan@cravath.com
Brittany L. Sukiennik (*pro hac vice*)
bsukiennik@cravath.com

375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

***Counsel for Plaintiff***
***Robinhood Derivatives, LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 3, 2026, I electronically filed the foregoing Memorandum Of Points And Authorities In Support Of Plaintiff Robinhood's Opposition To Defendants' Motion To Dismiss Or Stay Proceedings And Reply In Support Of Plaintiff's Motion For Preliminary Injunction, with the Clerk of the Court by using the Court's CM/ECF system, and accordingly served the parties who receive notice of the filing via the Court's CM/ECF system.

*/ s/ Nicholas J. Schneider*
Nicholas J. Schneider